UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ARKEMA, a Pennsylvania Corporation and GENERAL METALS OF TACOMA, INC., A Washington Corporation, | ) ) ) |  Docket No. C05-5087RBL |

ARKEMA, a Pennsylvania Corporation
and GENERAL METALS OF TACOMA, INC.,
A Washington Corporation,                    )    Docket No. C05-5087RBL
                                             )
                    Plaintiffs,              )    Tacoma, Washington
                                             )    March 28, 2007
              v.                             )
                                             )
ASARCO, Inc., a New Jersey                   )
Corporation; ECHO LUMBER CO., an             )
Oregon Corporation; GOODWIN JOHNSON          )
(1960) LTD, a Canadian Corporation;          )
JOHNSON-BYERS, INC., a Washington            )
Corporation; DONALD E. ONLINE, a             )
Washington Resident; PETROLEUM               )
RECLAIMING SERVICE, INC., a                  )
Washington Corporation; and                  )
WEYERHAEUSER COMPANY, a Washington           )
Corporation,                                 )
                                             )
                    Defendants,              )
_____)

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE RONALD B. LEIGHTON
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff
General Metals:          MARK M. MYERS
                         TIMOTHY L. ASHCRAFT
                         Williams, Kastner & Gibbs PLLC
                         Two Union Square
                         601 Union Street, Suite 4100
                         Seattle, Washington  98101-2380

For the Plaintiff
Arkema:                  STEPHEN T. PARKINSON
                         Groff Murphy Trachtenberg & Everard LLP
                         300 East Pine Street
                         Seattle, Washington  98122

1                              JOHN D. McCARTHY
                               Holme Roberts & Owen LLP
2                              1700 Lincoln Street, Suite 4100
                               Denver, Colorado  80203-4541
3

4    For the Defendant
     Weyerhaeuser:            MARK D. COLDIRON
5                              KEITH J. KLEIN
                               Ryan, Whaley & Coldiron
6                              900 Robinson Renaissance
                               119 North Robinson
7                              Oklahoma City, Oklahoma  73102

8
                               KIMBERLY A. HUGHES
9                              Senior Legal Counsel
                               Mail Stop CH 1 J28
10                             33663 Weyerhaeuser Way South
                               Federal Way, Washington  98003
11

12

13

14   Court Reporter:          Julaine V. Ryen
                               Post Office Box 885
15                             Tacoma, Washington 98401-0885
                               (253) 882-3832
16

17

18
     Proceedings recorded by mechanical stenography, transcript
19   produced by Reporter on computer.

20

21

22

23

24

25

1          THE CLERK:  This is in Cause No. CO5-5087RBL, Arkema,

2   Inc., et al., versus Asarco, Inc., et al.

3      Counsel please make their appearances.

4          MR. MYERS:  Your Honor, Mark Meyers representing

5   plaintiff General Metals of Tacoma.

6          THE COURT:  Good morning, Mr. Meyers.

7          MR. MCCARTHY:  Your Honor, James McCarthy

8   representing plaintiff Arkema, Inc.

9          MR. PARKINSON:  Your Honor, Stephen Parkinson for

10  plaintiff Arkema, Inc.

11         MR. ASHCRAFT:  James Ashcraft representing General

12  Metals.

13         THE COURT:  Mr. Ashcraft, Good morning.

14         MR. COLDIRON:  Mark Coldiron representing

15  Weyerhaeuser Company.

16         MR. KLEIN:  Keith Klein for Weyerhaeuser, Your Honor.

17         MS. HUGHES:  Kim Hughes representing Weyerhaeuser.

18         THE COURT:  Good morning.

19         MS. HALE:  Jennifer Hale representing Weyerhaeuser.

20         THE COURT:  Good morning all.

21     All right.  There are a number of motions for summary

22  judgment that I would like to deal with today.  What I would

23  like to do is deal with the issue of whether wood is a

24  hazardous substance under CERCLA or MTCA first.  That may

25  inform outcomes in other motions, and we will deal with the

1   contribution issue last.

2       So my proposed order or sequence would be docket 198,

3   Weyerhaeuser's motion for partial summary judgment, then back

4   to the first in, first out:   193, plaintiffs' motion for

5   partial summary judgment, then Weyerhaeuser's motion for

6   partial summary judgment as to costs incurred at CO-12 and

7   CO-13, and then we will finish up with the contribution

8   protection that is being sought under MTCA by Weyerhaeuser.

9       I have reviewed the materials that have been submitted,

10  and that would include the errata documents that were filed

11  yesterday, together with Weyerhaeuser's response to

12  plaintiffs' notice of supplemental legal authority and

13  deposition testimony, and obviously I have looked at the

14  plaintiffs' additional authority which was the decision

15  written by Judge Berzon of the Ninth Circuit.

16      Anything that I should have reviewed that I have not?

17      Anything more recently filed?

18          MR. MYERS:   Your Honor, I think that's everything.

19          MR. COLDIRON:   It sounds complete.

20          THE COURT:   All right.   198 is Weyerhaeuser's motion,

21  so Mr. Coldiron.

22          MR. COLDIRON:   Okay.

23      It would be helpful to start, Your Honor, with the issues

24  of what we call undisputed facts.   We believe that all sorts

25  of things are important for consideration as undisputed facts.

1  Weyerhaeuser has operated the log sort yard on the Hylebos

2  since 1971.  It obtains its logs from the northwestern part of

3  Washington and British Columbia.

4      Since 1978, logs have been debarked at the facility with

5  minor trim.  The raw logs are not processed.  They're not a

6  manufactured product in the sense of being manufactured.

7  They're a raw product.  They're not treated, painted, or

8  stained or anything like that at this facility.

9      The raw logs are handled in the water near the ramp in the

10 Weyerhaeuser dock, and in the process of that handling, it's

11 undisputed that debris from the raw logs includes pieces of

12 logs, whole logs, chunks of logs, bark, that sort of thing, as

13 it attends to the activities of loading ships and unloading

14 logs to the facility and back into the water and to load

15 ships.

16     It's clear that in the area that they've expended costs

17 that there is wood debris from Weyerhaeuser's TEF, and that's

18 the subject of this motion, whether that debris in the water

19 is indeed a hazardous substance under CERCLA.

20     It's also undisputed that at times upland storage, when

21 upland storage on the TEF itself gets full and when logs and

22 ships need to be loaded with those logs, there's temporary

23 storage in the waterway by third parties in order to load the

24 ships.

25     We believe that summary judgment is appropriate, Your

1   Honor, because the question of whether Weyerhaeuser has

2   deposited wood debris in this area is a release of hazardous

3   substance which we believe is strictly a question of law.

4       Liability in a contribution action is several and not

5   joint and several.  A lot of the cases cited deal with joint

6   and several liability and the nuances that go with trying to

7   avoid the severe nature of joint and several liability that

8   came about in the 1986 SARA amendments to Superfund.

9       If I could review, point out, we don't believe that wood

10  is a hazardous substance under all of the scenarios.

11          THE COURT:  Let's talk -- I just want to make sure

12  I'm clear as to the different conditions in which the wood

13  enters the waterway.

14          MR. COLDIRON:  Okay.

15          THE COURT:  Or at least these are configurations that

16  are at issue here in this motion.

17      There is an argument that the wood that is stored at the

18  TEF and becomes the source of the debris in the waterway is

19  contaminated with PAHs that are generated either at

20  Weyerhaeuser or elsewhere.  That's one argument, and creates

21  an argument about a mixture that --

22          MR. COLDIRON:  I've got something to bring to the

23  court's attention on that.

24          THE COURT:  Yes.  I just want to make sure that

25  I understand --

1              MR. COLDIRON:  Can I address that issue?

2              THE COURT:  Wait just a second because what I'm

3     trying to do is make sure that I understand the constellation

4     of forms in which wood is being considered as a hazardous

5     substance in the context of this case.

6         One, I think, is wood with PAH.  One is wood being,

7     whether it's co-mixed or co-located, depending on the

8     vernacular one chooses, with chemicals and other contaminants

9     already in the water.

10        One is simply wood debris in its form and the fact that in

11    the process of breaking down, ammonia is created or sulfites

12    are created which are a hazardous substance.

13        Am I missing any other -- I just want to --

14             MR. COLDIRON:  The only one that I would think that's

15    in addition to those would be that the wood inherently

16    contains those things that they --

17             THE COURT:  I understand that's a dispute.

18             MR. COLDIRON:  Right.

19             THE COURT:  And that the ammonia -- Weyerhaeuser's

20    argument is that Weyerhaeuser -- that the wood as it breaks

21    down as a result of microbial action or critters, the critters

22    create --

23             MR. COLDIRON:  Right.

24             THE COURT:  -- create the ammonia, and so there's not

25    a release of the ammonia from the wood, but it is created, and

 1   then you run into -- language is so critical here.

 2          MR. COLDIRON:  Yes.

 3          THE COURT:  But I saw in the Motorola case where

 4   release sort of morphed into generates or release, and I'm not

 5   sure generates is a term in the CERCLA vernacular, but clearly

 6   wood is a tweener here.

 7          MR. COLDIRON:  Right.

 8          THE COURT:  I mean, we don't have a situation where

 9   it needs to be burned, as in the Serafini case -- I think it

10   was Serafini.  There the court held that the fact that it had

11   to be burned to create the hazardous substance broke the

12   responsibility of the generator of that material.

13       You would argue that there is nothing that is released

14   from the wood itself that would constitute a hazardous

15   substance.

16          MR. COLDIRON:  Yes.

17          THE COURT:  Okay.  I just wanted to make sure I

18   understood.

19          MR. COLDIRON:  I think I can touch on all of that.

20          THE COURT:  All right, go ahead.

21          MR. COLDIRON:  Let me start with something I think we

22   all have missed that's important on this issue, the vehicular

23   emissions that they've alleged in one spot or another impacted

24   the logs, if I could.

25          THE COURT:  Sure.

1          MR. COLDIRON:   May I approach the bench with some

2     cases?

3          THE COURT:   You may.

4     More reading, good.   My eyes used to work pretty well.

5          MR. COLDIRON:   I understand.   Everybody here

6     understands.

7     One of the things that has developed in recent discovery

8     is this issue, we have exhaust emissions from the vehicles, or

9     the big motorized equipment at Weyerhaeuser, and it's

10    acknowledged that we found some of those in some of our study

11    of diesel emissions, whether from our or from Taylor Way,

12    truck traffic, it is up in the air.   One of the things that we

13    didn't point out that we should have is that there is an

14    exclusion in the definition of release -- and I believe that's

15    on page 6, Your Honor, under section 22.

16    That exclusion, for the term "released," is under section

17    (b) of that section, 22.   And then there they define release

18    broadly, as everything in CERCLA is broadly defined, and it

19    says "but excludes" and then it goes to (b), which is

20    emissions from the engine exhaust from the motor vehicle,

21    rolling stock, aircraft, vessel, or pipeline pumping station.

22    We looked and found a few cases, not many, discussing what

23    that exclusion means in our context here.

24    The Reading Company v. The City of Philadelphia, starting

25    on page 16, under engine exhaust exception, page 16.

1          THE COURT:  I have it.

2          MR. COLDIRON:  Yes, sir.  There they were trying to

3     use this exclusion to say that PCB from a transformer on an

4     air conditioning unit on a train, which is rolling stock,

5     Congress intended it to be under that exclusion, and they talk

6     about this engine exhaust exception to CERCLA does exclude

7     emissions from engine exhaust from a motor vehicle, etc., and

8     then they discuss that, down in the context of this dielectric

9     fluid from a transformer, on page 17, "the exhaust exception

10    illustrates Congress' intention that CERCLA liability not be

11    imposed for 'the emissions of fluids necessary and integral to

12    the normal operation of a vehicle.'  Clearly, an emission from

13    a railcar's transformer is not in any sense an emission" that

14    this court finds no basis for saying that it's an engine

15    exhaust emission.  And they believe that CERCLA's language

16    here is unclouded as to this exclusion.

17         The other case, the Uniroyal case, near the end of it,

18    talks about this exclusion on page 20, on the right hand side,

19    the second paragraph.  And they're talking about various

20    exclusions and exemptions.  And it says that it also exempts

21    emissions from engine exhaust from a motor vehicle, hence when

22    congress wanted to except from CERCLA liability the useful

23    commercial product or the by-product of the useful production

24    activity it did so through an express exclusion.

25         And then hitting one other case, and it's really just a

1  parting comment in that case, and that's The Town of New

2  Windsor v. Tesa Tuck, Inc., in the United States.  On the last

3  page, 5, and it calls this exclusion CERCLA's tailpipe

4  emission exemption, and that's really all it says.  It

5  acknowledges it.

6        THE COURT:  It just gives it a name.

7        MR. COLDIRON:  It gives it a name.  So it's the

8  tailpipe exclusion.

9     To respond to your question, then, about the facts we have

10 here under this exclusion that exists as to the definition of

11 a release, plaintiffs cannot make a prima facie case on the

12 fact that we have tailpipe emissions that are found on wood or

13 anything else.

14    I would also note that in any urban area where there's

15 industrial activity, any urban area, there's these excluded

16 tailpipe emissions that contain PAHs.  In that sense, PAHs are

17 background, and many times they're discussed by scientists and

18 other people as urban background, urban runoff, storm water.

19 But you can find these everywhere.  They are ubiquitous.

20    So our point to that is that while they may be on the logs

21 while they sit on the yard, the exclusion prevents them from

22 being a release.  It doesn't mean they're not there, it

23 doesn't mean they're like background, but congress did not

24 intend to regulate them, so while they are there, and they may

25 cause some factual issues later on in the trial, they can't be

1  held as -- they can't be the prima facie case on those

2  emissions.

3           THE COURT:  Is there an issue between an initial

4  release and a subsequent release?  For example, it comes out

5  of the tailpipe and the congress has said tailpipe exception,

6  we're not going to regulate the PAHs.  On the other hand, when

7  it settles on wood in a log sort yard and a decision is made

8  to introduce that wood into the water, in a storage or

9  transport effort, is there any argument that the initial

10 exclusion is lost?

11          MR. COLDIRON:  I don't believe the exclusion is ever

12 lost.

13          THE COURT:  Okay.

14          MR. COLDIRON:  But it doesn't mean that you can

15 always identify it with science.  But I don't believe the

16 exclusion ever is lost to these kind of PAHs.  Sometimes under

17 the new, what's been developed in the last ten years or so,

18 chemical fingerprinting techniques, they can particularly pick

19 out diesel and gasoline engines and things like that, and you

20 can even say it is from a tailpipe.

21     I'm not saying as it degrades, or whatever it does, that

22 you can always identify it, but certainly in that sense that

23 they're alleging occurred here, it looks to us like the

24 exclusion applies and you can't -- they can't make a prima

25 facie case on that.

1          THE COURT:  Okay.

2          MR. COLDIRON:  Does that?

3      The next point you asked me to address was what is co-mix

4  or co-located once it's deposited in the waterway with other

5  chemicals.

6      We believe, and we said so in our brief, that the release,

7  that you determine whether -- you determine whether it's a

8  hazardous substance at the point of release, and at the point

9  of release, we maintain that raw logs and the debris from it

10  are nonhazardous materials.  It's not a mixture, it doesn't

11  contain hazardous substances, and it's released as a

12  nonhazardous material.

13      Once it's in the waterway, then chemicals from sediment or

14  whatever releases in other parts of the waterway co-locate or

15  mix on it or cover it, then it's still, that doesn't change

16  its nonhazardous character because it wasn't released, or at

17  the time of release it wasn't mixed.

18      I'm thinking of the Asarco-Louisiana Pacific case where

19  wood debris was scraped up on a yard and included rock and

20  sand and slag from Asarco and taken to a landfill, and that's

21  clearly a mixture at the time of disposal and it had hazardous

22  substances in it from the slag.  So that's certainly

23  distinguishable from just a raw log sinking or a piece of bark

24  sinking and creating wood debris on the bottom of the

25  waterway.

1           THE COURT:   But when the slag mixes with the bark at

2    the log sort yard, does CERCLA have any say over the necessity

3    and the standards by which a cleanup of the yard itself must

4    be made?

5        Now you've got the mixture.   You've got wood, you've got

6    slag being co-located with wood debris.   Not the transport to

7    the landfill, which is a mixture at that point.

8           MR. COLDIRON:   You wouldn't have a release under

9    CERCLA until there's some disposal or some act of discarding,

10   and so --

11          THE COURT:   And the leachate --

12          MR. COLDIRON:   -- you can manage it however you

13   wanted to on your site, and if it doesn't leave your site and

14   get into what we call the facility under CERCLA, then there's

15   no issue about did you dispose of it.

16       Our point here is that when the logs -- when the log

17   debris enters the waterway, it is strictly wood.   And that's

18   all it is.   And it's nonhazardous, and when it comes to

19   settling on the bottom, subsequent co-location of these other

20   chemicals doesn't change the initial or the original character

21   of it.   It's nonhazardous when it was released in that sense.

22       This last one that you asked me about is pretty

23   technically complicated.   There's a lot of things said in the

24   documentation and the motions and whatnot about EPA, and

25   Ecology gets into the act of saying, you know, that it

1   produces or generates, it's hard to decide exactly what is

2   going on.  But Dr. Floyd in her affidavit makes it real clear

3   that this is a geochemical biological process that's going on,

4   and it goes on basically everywhere in the woods.  Anywhere

5   wood comes to be it starts decaying, and there is a microbial

6   process that goes on, and in that process, the microbes,

7   depending on whether it's aerobic or anaerobic or whatever the

8   conditions are, they produce certain things that can be

9   hazardous substances as part of their food chain.  It's really

10  their, you know, excrement that produces as they live off this

11  stuff.

12      So wood provides some nitrogen and the bugs are in the

13  saltwater, so they can produce the hydrogen sulfite and the

14  ammonia and the phenyls and the things like that in their life

15  cycle.

16      That's not -- plaintiffs try to make that a volume

17  determinative thing.  It doesn't have anything to do with

18  volume.  Anywhere these organic materials are, these bugs are,

19  and they do their job.

20      We do not believe that process is covered by CERCLA.  We

21  don't think that is the -- contained or anything like that or

22  it's not a chemical reaction, it's not like the PVC case where

23  PVC was alleged to have vinyl chloride monomer in it and it

24  somehow could get out.  The court found it couldn't, it wasn't

25  a hazardous substance.  It's not even like that.  It's not

1  like the mining ore cases because they contain the metals that

2  do come out.  Wood doesn't have that.

3      So we think that's a distinguishing point for wood and

4  wood debris as to why it's not a hazardous substance as it

5  decays naturally wherever it's located.  In this case it was

6  in the water.

7      That's as quick an answer I can make on that.  It's

8  probably more complicated than that.

9          THE COURT:  You have emphasized the distinctions, and

10 I'm not sure I found a case where the hazardous substance,

11 inert though it may be, in the view of the particular

12 defendant involved, whether it's grinding sludge or whatever.

13 But in all of the cases I have seen, the material that

14 ultimately -- the element that was ultimately determined to be

15 a hazardous component part -- was hazardous, was a component

16 part of the material itself.

17     And your argument is, is that wood does not contain any

18 hazardous substances as a component part or otherwise, and

19 that it is the breakdown of the material itself through these

20 bugs, the microbial action, that, if at all, creates the

21 ammonia.  Although apparently there's an issue of fact as to

22 whether or not the ammonia found in the Hylebos is associated

23 with wood debris.

24     Is that correct?

25         MR. COLDIRON:  Yes.  Dr. Floyd points out she found

1    no, in her supplemental expert report, no exceedances due to

2    ammonia even though there is minor amounts of it around.

3         THE COURT:  But for purposes of this argument, we're

4    going to assume that ammonia is created in the process of the

5    breakdown of wood debris?

6         MR. COLDIRON:  Yes.  In other cases, you know,

7    sometimes it produces methane.  There's various things being

8    produced by organic material decaying, it's just that our

9    point is that unless that organic material, for whatever

10   reason, has hazardous substances innately in it, then it

11   shouldn't be considered a hazardous waste and decay, in the

12   natural decay process.

13        THE COURT:  What about the Spano case?  I mean,

14   doesn't --

15        MR. COLDIRON:  In Gallagher v. Spano there was two of

16   those, I think.  One of them was --

17        THE COURT:  I was thinking of Spano Building

18   Corporation v. Wilson.

19        MR. COLDIRON:  I believe that was the administrative

20   hearing part of it.  In the Gallagher v. Spano they talk about

21   this wood debris and various other things that got in this

22   housing addition and created methane gas that got into the

23   residences, and EPA came out and looked at it and EPA examined

24   all the material and didn't find any of it to be hazardous.

25   We cited about four or five of those cases that actually find

1  wood in one form or another as not being hazardous.  That's

2  one of them.

3          THE COURT:  But is it a true statement of law that

4  nonhazardous materials placed in landfills that generated

5  methane were hazardous material -- were found to be hazardous

6  material?

7          MR. COLDIRON:  I don't agree with that case.  I don't

8  agree with that position.

9          THE COURT:  I always say, you know, law is nothing

10 but common sense except in the case of employment law and

11 environmental law.  And I have lots of examples in employment

12 law, and I probably ought to be careful in the area of

13 environmental law.  But that seemed to be one of those odd --

14         MR. COLDIRON:  You have two Spana cases that say

15 different things, and one of them is the Gallagher part of the

16 case.  Same set of facts.  EPA examined it all and said it

17 wasn't hazardous.

18     The other one was an administrative direction dealing with

19 state law, and I think they did make that comment about

20 methane.

21     But clearly, organic materials throughout the universe

22 here we live on, you know, it has a natural process that is

23 designed to remove it, or we, you know, we wouldn't be able to

24 move around there would be so much of it.  And it creates the

25 forest mulch that's in the forest, things like that.  It

1    breaks down.

2        And we don't believe that natural process where the bugs

3    create something that might be considered hazardous is related

4    to the CERCLA decision of whether something contains a

5    hazardous substance.  And it's not a chemical reaction.  There

6    are some cases on that.  And it doesn't -- it doesn't fit any

7    of those Alcan, there's five or six examples in the Alcan

8    cases, even using milk.  But they all assume there's hazardous

9    substances with it.

10            THE COURT:  Within it.

11            MR. COLDIRON:  Yeah.  So we have just wood, I think

12   it's undisputed, raw logs, debris from it, that goes through

13   the natural process, and even though EPA and ecology staffers

14   made some statements regarding it was from the wood in fact, I

15   don't think anybody's going to dispute that Dr. Floyd is not

16   correct, that it's a biological process where the microbes

17   generate it, not the wood.

18            THE COURT:  Okay.

19        All right, I will give you a chance to rebut.

20            MR. COLDIRON:  Okay.

21            THE COURT:  I want to hear from the HH -- are you the

22   HHCG now, or are you the --

23            MR. MYERS:  Yes, Your Honor.  I think when we're

24   doing the cleanup we're the HHCG; here we are General Metals,

25   but you can refer to us as however you please.

1          THE COURT:  Last time I referred to you as witness.

2          MR. MYERS:  Touché.

3      May it please the court, my name is Mark Meyers.  I

4  represent General Metals of Tacoma, one of the two plaintiffs

5  in this action.

6      I'm glad that we are not talking about trees, we're not

7  talking about logs, we're not talking about dimensional

8  lumber, the items that are listed in Weyerhaeuser's brief.

9  What we are talking about is wood garbage.  We're talking

10  about ground apart, we're talking about wood chips, we're

11  talking about wood fibers in ten to fifteen-foot thick

12  deposits along Weyerhaeuser's property that admittedly caused

13  environmental damage and that Arkema and General Metals were

14  required by EPA under the Superfund cleanup of Commencement

15  Bay to spend millions of dollars cleaning up.  We're trying to

16  recover those costs from the Weyerhaeuser Company in this

17  action.

18      You have raised questions, Your Honor, about the different

19  mechanisms in which we claim that hazardous substances were

20  part of the wood debris or wood waste that accumulated in the

21  CO-14 area and others that were generated by the Weyerhaeuser

22  Company.

23      I've got a variety of canned arguments.  I'm going to

24  dispense with those and go straight to the questions that you

25  asked Mr. Coldiron, and I'm more than happy to answer any

1    other questions that you have.

2        I would like to start, though, by quoting from the Alcan

3    case, one of the early CERCLA cases.  And it says that, that

4    various listed substances are naturally found in the

5    environment, i.e., in the normal course of events, does not

6    stand in the way of imposing liability against the generator

7    of that substance.  The corporate generator, a nonnatural

8    person, has added to what nature has already seen fit to

9    provide for that -- for the continued existence of various

10   flight forms on this planet.

11       That's what's happened here.  They've added wood waste.

12           THE COURT:  Here's what I'm wrestling with.  Right

13   now everything you say is true, that wood debris is a problem

14   in the Hylebos, it had to be cleaned up, and there were

15   extensive -- there were a lot of costs incurred.  And we've

16   been through a trial to talk about all of the machinations

17   that everybody had to go through to get it clean.

18       But in a contribution action, you still have to establish

19   that the party you targeted is an owner or operator or

20   transporter, that they deposited a hazardous substance, a

21   release or there was a threatened release.

22       And language becomes very, very important, and I get the

23   impression from the fact that there's a secret memo out there

24   and reading all of the materials that have been created over

25   the years with regard to the Hylebos, is that we've used

1  CERCLA so broadly that it gives us the authority to fix what's

2  wrong, and we start to get sloppy in our language about what

3  it is that is regulatable, and Weyerhaeuser is saying, wait,

4  stop for a second.  Show me a case that says an item that is

5  not only nonhazardous in its useful form, but also doesn't

6  have any hazardous substances within it that are released or

7  can be threatened to be released, but that we have gone to the

8  point now where in the breakdown of the process, the fecal

9  material, as it were, of the bugs that feed off this stuff now

10 become attributable to the log sort yard or the export

11 facility or whatever.

12      I mean, wood, it seems to me, is one of those tweener

13 materials right now, and I'm -- I understand the broad, the

14 broad purposes of CERCLA and it should be liberally construed

15 and so forth.  But language, it seems to me, does matter in

16 the statute.

17         MR. MYERS:  Your Honor, and you're right.  Back in

18 the HCC days, when it was Arkema and General Metals with

19 others contributing, we fought this issue.  We debated with

20 EPA in the mid to late 1990s on this exact issue because the

21 import to us was a difference of dredging a hundred thousand

22 cubic yards.  We didn't want to do it.

23      EPA came forward with the full support of the Department

24 of Ecology and said, this is a hazardous substance under

25 CERCLA.  You must address it.  We are requiring you to address

1  it.   That was EPA's formal position.

2      Now, what's EPA's basis for that?   EPA's basis for that

3  is, as stated in the documents that we have submitted, the

4  Alison Hiltner EPA project manager letters and memos, all

5  bedded through EPA management, with EPA's lawyer cc'd on every

6  one of them, she said that, number one, wood does contain

7  chemicals.   It contains phenyls, it contains resin acids that

8  are toxic in the marine environment.

9      We're not talking about wood waste in the forest.   We're

10  not talking about wood waste sitting on a concrete pad.   We're

11  talking about wood waste as it sits in saltwater, in an

12  environment that is low in oxygen or devoid of oxygen.   Those

13  are the conditions.   They have chemicals in them.   That was

14  EPA's position, one of their positions for requiring this.

15      Another position is that wood waste as it degrades does

16  generate and release ammonia and sulfites, two listed CERCLA

17  hazardous substances, and this activity occurs where the wood

18  waste is located, which just happens to be on property owned

19  by the Weyerhaeuser Company.   There is a release of hazardous

20  substances, of CERCLA hazardous substances from these huge

21  wood waste piles on Weyerhaeuser's property.   That is

22  undisputed.

23          THE COURT:   Is this a case -- Mr. Coldiron makes a

24  point that this is a question of law that really needs to be

25  resolved by the court, that it's ultimately a matter of

1   statutory and regulatory interpretation.

2       Is this a case, nevertheless, a situation, nevertheless,

3   where the decision ought to be made after or as a part of the

4   jury instruction packet on a directed verdict after the court

5   has heard the kind of testimony, allowed cross-examination of

6   Dr. Floyd, allowed evaluation of the other matters that you

7   have alluded to in terms of Ms. Hiltner's and EPA's view that

8   there are chemicals in the wood and so forth?  Because

9   obviously Weyerhaeuser's characterization of the components --

10  the constituent elements of wood is a little different.

11          MR. MYERS:  That's true, Your Honor.  I think from

12  working on this issue for a number of years, I feel very

13  strongly that EPA's position is a valid position.  Certainly

14  the Department of Ecology under different standards is --

15  there's no question, that's why Weyerhaeuser signed an agreed

16  order and a consent decree and spent millions of dollars

17  cleaning up their own wood waste in other areas under the

18  Model Toxics Control Act.  So under MTCA I think it's really

19  clear.

20      Under CERCLA it is a more debatable issue, but the

21  evidence that EPA came forward with that required our

22  companies, our clients, to remediate, I think, clearly shows

23  that this is, under a broad definition of hazardous substance,

24  a CERCLA hazardous substance.

25      Your Honor, if you're not comfortable with the record

1   that's in front of you showing that this is a hazardous

2   substance, I think it would be appropriate for you to hear the

3   experts because the Department of Ecology and our own expert,

4   Teresa Michelsen, who is the scientist for the Department of

5   Ecology, says that this determination is on a case-by-case

6   basis.  It's based upon where the wood waste goes.

7           THE COURT:   Here's my problem.

8           MR. MYERS:   Sure.

9           THE COURT:   I thought the weakest argument that was

10  made in support of wood being a hazardous substance was the

11  reference to the sediment management standards and the

12  rulemaking authority.  I mean, my guess is that the language

13  in MTCA that allowed the determination by the director by rule

14  to determine something was a threat to human health or the

15  environment contemplated something that was very direct and

16  said wood, under these circumstances, is going to be a

17  hazardous substance when placed in, you know, and dealt

18  with -- and not in a post hoc case-by-case basis looking

19  through the rear view mirror.

20      Now we've got this, we're going to regulate it because we

21  think it's a deleterious substance and we've got all the

22  rule-making authority that was contemplated under MTCA, and

23  the wood folks should have been more vigilant in dealing with

24  the SMS standards and just the pregnancy of a future listing,

25  as I said, on a case-by-case basis.

1      That argument troubled me because it didn't comport, I

2  guess, with my understanding of what administrative rulemaking

3  was intended to accomplish.

4          MR. MYERS:   Your Honor, I think the best discussion

5  of how MTCA and the SMS govern wood waste and the regulatory

6  framework for addressing wood waste by the Department of

7  Ecology is in the policy paper by Dave Kendall and by Dr.

8  Michelsen.   It's Exhibit S in our materials.   And at pages --

9  I think I have this right -- I think it's pages 3 and 4 of

10  that document, they talk about how MTCA and SMS work together

11  to regulate wood waste.

12      And that's one of the reasons why Weyerhaeuser, as well as

13  two other wood waste generating companies, signed MTCA consent

14  decrees and MTCA agreed orders to clean up wood waste in the

15  Hylebos Waterway.

16      I think the most direct answer to your question, or maybe

17  to help you overcome the problem that you're having, is if you

18  look at the definition of other toxic radioactive biological

19  or deleterious substances, it specifically identifies EG

20  organic debris.

21      And that, if you look also at the definition of hazardous

22  substances under MTCA, subsection 7(e), is any substance

23  including solid waste decomposition project -- products

24  determined by the director by rule to present a threat to

25  human health or the environment if released in the

1    environment.

2         Together, where you have a deleterious substance, here

3    organic debris, that as it breaks down it depletes oxygen as

4    it breaks down and generates ammonia, it generates sulfites,

5    hazardous substances.  That that's -- these regulations

6    together specifically give the Department of Ecology authority

7    under the Model Toxics Control Act to regulate it as a

8    hazardous substance and to require clean up.

9         I don't think I can say that as eloquently as Mr. Kendall

10   and Dr. Michelsen say it in their policy paper, but that's the

11   reason why Ecology has the authority to regulate wood waste.

12   That's why Weyerhaeuser, Manke Lumber and Louisiana Pacific,

13   the two other Wood Debris Group parties in the 1990s, signed

14   on an Ecology-MTCA agreed order and then an Ecology-MTCA

15   consent decree to remediate wood waste.

16              THE COURT:  Okay.

17              MR. MYERS:  Now, I would like to address also this

18   issue of wood at Weyerhaeuser containing PAHs that get into

19   the water.  Mr. Coldiron raises this issue of the tailpipe

20   release.  And in reading the definition of release, it's

21   specifically to emissions from engine exhaust.  It's not from

22   contaminants that have got on wood product or wood fiber that

23   gets into the waterway.  It's not contaminants in storm water

24   that are released off the Weyerhaeuser property into the

25   Hylebos sediments.

1       If we're solely dealing with just releases from engine

2   exhaust, that would be one thing.  That's not what we're

3   dealing with here.  We're dealing with wood debris, wood

4   waste, that has these engine exhaust PAHs on them, and that is

5   the release that's getting into the environment and

6   commingling with these other substances.

7           THE COURT:  Now, that argument fits more closely to

8   the definition in the statute and is an easier fit for me as I

9   look at -- and I'm particularly concerned, obviously, with the

10  whole ammonia-sulfide -- ammonia and sulfide creation process

11  and the degradation of wood once it's been introduced.  But

12  clearly, if the PAH -- the two arguments that I found

13  persuasive before coming out here was the PAH attachment to

14  the wood.  Obviously, Mr. Coldiron has given me some more

15  reading to do about that.  That seemed to be a more

16  traditional kind of release of a mixture containing a

17  hazardous substance justifying the denial of a motion for

18  summary judgment.

19      The more realistic concern from an environmental

20  standpoint, the more practical issue is simply the ammonia and

21  the sulfite creation in the degradation of the wood debris,

22  and ultimately just the sheer volume of the stuff and what it

23  does to the cleanup of a Superfund site.

24      I mean, that's the real world, and we're dancing around --

25  we're trying to -- we're trying to develop all sorts of

1   arguments to reach the conclusion that wood is a hazardous

2   substance, at least in the context of this case.  But I have

3   to say, it is not an easy fit.  I mean, I feel like the ugly

4   sister trying to try on the small shoe.

5       I think much of what Weyerhaeuser says, although the

6   practical reality of where we are and how far we have come in

7   the cleanup with Weyerhaeuser's participation, etc., etc., may

8   belie the authenticity of their arguments.  The arguments,

9   nevertheless, ring somewhat true to me, and there is a dearth

10  of authority that one would think, after 25 years of a lot of

11  litigation, that there ought to be a silver bullet out there

12  that decides this issue, and it doesn't seem to be that there

13  is one.  We're coming up with lots of innovative, creative

14  arguments which really don't go to the heart of why we're here

15  and don't go to the money issues.  But we're looking for a

16  book.

17      I say that as if I'm a participant on your side of the

18  argument, and I'm not.  I'm just, in terms of evaluating where

19  this case is, it doesn't seem to be that there is a real clear

20  hook for the court to hang its hat on regarding wood as a

21  hazardous substance in this case.

22          MR. MYERS:  Your Honor, I think that the fact that

23  the wood did have some amount of PAHs on it that were released

24  into the environment provides you with that hook.  I think the

25  fact that Weyerhaeuser's pilings that were in the same area

1    and admittedly leached creosol containing PAHs, the substance

2    that everyone was concerned about along with the wood waste

3    issues, creates a hook for you.

4        I think the fact that these substances generating ammonia

5    and sulfites as they sit on Weyerhaeuser's property and

6    release those to the environment, that that gives you a third

7    hook.

8              THE COURT:  That's the one I'm really wrestling with,

9    I must tell you.  I am going to read Reading and these other

10   cases with regard to the tailpipe exception, and so forth.

11   But everything that I have read from Motorola to Serafini to

12   New Castle, all speak of the hazardous substance being some

13   constituent element of the material that was disposed of.

14             MR. MYERS:  In each of those --

15             THE COURT:  I'm familiar with the issues of inert --

16   I mean, we wrestled with that for months and months and months

17   and months with regard to the Asarco slag.  I was involved in

18   that to a great extent.  So those issues don't trouble me too

19   much.  But the question about whether or not the hazardous

20   substance ultimately to be released is a component part or a

21   constituent element or whether that's even required.  In

22   Motorola, the judge did sort of -- and I don't know whether it

23   was just sloppiness or intentional, but did, in addition to

24   making reference to a release, indicated that generate -- and

25   I could see where this is generating ammonia.  Is that

1   sufficient under the statute, or was that just a slip of the

2   tongue by the district judge in Arizona?

3           MR. MYERS:  Your Honor, I think in those cases, those

4   are all generator liability cases.

5           THE COURT:  Right.

6           MR. MYERS:  It's all somebody shipped something to

7   someone else's property, and a chemical reaction takes place

8   or some process happens where an allegedly inert substance

9   produces a CERCLA hazardous substance.

10      Here we have Weyerhaeuser being the owner of this

11  substantial portion of the property where this wood waste is

12  located.  They're the owner of the property where the ammonia

13  is being generated, the sulfites are being generated, and they

14  are being released into the environment.

15      As an owner, they are liable under CERCLA because there is

16  a release of a hazardous substance.  It may be from an

17  allegedly inert natural product, but like with the landfill

18  cases that many of us have dealt with for a long period of

19  time in our careers, you know, the fact that the material

20  going into the landfill may be inert doesn't mean that the

21  landfill owner has no liability when hazardous substances are

22  generated in the leachate.

23      I think that's an analogy here that applies.  When

24  Weyerhaeuser owns the property or substantial portion of the

25  property where these huge quantities of wood waste are located

1  and where EPA has ordered us, ordered our companies, our

2  clients, to spend millions of dollars remediating it because

3  it has these substances, these are hazardous substances under

4  CERCLA, and they are harming the marine environment.

5          THE COURT:  Mr. Coldiron may or likely will come up

6  and say, look, as long as we're talking about the practical

7  real world impact of what's going on, let there be no mistake,

8  the reason the Hylebos is being cleaned up is because there

9  are a lot of noxious chemicals in there, and that's what

10 triggered the cleanup of the Hylebos, and the fact that there

11 happens to be wood debris that may add up to 20 percent of

12 volume is, you know, the rub of green.  I mean, that's -- I

13 sense that may be what he says.

14     Go ahead.

15          MR. MYERS:  I'm more than happy to address that

16 argument, Your Honor.  That's why as a lawyer representing one

17 of the six companies in the HHCG we fought EPA on this issue.

18 We did not want to have to dredge 100,000 cubic yards of wood

19 waste sediment.

20     What EPA looked at under the record of decision is the

21 biological activity in the top ten centimeters or top four

22 inches of the sediment, and in these areas that are designated

23 in the neck as wood debris sites 1, 2, and 3, there were not

24 chemical exceedances in the top ten centimeters that EPA could

25 require us, require the companies to clean up.

1      Therefore, EPA said, well, wait a minute, there's wood

2   waste, there's these biologic failures, and under the record

3   of decision, it's not just chemicals that EPA looks at, it's

4   also the real impact, what's the real impact of what's going

5   on out here.  When you have biological failures in your

6   testing, then that's showing a problem, and we're going to

7   make you clean up the wood waste because there are these

8   biological problems and because it generates ammonia sulfites

9   and has chemicals in and of itself of phenyls and resin acids,

10   you know, and so on and so forth.

11          THE COURT:  All right.

12          MR. MYERS:  Thank you, Your Honor.

13          THE COURT:  Thank you very much.

14      Mr. Coldiron.

15          MR. COLDIRON:  I've already fully discussed the

16   engine exhaust discussion.  I believe the exemption exclusion

17   applies, and that's it.  It doesn't change because obviously

18   it doesn't make any sense at all.  It's nonsensical if it only

19   applies at the tailpipe and not where the material comes to

20   rest in the environment.  That wasn't the purpose of Congress.

21   It recognized that it had 200 million Americans driving cars

22   and trucks and they didn't want to regulate that activity

23   through the tailpipe.

24      On the issue of MTCA liability, and in terms of the

25   summary judgment, this is a focused summary judgment on the

1    issue of wood waste.  It's not talking about creosote.

2    There's substantial dispute about creosote.  There's

3    substantial dispute over PAHs.  This has to do with just the

4    wood debris itself.  We don't think there's any genuine

5    material facts in dispute.  We don't think there's a need for

6    the court to include in the trial a large amount of testimony

7    and delay the trial over these issues because we think as a

8    matter of law the court can rule on this.

9        The staffers in EPA, and I've been in Superfund for 24

10   years, sure, they say a lot of things to get you to spend

11   money and clean stuff up.  But if you look, as Dr. Ford

12   pointed out, at all the decision documents that are in the

13   record for these parties, not a single mention of wood debris.

14   It's all about chemicals.

15       So if that was really their position, EPA could have put

16   it there.  If you look at -- in those documents.  They did

17   not.

18       If you look at the listings under CERCLA, wood's not

19   there.  It doesn't fit any category.  It's not listed.  It's

20   simply void.  And there's lots of cases, landfill cases, where

21   there's wood associated with other hazardous substances, where

22   even the EPA in the Gallagher case came out and said this is

23   not hazardous.

24       So language is very important, I agree with the court.

25       In here we have a situation where there is some wood

1  debris, but it's not -- at the time it was disposed, it was

2  not a hazardous substance, and we think the court should find

3  that, and we shouldn't have to deal with that throughout this

4  trial.

5      That's --

6          THE COURT:  What would you see as the echo effect of

7  a decision that wood debris was not a hazardous substance in

8  this case?  Answer the so what question for me.

9          MR. COLDIRON:  Well, it has something to do with

10  CERCLA several liability and the volumes that would be

11  involved in that because you can't get there if that's the

12  case, on those volumes.  You take all of that out.  It

13  simplifies the CO-14 -- CO-13 and 12 issues.

14      There's plenty left to be disputed, don't get me wrong.

15  They maintain our wharf pilings have created all this PAH

16  contamination where they spent the money in front of our

17  facility.  They also maintain that this single sample, that we

18  are going to talk about in the next motion, creates liability.

19      So there's plenty of issues left for the court to have to

20  sort through.  It's just that this one, just to us, doesn't

21  seem like it should be included.

22      You know, Dr. Michelsen in her paper, that's not an

23  official position of ecology.  In fact, that whole

24  determination is for this court to determine, and it is a

25  major leap to take the sediment management standards that says

1    wood could be and situationally a dilatory substance.   And

2    admittedly, we signed up orders that call it a regulated

3    substance but not a hazardous substance.   It could be, and

4    indeed could be regulated under sediment management standards,

5    and we've said so.

6                THE COURT:   Right.

7                MR. COLDIRON:   We haven't admitted that it's

8    hazardous or anything else.

9         But we did our job and spent a lot of money --

10               THE COURT:   I can understand why wood debris would be

11   a regulatable --

12               MR. COLDIRON:   Yes.

13               THE COURT:   -- substance.

14               MR. COLDIRON:   For sediment.

15               THE COURT:   But this motion --

16               MR. COLDIRON:   But they're saying -- pardon me.

17               THE COURT:   Go ahead.

18               MR. COLDIRON:   They're saying passing -- by them

19   incorporating the sediment management standards that were

20   passed under six statutes or so, by them -- the act of just

21   incorporating it, that was rulemaking under Section 5, and I

22   just don't see it.   If they wanted to say, believe me, that

23   wood is a hazardous substance, the forest products industry

24   would be in here in a minute.

25        You know, it's interesting, we're in Oklahoma, and in

1   Oklahoma petroleum is a dilatory substance and regulated

2   nonhaz, and out here, they say wood should be.

3       But the plaintiffs are trying to say, oh, no, you can

4   reach all the way back to this Superfund statute, and it -- by

5   that reach back, anything could be.  It could be sand, glass,

6   rock.  The riprap on the water.  They would make the whole

7   universe hazardous in a way, because it has to be rulemaking,

8   and anything falls under it.

9       I don't think that's the intent, that's not the way you do

10  rulemaking, and I don't think Ecology would want to do that.

11  But I don't know what they would want to do.

12      But that's our position on the MTCA question.

13      Its listing under CERCLA is not situational.  When

14  something's a hazardous substance, it's a hazardous substance,

15  and it stays a hazardous substance and you have to manage it.

16  That's the message to industry when CERCLA was passed.  You

17  have to use care when you manage it because it's not normal

18  after they've listed it.

19      And there are thousands of things that are listed,

20  chemicals, and wood's not on there.  And we just don't see any

21  genuine material issue of fact that requires finding of fact,

22  and we think it would greatly simplify the trial just to get

23  wood out of the case.

24          THE COURT:  Okay, thank you, Mr. Coldiron.

25      This one, unlike a couple of the others, I'm going to take

1   under advisement.  I need to look at the material Mr. Coldiron

2   has presented because I thought, when I came out here,

3   frankly, that the PAH attached MTCA to the wood, probably met

4   sort of the classic definition of a release of a mixture.

5   This is new information.  I will look at it and make my

6   decision.

7       I'm still, frankly, concerned about whether or not

8   biowaste created by the degradation of an organic substance

9   makes the organic substance itself a hazardous substance.

10  That is troublesome to me, particularly in the absence of any

11  case law that seems to fit even by analogy.

12      And I do agree with Mr. Coldiron with regard to the

13  rulemaking argument on the sediment management standards.  I

14  don't think that that's the way rulemaking was intended, for

15  the director to be able to envelop a subject by stealth on a

16  case-by-case basis after the fact.

17      It's been a long time since I took administrative law, but

18  I have a clear recollection that notice was intended to

19  accomplish a purpose to give the public an opportunity to

20  comment.  I guess I agree with Mr. Coldiron that the forest

21  industry, the forest products industry would be there at the

22  hearing in force if such a rule were contemplated.

23      Nevertheless, as a practical matter, I look at where we've

24  been.  It's clear to me that there are a lot of people who

25  belief that CERCLA regulates this wood debris in the Hylebos,

1   and that fact is persuasive, although not ultimately

2   determinative.  It seems to me that the court has to look at

3   the case law, the statutory language itself, and come to a

4   reasoned opinion about whether or not wood debris in this

5   situation, in this case, and perhaps, as Mr. Coldiron argues,

6   in all cases, is a hazardous substance.

7       But I will take it under advisement and hope to get an

8   opinion in the not -- I don't want to make promises.  I've got

9   a trial starting Monday and I'm going down to sit on the Ninth

10  Circuit for a few days as well, so this is -- this, I think,

11  is the most significant issue in the array of motions that

12  have been submitted here today, and I want to make sure I look

13  at everything thoroughly before rendering a decision.

14      All right.  Let's move on now to plaintiffs' motion for

15  partial summary judgment.  And I guess I would ask you, Mr.

16  Meyers, to answer the so what question in the first instance.

17      What does it matter whether Weyerhaeuser is named by the

18  court at this point as a liable party under MTCA and CERCLA?

19  You're going to present the same evidence at trial, and

20  it's -- I guess I would say that there may be some issues of

21  fact here that are disputed, but -- Weyerhaeuser probably

22  wouldn't want me on the jury reaching that decision ultimately

23  based on the material that I've seen, but again, I'm not sure

24  you need this issue to be decided by a court and have it

25  reviewed on appeal under a different standard than presenting

1    the evidence to a jury.

2           MR. MYERS:  Your Honor, this is a legal issue that is

3    important to get resolved, as it is in many cases, many of the

4    cases cited to you in our brief, as well as Weyerhaeuser's

5    brief, and the parties have found that designation of either

6    plaintiffs or defendants as PLPs, potentially liable parties,

7    to be important.  I think the reason is twofold.

8        Number one, it's over a fundamental issue that

9    Weyerhaeuser has raised in this case, and that's their claim

10   that they're not liable.  They're not a liable party.  And

11   they have stated that repeatedly, and they state that here

12   today.

13       We want to get that issue resolved.  I think it's

14   important for our clients to get that issue resolved, as to

15   whether Weyerhaeuser is liable and our case goes forward on

16   the issue of allocation or whether we spend the court's time

17   determining whether Weyerhaeuser falls within the categories

18   of a liable party.

19          THE COURT:  For example, if I say there's PLP for no

20   other reason than the creosote pilings.  How does that shorten

21   trial by as much as 30 seconds?

22          MR. MYERS:  Hopefully it shortens the amount of time

23   I stand up here arguing, Your Honor, when we are at trial on

24   opening statement and closing.

25          THE COURT:  But you still have to make your case on

1    the broader issues.

2                MR. MYERS:   Absolutely.

3                THE COURT:   On the dollar issues.

4                MR. MYERS:   Absolutely, Your Honor.   It also, under

5    the Model Toxics Control Act, means that we're the prevailing

6    party.   If we prevail against their claim that they're not

7    liable, they are a liable party, and we are entitled to an

8    award of attorneys' fees under MTCA as the prevailing party.

9    That's a very important issue.

10               THE COURT:   And, of course, that's an issue that's

11   going to be front and center in the contribution claim.

12               MR. MYERS:   Correct.   Correct.

13        So here our motion, we have tried to style it as being

14   very simple.   Weyerhaeuser is liable under both MTCA and

15   CERCLA because it owns property that was contaminated, that

16   Arkema and General Metals paid to clean up.   The statutes say

17   that parties are strictly liable.   Whether they polluted it or

18   not, if you're an owner, you're strictly liable.   Mr. Coldiron

19   references several liability.   The standard actually is strict

20   liability.   Allocation is based on several liability.

21        There are liability defenses under CERCLA and MTCA.   None

22   of them apply here.   It's undisputed that Weyerhaeuser owns

23   half of the CO-14 area where these deposits were located,

24   chemicals and wood waste were intermingled.   The Fuglevand

25   declaration shows the area that our companies cleaned up,

1   spent millions of dollars cleaning up.  Weyerhaeuser doesn't

2   dispute.  In fact, Mr. Coldiron here today acknowledges that

3   they own that area and that our clients cleaned up that area,

4   paid for the cleanup.

5       So they are an owner, they are an owner of a facility.

6   Facility is broadly defined under both MTCA and CERCLA as

7   where hazardous substances have come to be located.

8   Plaintiffs incurred costs to clean up, they incurred those

9   costs under an EPA administrative order.  They incurred those

10  costs under an EPA unilateral order, and they incurred those

11  costs under an EPA consent decree, all with EPA oversight

12  which our clients paid for.

13      Weyerhaeuser raises the defense that it's a nonpolluting

14  property owner, and that defense is, number one, wrong.

15  Number two, it's legally irrelevant.  It's wrong because even

16  their own experts admit that they are a source.  They claim to

17  be a minor source, but they are a source of PAH contaminants

18  that were found in the sediments off their property.  You have

19  the pilings that you alluded to that Dr. Floyd admitted

20  leached creosote, leached PAHs to the sediments that's on

21  Weyerhaeuser's property.  That's undisputed, they are a

22  source.

23      It's legally irrelevant because of the recent case that we

24  provided to you, the Department of Toxic Substance Control v.

25  Burlington Northern out of the Ninth Circuit that says, and I

will quote:  "Most notably PRP status premised on ownership of
the facility does not require any involvement in the disposal
of hazardous substances."  If you own the property and it's
contaminated and you don't qualify for a statutory defense,
you are liable.

That's also decided in the Union Station Associates v.
Puget Sound Energy case in the Western District of Washington
where the parties said, hey, I didn't pollute.  I may own it,
but I didn't pollute it, and the court said that's not a
relevant issue, that's not a defense to CERCLA and MTCA
liability.

Weyerhaeuser raises the issue of having defenses.

Now, first, they did not affirmatively -- they did not
raise these as affirmative defenses, and they are required to
raise these as affirmative defenses in their answer or they
are waived.  And here we submit those defenses are waived.

Second, as to the substance, CERCLA defense 42 U.S.C.
section 9607(b) states, quote:  "There shall be no liability
under subsection (a) of this section for a person otherwise
liable who can establish by a preponderance of the evidence
that the release or threat of release of a hazardous substance
and the damages resulting therefrom were caused solely by...
an act or omission of a third party."

Here it's clear the releases were not solely by a third
party.  Courts that have looked at that have looked at it very

1    strictly.  Weyerhaeuser does not qualify for this defense,

2    even if the court finds that it has not been waived by their

3    failure to raise it in their answer.  Therefore we believe

4    they're a liable party, they own the property that was

5    contaminated and cleaned up by our clients.  They don't have a

6    defense.  They're liable.

7        Thank you.

8            THE COURT:  Thank you, Mr. Meyers.

9        Mr. Coldiron.

10            MR. COLDIRON:  Your Honor, I would like to address

11    the waiver issue in the pleadings first, and if I could --

12            THE COURT:  I'm not going to rule that the defense is

13    waived, so let's get to the substance.

14            MR. COLDIRON:  Okay.  Judge Bryan last month had a

15    similar technical defense where he said, well, the pretrial

16    order will catch all of that.  And in the pleadings, there's

17    been extensive discovery on that, and they have not said they

18    are surprised.

19            THE COURT:  No, we're going to deal with it.

20            MR. COLDIRON:  All right.

21            THE COURT:  But I must say that, you know, I'm not

22    sure that the position taken by Weyerhaeuser on this motion

23    passes the giggle test.  I mean, you know, you've got an

24    industrial facility there, you're on the waterway, you've got

25    a lot of activity going on.  It seems to me from all that has

1  happened -- and this is not an issue that has just surfaced.

2  I mean, there are people who have been cleaning up around the

3  TEF for some lengthy period of time.  It just seems

4  inconceivable to me that the plaintiffs will not be able to

5  establish that Weyerhaeuser is indeed a liable party for the

6  operations that have been there, given the fact that there are

7  no quantitative limits imposed, primarily.

8      And that was not intended to be an insult.

9           MR. COLDIRON:  No, not at all.  And they may well --

10          THE COURT:  It's a way I communicate the fact that

11  the argument, ultimately, isn't very persuasive.

12          MR. COLDIRON:  Okay.  And they may well at trial show

13  that to the court.  We think that there is a genuine material

14  issue of fact on whether we've had a release.  Counsel

15  admitted that issue.  And we've -- and in just the engine

16  exhaust exclusion just came to our radar screen within the

17  last few days.  Clearly, we found some PAHs in our studies on

18  our facility.  We believe those now are exempt, excluded from

19  consideration.

20      We have an affidavit of Dr. Boehm, who is a world-class

21  scientist, and he says he can't detect -- he looked at our

22  roles on our facility, and as hard as it may believe, you

23  can't detect it even in the consort ditch or in the storm

24  water ditch.

25          THE COURT:  Why aren't you a PLP just for the

1  pilings, the creosote pilings?

2         MR. COLDIRON:  Well, that's disputed, but they

3  haven't brought their motion.

4         THE COURT:  How can you possibly dispute it?

5         MR. COLDIRON:  But they haven't brought their motion

6  on the issue of pilings.  They brought their motion on a

7  single storm water sample that had three PAHs in it at parts

8  per billion levels.  And in their reply, that procedurally we

9  haven't been able to respond to as this is set up, they throw

10 out all these other activities that they say show or you

11 should infer means we've had a release.

12     I could go through each one of those, but each one of

13 those shows that some control equipment, for instance the

14 sludge on the site that had high PAHs, that was being disposed

15 of off site.  Every one of those -- the oily wash water, it

16 was being disposed of off site.  I mean, they have this burden

17 to at least have a nexus of a release from our facility.

18     We had various controls, and at least the detection limits

19 of instruments should be something to consider whether there's

20 a release or not.

21     You know, we may not prevail on that, as to what they've

22 asked in their motion for, but we think we have created a

23 genuine dispute on that issue.

24     And we do dispute whether in the area of the cleanup there

25 are creosotes from our pilings under our dock.  We clearly do

1   that.   The area under our dock was left as a natural

2   attenuation area, even though they found some creosote.

3   There's quite a few factual disputes on that issue.

4           THE COURT:   All right.

5           MR. COLDIRON:   So that's our point, is that on that

6   issue we've at least maintained at this stage the court should

7   hear evidence and then decide whether we have liability.

8           THE COURT:   Thank you.

9       Mr. Meyers, briefly.

10          MR. MYERS:   Briefly.

11      Dr. Floyd's second deposition, which was taken well after

12   the briefing was done, we provided to you.

13          THE COURT:   Right.   I've read it.

14          MR. MYERS:   That kills Weyerhaeuser in their defense.

15   She admits PAHs are released from the pilings.   PAHs from the

16   pilings accumulated in sediment on Weyerhaeuser property.

17   Weyerhaeuser owns the property.   They are a source of the

18   contamination.   That's it.

19          THE COURT:   I'm going to grant the motion, but I will

20   tell you, I don't think it -- I do believe that Weyerhaeuser

21   is a liable party, and jury instructions will include that

22   finding by the court.   I don't think it's going to change one

23   iota the evidence that is adduced at trial and the plaintiffs'

24   burden to persuade the jury regarding the nature and extent of

25   the release, but it appears clear to me from the testimony of

1  Dr. Floyd an acknowledgment that a release has occurred.

2  Clearly Weyerhaeuser is the owner of the facility, and the

3  materials that have been released in detectable quantities,

4  although very minor with respect to the creosote pilings,

5  etc. -- or creosote pilings, I'm just going to leave it

6  there -- are hazardous substances.

7      Mr. Myers.

8          MR. MYERS:  Your Honor, just one clarification.  This

9  will be a bench trial.

10         THE COURT:  Oh, okay.

11         MR. MYERS:  So I don't know if you want to temper

12  your comments or expand on them one way or another.

13         THE COURT:  No, I'm not going to expand on them.  I

14  still want to hear the evidence then.

15         MR. COLDIRON:  We understood it was a bench trial.

16         MR. MYERS:  Thank you, Your Honor.

17         THE COURT:  All right, 193.  That was docket number

18  193.

19     Now we have docket 199, Weyerhaeuser's motion for partial

20  summary judgment of costs incurred in connection with CO-12

21  and CO-13.

22         MR. KLEIN:  Your Honor, Keith Klein for Weyerhaeuser.

23         THE COURT:  Mr. Klein.

24         MR. KLEIN:  This motion is for two areas that are

25  separate from the one you've just ruled on.  You ruled on

1  CO-14.

2          THE COURT:   Right.

3          MR. KLEIN:   We're talking about two other areas.

4          THE COURT:   This is where Foss ties up at the

5  Pennwalt Tie log rafts that are waiting either transshipment

6  by loading on a ship or sending over to the Foss permanent

7  storage area.   Right?

8          MR. KLEIN:   Exactly, Your Honor.

9          THE COURT:   Okay.

10          MR. KLEIN:   These are areas that are owned by Arkema,

11 not Weyerhaeuser, so our position is that owner liability does

12 not apply to them.   And these areas -- it came to our

13 attention that we should make this motion to carve out these

14 areas if we possibly can and streamline the trial because Paul

15 Fuglevand, the plaintiffs' expert, submitted an expert report

16 allocating the response costs that the plaintiffs have

17 incurred for only -- for these three areas, 12, 13, and 14,

18 based on the amount of wood debris that was in these areas.

19      And, in fact, if you look at the opinions in Fuglevand's

20 report, you will see that in allocating -- in doing that

21 allocation with regard to wood volume, he expressly did not

22 include chemicals.   In fact, he derived Weyerhaeuser's

23 percentage shares solely from wood, not chemicals.

24      So we thought, well, the plaintiffs are just alleging that

25 Weyerhaeuser has released wood to these areas, so let's try

1   and deal with that.

2      Now we find in the plaintiffs' response that they're also

3   claiming PAHs migrated down to that area.  But I will deal

4   with that in a moment.

5      But dealing with the wood, it was our belief that that was

6   the only concern in that area, and that it got there from

7   deposition from these rafts that were tied up at the Pennwalt

8   Tie.  It was not property that we owned.  It was not any area

9   that we controlled.  In fact, one of our former managers

10  didn't even know where the Pennwalt Tie was.

11          THE COURT:  But why don't you have liability as an

12  arranger?

13          MR. KLEIN:  Your Honor, because the logs, when they

14  were put into the log rafts and throughout, they remained a

15  useful product.  They were immediately destined either for

16  shipment or, as you discussed, other storage, but ultimately

17  for shipment, and so the useful product defense we believe

18  still applies, even in light of the Burlington case which

19  seems to -- plaintiffs are arguing has narrowed that useful

20  products defense.  But it does say that it applies where the

21  leakage, in that case, was necessarily and immediately a

22  consequence of the, I guess in that case it was shipment and a

23  sale of the product.

24          THE COURT:  Don't you know that, though, that a log

25  raft inevitably is going to result in wood debris being

 1   deposited at the base of the waterway?  I mean --

 2          MR. KLEIN:  No, Your Honor, I don't think that the

 3   operators --

 4          THE COURT:  You may not, but the people who founded

 5   Weyerhaeuser Company sure as heck did know.

 6          MR. KLEIN:  I would argue the operators, they

 7   certainly didn't know that wood debris was a hazardous

 8   substance.  Unlike the pesticides --

 9          THE COURT:  That's another motion, though.

10          MR. KLEIN:  But in the Burlington case, the pesticide

11   was viewed as -- arranger liability wouldn't apply there.  It

12   wasn't a useful product because it necessarily immediately

13   would result in the disposal of a hazardous substance.  But

14   the operators at the TEF would not have known that wood debris

15   would result in the disposal of a hazardous substance, nor

16   would they necessarily have known that wood debris deposition

17   would occur.

18      Now, the point I'm about to make, I fully realize is one

19   to be saved for trial, but I do want the court to understand

20   that at trial, we will present evidence from Dr. Floyd using

21   bathymetry data that there hasn't been any wood debris

22   deposition from the Weyerhaeuser log rafts being tied up at

23   the Pennwalt Tie.  All the wood in that area comes from the

24   Dunlap yard tennants which are Arkema's lessees over the years

25   from 1964 to 1986.  And so, so why would our operators believe

1   that wood debris is being deposited there when we have that

2   kind of information?

3       Now, I realize that's going to be a factual dispute.   But

4   it wasn't necessarily the case that taking the log rafts over

5   there was going to result in wood debris deposition.

6       And on top of that, you have log rafts that in most cases

7   have been debarked, so there isn't bark to fall off of them.

8   And you have -- they are bundled in a manner that the logs

9   themselves aren't going to come loose and fall off, and so

10  it's not foreseeable.   So it is a different case than what

11  Burlington did in narrowing arranger liability, we think.

12      And, you know, the plaintiffs have talked about, well,

13  CO-12, 13, 14 are just lines drawn on a map, but those are

14  their lines, those are their areas.   All boundary lines are

15  lines drawn on a map to that extent.

16      We didn't conduct operations in that area.   We didn't

17  control Foss.

18      And, Your Honor, I would like to point out something which

19  happened in the plaintiffs' response to this motion as well as

20  some of the others, which is we set forth detailed numbered --

21  and I understand you don't have to number them -- but material

22  facts.

23      If you look at the plaintiffs' response, the plaintiffs

24  did not rebut what we said or controvert or raise a genuine

25  issue of material fact that we control that area.   We said we

1   didn't control it, that Foss, which is an independent company

2   that does work for lots of other companies, made the exclusive

3   decision whether to use the Pennwalt Tie.  We never directed

4   them to use it.  That was not controverted, and so there's

5   really no way that operator liability should attach in this

6   case.

7       So you don't have owner liability, you don't have operator

8   liability, and you don't have arranger liability, and that's

9   why we think these areas can be carved out.

10      I might as well also address, what I think the plaintiffs

11  are going to say is, well, based on Burlington, you still have

12  owner liability.

13      Now, that's interesting because the plaintiffs' motion on

14  liability was only filed on the basis of owner liability for

15  CO-14, which is what we actually own.

16      We agree that if there was migration of substances

17  released from our property, from CO-14 down to 12 or 13, we

18  agree that that would impose liability on us.  We understand

19  that.  You know, we had a facility that was a release that

20  moved somewhere else.  And the plaintiffs have in their

21  response come back and raised that very issue, which they

22  hadn't ever brought up in the Fuglevand allocation model as a

23  means of defeating the motion.

24      But in response to that, Your Honor, I would just point

25  out a few things regarding this migration issue, which is that

1   -- first of all, this is the first time the plaintiffs have

2   ever said that.  There is no document, there is not even a

3   document from Farlow or Bornhold, their primary experts on

4   whom they rely for that proposition, which says that

5   Weyerhaeuser substances migrated from 14 down to 12 or 13.

6   The best they did, as I understand it, is Farlow said that

7   PAHs went into 14.  Weyerhaeuser disputes even that because 14

8   is not the dock area.

9          THE COURT:  Right.

10          MR. KLEIN:  Bornhold said the release of creosote

11   derived PAHs from the Weyerhaeuser wharf is a likely source of

12   PAHs to sediments in the waterway.  But he didn't say where

13   those sediments were, and he was talking about CO-14,

14   regardless of what they are now saying, that he was also

15   talking about 12 or 13.

16      But even if you set that aside, if you look at our Daubert

17   motions and if you look at our reply, we talk about how Farlow

18   and Bornhold can't be used to raise a genuine issue of

19   material fact as to migration of hazardous substances down in

20   12 or 13 because their opinions are fundamentally flawed.

21   Farlow has said that the creosote in 14 was based on a flawed

22   mathematical model.  He's admitted that.  And in any event, he

23   was only talking about 14.

24      And then Bornhold, he only assumed that the release

25   described by Farlow was actually occurring, and he still never

1   said it went to 12 or 13.

2       So we just don't see how it creates a genuine issue of

3   material fact to defeat this motion.

4       And then we're back to -- one last thing I think I would

5   say is we're back to, well, under Burlington can the

6   plaintiffs say we're still liable as an owner because the

7   whole, the whole site is a facility, and we own a part of it.

8   And, Your Honor, I would just say, first of all, that the

9   Burlington case was decided in the context of a government

10  cost recovery action under Section 107(a) where liability is

11  joint and several.  This is a contribution action.  It did not

12  make a decision regarding contribution where liability is

13  several only.  Divisibility, carving out 12 and 13 is possible

14  and should be done in this case.

15      And I guess maybe it depends on how you define the unit of

16  analysis.  Is a facility just Weyerhaeuser's TEF or is the

17  whole site a facility?  And if you start using that rationale

18  of going to the whole sight as a facility, you could say that

19  the whole Commencement Bay is Superfund site, is a facility,

20  and everyone who deposited anything into the water in the

21  Hylebos is liable in the Foss waterway, because it's all part

22  of the same site.  Which becomes not helpful or not useful as

23  an analysis.

24      So we think RTF is the facility, not 12 and 13.  They are

25  not our facility and we're not the owner of it.  Therefore,

 1   the court should carve out and find divisibility as to those

 2   areas.

 3        And excuse me, just one more piggyback thing to that is,

 4   even if you did following the Burlington analysis, Burlington

 5   says that apportionment or divisibility can occur if you have

 6   a reasonable basis or if you can show that the contamination

 7   is not traceable back to our facility.  And in this case for

 8   all the reasons I mentioned earlier, it's not.

 9        THE COURT:  Okay.  Thank you very much.

10        MR. MCCARTHY:  Thank you, Your Honor.  John McCarthy

11   for plaintiff Arkema.

12        THE COURT:  Mr. McCarthy.

13        MR. MCCARTHY:  I think what I would like to talk

14   about is the Burlington case and its applicability here, but

15   first let me give you the bigger picture.

16        Mr. Klein was saying that he wants to define the site or

17   the facility for his purposes as just the TEF, but the

18   Burlington case speaks just to that point.  Where you have a

19   single site that has multiple property owners, there is but

20   one facility.  And as the Burlington case held, when you're an

21   owner of a part of the facility, you're a liable party for the

22   whole facility.  And if you want to make a divisibility

23   argument, as Weyerhaeuser has done here, the burden is very

24   heavy.

25        One of the confusions that comes about in talking about

1    divisibility and allocation is that sometimes the court used

2    the word "apportionment" to say apportioning liability under

3    Section 113, and in the case of the divisibility cases where

4    you are actually at the liability phase, they talk about

5    apportionment or divisibility.  So to try and avoid the

6    confusion, I will use divisibility when we're talking about

7    107 liability.

8         Under section 113, which is the section of CERCLA that we

9    use, very similar in MTCA, it's where a potentially liable

10   party under Section 107 brings an action for contribution

11   against another potentially liable party under Section 107.

12   So you have to go to the 107 analysis, which is what

13   Burlington talks about.  The burden is -- and one of the few

14   exceptions is divisibility.  It's a narrow exception that is

15   not used very often, the Burlington court and many other

16   courts have held, and it's the burden of the defendant to

17   prove that the contamination is in no way traceable to their

18   property.

19        Now, I guess I disagree with Mr. Klein's characterization

20   of the evidence that we presented in our papers.  Dr.

21   Bornhold, who is a renowned marine geologist and

22   sedimentologist, performed modeling exercise on the Hylebos

23   Waterway and found that PAHs released from the Weyerhaeuser

24   wharf didn't migrate to CO-14.  He says approximately 40

25   percent migrated to the neck, which is the area that our group

1    cleaned up, and then out towards Commencement Bay, although

2    the majority stayed in the vicinity of the Weyerhaeuser wharf

3    and went to the upper turning basin.  So at the very least

4    there's a disputed fact about this migration issue.

5        I would like to go to the generator argument.  And first

6    of all, Your Honor, if Your Honor --

7              THE COURT:  You know, I --

8              MR. MACARTHY:  -- believes that Burlington controls,

9    we don't need to get into those other arguments.

10             THE COURT:  You don't.  I'm satisfied that there are

11   a number of issues of fact here and that the court cannot,

12   should not enter any order on divisibility at this time based

13   on the record that's been presented to the court.  And so the

14   motion is going to be denied, and we will, I'm sure, wrestle

15   with this issue during the trial.  But the motion -- there are

16   sufficient issues of fact here for the court to be pretty

17   confident at this point that the motion should be granted.

18             MR. MACCARTHY:  If I might chime in --

19             THE COURT:  Go ahead.

20             MR. MACCARTHY:  -- on one other issue, Your Honor.

21             THE COURT:  All right.

22             MR. MACARTHY:  We brought up the wood waste issue

23   once again, and I would like to direct Your Honor's attention

24   to those EPA memos in which, when we were first told to clean

25   up the wood waste it was because EPA informed us that wood

1    waste contains phenolic substances, phenyls which are CERCLA

2    hazardous substances, and that was the threat of release that

3    caused them to require us to do the cleanup.

4        Subsequent when we did the cleanup action investigation,

5    we found out that although there were phenyls found in the

6    sediments, that the major issue was the generation of ammonia

7    and sulfites.  But CERCLA hazardous substances and log

8    substances were there.

9        And we would also like Your Honor to know that we do plan

10   on calling witnesses from the Department of Ecology to testify

11   on why they believe wood is a hazardous substance under CERCLA

12   and MTCA.

13       Thank you.

14           THE COURT:  Very well.

15       Let me also apologize.  I was looking at the -- before I

16   came out here, I looked at the docket sheet and I stopped at

17   the August 17th entry, which included a 15-day jury trial, as

18   the reference point, but the subsequent order of April 13,

19   '06, does indicate that it is a bench trial.

20       So I wanted to apologize for my confusion on that point

21   earlier.

22       Thank you very much.

23           MR. MACARTHY:  Thank you, Your Honor.

24           THE COURT:  Motion for partial summary judgment as to

25   costs incurred in CO-12 and CO-13, docket number 199, that

 1  motion is denied.

 2      And now we go to the motion for partial summary judgment

 3  regarding MTCA contribution protection.   That docket is number

 4  196.

 5          MR. KLEIN:   Your Honor, this motion is based on

 6  Section XX, Roman numeral 20, of a January 17th, 2001, consent

 7  decree between Ecology and the Wood Debris Group members that

 8  we attached as Exhibit A to our motion, and it is a motion

 9  brought under MTCA only for contribution protection.   And the

10  issue was whether the -- well, let me first read the sentence.

11      It says:   "With regard to claims for contribution against

12  the WDG member companies for matters addressed in this

13  decree," and then Ecology grants contribution protection.

14          THE COURT:   Uh-huh.

15          MR. KLEIN:   So the issue is whether matters addressed

16  include the work done by the plaintiffs, that is the subject

17  of their contribution claim.

18      And when I say that, I believe this to be the case, and

19  the plaintiffs can correct me if I'm wrong, I think the

20  plaintiffs have focused attention on the work they did in the

21  neck, but that the overall response costs that they had at the

22  site does also include some study and investigation in the

23  upper turning basin area.   So it's not just an allocation of

24  costs or a percentage of costs that came exclusively from the

25  neck.

1        But in any event, we believe that the matters addressed

2    can be determined from the four corners of the consent decree

3    in the context of what was happening at the site, and the

4    cases have made it clear that you would obviously not consider

5    this in a complete vacuum, but actually the historical facts

6    are contained within the consent decree.  And so as a result

7    it's really not necessary to consider extrinsic evidence, and

8    extrinsic evidence can't be used to vary or change the terms

9    of the consent decree anyway.  So I'm not going to address the

10    extrinsic evidence issues.  I think those are easily

11    answerable.

12        But really the simplest way to look at this is to just

13    ask, what's the contribution protection for?  It has to be for

14    something, you know.  It certainly wasn't for Weyerhaeuser to

15    get the contribution protection against suing its own self.

16    And it wasn't --

17             THE COURT:  You agree that there was work done by

18    other parties in the turning basin, correct?

19             MR. KLEIN:  Yes, Your Honor.

20             THE COURT:  It wasn't Weyerhaeuser alone?

21             MR. KLEIN:  That's right.

22             THE COURT:  Okay.

23             MR. KLEIN:  But the other parties --

24             THE COURT:  Even as to that area, there still would

25    have been a logical reason to want contribution protection for

 1   the upper -- if it were confined to the upper turning basin

 2   alone?

 3             MR. KLEIN:  Well, not from the other Wood Debris

 4   Group companies.  We think the way that sentence is written,

 5   it's not talking about contribution claims among the wood

 6   companies.

 7             THE COURT:  I understand.  But there was work done in

 8   that area by other than the Wood Debris Group, right?  Or was

 9   it all --

10             MR. KLEIN:  There wasn't other dredging work, there

11   wasn't other cleanup work, is my understanding.  So only the

12   plaintiffs' possible investigation work that I was talking

13   about.  It wasn't contemplated, it wasn't within the

14   understanding of the parties that there was going to be future

15   work done in that upper turning basin area.  It was our

16   understanding --

17             THE COURT:  So your argument would be that there is

18   no reason for contribution against one's self if, if the

19   remediation work was all done by the Wood Debris Group?

20             MR. KLEIN:  Right.

21             THE COURT:  There's no reason for contribution

22   protection at all so it has to mean something.

23             MR. KLEIN:  Something else, which includes the neck.

24   In fact, that's the number one clue as to what the -- what

25   "matters addressed" means is that we all knew there was going

1   to be work done in the neck by the HCC, or whatever their

2   later names were.

3       And if the matters addressed was just restricted to the

4   work assigned to the Wood Debris Group members, it wouldn't

5   have any meaning.

6       What you see the plaintiffs saying in this case is that

7   the matters addressed are only the affirmative work to be done

8   by the Wood Debris Group in the upper turning basin, the work

9   that the settling parties are required to take.   And again,

10   that has no meaning.   It has to be the work that someone else

11   is going to do that will be the subject of contribution

12   protection.

13       And so to limit the matters addressed to the work to be

14   performed and to focus on those sections as the work to be

15   performed doesn't tell us what the contribution protection is

16   designed for.

17       Now, obviously, I think it's already established that the

18   majority of the work and the costs that the plaintiffs

19   occurred was in the neck.

20       The site here within the consent decree is called the

21   Hylebos -- the Hylebos wood debris site, the HWDS, and it's

22   not exactly the same as the head of the Hylebos problem area,

23   but it's similar, and it definitely encompasses the neck where

24   the plaintiffs did the work.

25       And in addition -- well, the expansive definition of the

1   site shows that the matters addressed include the neck.

2       And I would like to point out that the plaintiffs have

3   misquoted the definition of site in at least several places in

4   their response where they said that site excludes areas where

5   non-wood debris parties -- non-Wood Debris Group parties are

6   cleaning up chemically contaminated sediment.  What it

7   actually says is that the HWDS includes intertidal areas

8   except where the plaintiffs -- or where non-Wood Debris Group

9   companies are cleaning up chemically contaminated substance.

10  So that's just a small sliver, if anything.  The subtidal

11  areas is where the majority, if not all, of the dredging work

12  was done as a result --

13          THE COURT:  Why do you believe that it was necessary,

14  in the practical sense, to exclude from the intertidal areas

15  those areas where the HHCG was working?

16          MR. KLEIN:  Your Honor, I'm not sure that I have an

17  answer for that.

18          THE COURT:  That doesn't seem logical to me.

19          MR. KLEIN:  It doesn't seem logical, nor do we think

20  that that should be a basis for carving out that little slice

21  from the contribution protection.

22          THE COURT:  I agree in terms of sentence structure,

23  you're exactly right, that the modifier refers to -- the

24  modifier is the intertidal area.  But as a practical matter, I

25  can't understand for the life of me why that part would be

1  excluded as opposed to the subtidal areas as well.

2          MR. KLEIN:  I'm not sure I can answer that, Your

3  Honor, but I would say, I don't want to unnecessarily use the

4  definition of site to restrict matters addressed that is only

5  within the site.  I mean, the HWDS clearly include the

6  intertidal areas --

7          THE COURT:  Right.

8          MR. KLEIN:  -- and still the matter's addressed by --

9  basically, in part, some of what we are saying is you can have

10 a matter addressed even though it's excluded.  You addressed

11 it by excluding it, and then you get contribution protection

12 because it's not work you had to do, it's work someone else

13 had to do.

14     And there's a variety of provisions in this consent

15 decree, Your Honor, that support the idea that the plaintiffs'

16 work in the neck is a matter addressed.  If you look at this

17 statement of facts on pages 4-6 of the consent decree, it goes

18 through the history of the chemical contamination of the

19 waterway and it discusses areas excluded because they are

20 highly chemically contaminated sediments, talks about how EPA

21 is going to require the parties to deal with that kind of

22 work.

23     So there was a recognition and understanding with this

24 contemplation, and everything was foreseeable that there would

25 be contribution claims coming from that work.

1    The work -- now, the plaintiffs have focused on the word

2   "addressed" and the work to be performed where it says the

3   work that the wood debris groups will address and what it

4   won't address.  But the use of the word "address" there is not

5   the same as "matters addressed" in a different place.  And I

6   do want to draw that distinction.

7    And then when you get to other actions on page 15, in

8   Roman numeral XVIII, it says the consent decree is limited in

9   scope to the geographic area in Exhibit A, which is the HWDS,

10  quote, "and to those impacted sediments that Ecology knows to

11  be at the Site when this Decree is entered."

12   Those impacted sediments were not just the wood impacted

13  sediments, those were the chemically contaminated sediments

14  that they talk about earlier in the consent decree.  It didn't

15  say that it was -- the scope of the decree was limited to wood

16  impacted sediment.

17   Then finally you get to the covenant not to sue.  And

18  first of all, let me say that under the Akzo case, I fully

19  understand that the covenant not to sue is not dispositive of

20  what "matters addressed" are, but contrary to what the

21  plaintiffs said, you don't ignore it.  It sheds some light on

22  what "matters addressed" means, particularly since it follows

23  right after the contribution protection provision, and in

24  there it says that matters addressed, in a parenthetical,

25  includes all matters relating to sediments with chemical

 1    contamination at levels exceeding the values set forth in

 2    section 6(a).

 3        Well, those are the highly contaminated, chemically

 4    contaminated sediments for which the plaintiffs are

 5    responsible.

 6        So they've included all matters relating to sediments with

 7    the highly contaminated sediments that the plaintiffs are

 8    responsible for, and that's -- that probably should cinch the

 9    deal there, but let me also talk about the important public

10    policy considerations.  The whole purpose of giving a

11    contribution protection is to provide an incentive to the

12    parties to settle so the taxpayers don't have to foot the

13    bill.  You make the scope of the contribution protection broad

14    enough to actually protect the settling party against

15    uncertain claims.  The plaintiffs' work in the neck hadn't yet

16    been done.  You reward the settling party for its doing work.

17    And in this case, considering that the work that was done by

18    the Wood Debris Group companies did also extend into the neck,

19    it's even more fair to make "matters addressed" include work

20    in the neck.

21            THE COURT:  You also made the argument that not only

22    did the contribution protection extend into the neck, but also

23    that it extends into the entire Hylebos waterway by virtue of

24    Ecology agreeing that the WDG members had no liability for

25    wood debris or chemicals beyond the extent of the site.

1       That strikes me as a bridge too far, but could you address

2   that issue?

3           MR. KLEIN:  Well, if it strikes you that way, I would

4   be glad to withdraw it because I don't think it's necessary

5   for the purposes of this motion since I don't think the

6   plaintiffs are claiming areas for response costs that go

7   outside the neck.

8           THE COURT:  Okay.

9           MR. KLEIN:  And I just would like to point out that

10  Weyerhaeuser alone spent, I think it was, about 1.8 million to

11  do investigation work in the neck.  The Wood Debris Group

12  companies, the other ones, had a similar share.

13      So we did work in the neck, so the work we did was not

14  just in the upper turning basin.  So when you consider whether

15  "matters addressed" extends to the neck, that needs to be

16  factored in as well, along with the fact that that

17  investigation work was done pursuant to a cleanup plan that

18  was the subject of this earlier agreed order and then also

19  carried over into the consent decree.

20      I guess another thing I would like to point out, Your

21  Honor, is the SEPTA case, the Southeastern Pennsylvania --

22          THE COURT:  Right.

23          MR. KLEIN:  -- Transportation Authority case, said

24  there was a presumption, in fact.  I think it's on -- we have

25  a quote in our page 15 of our brief.  There's a presumption

1  that a contribution protection can extend to an entire site.

2          THE COURT:   Right.

3          MR. KLEIN:   And that all plays into the policy

4  purposes behind here.

5      And just a couple of other things to wrap it up, Your

6  Honor, that I would like to point out is EPA and Ecology

7  coordinated on this consent decree, and it was EPA that

8  ordered the work the plaintiffs did.  Both of the types of

9  work that were done, the plaintiffs' work and our work, were

10 long-term remedial actions.  So you don't have a situation

11 where they might have done a removal many years earlier.  That

12 was what happened in the Akzo case when the court said, no,

13 that's not a matter addressed, it's not a similar type of

14 work.

15     The plaintiffs' work here had not been done at the time of

16 the consent decree, so the timing is also important because

17 matters addressed is more likely to apply to future demands

18 that aren't fully -- at least the costs and the expense isn't

19 fully known at this point, but certainly the likelihood of

20 that kind of a claim is clearly contemplated.

21     And I think that's really what runs throughout the whole

22 consent decree, that the parties clearly knew and contemplated

23 that either the plaintiffs, or whoever, was going to do the

24 work that the plaintiffs did would -- that that work would be

25 done in the neck and that it was intended to make that a

1   matter addressed in the consent decree.

2       Thank you, Your Honor.

3           THE COURT:   Thank you very much.

4           MR. PARKINSON:   Your Honor, C. Parkinson on behalf of

5   Arkema.

6           THE COURT:   Mr. Parkinson.

7           MR. PARKINSON:   I will start with the so what

8   question since that's what you have been focusing on in the

9   hearing today.   I think there's a new so what that's emerged

10  in today's hearing.   I haven't had a chance to see any of this

11  briefing on this tailpipe exclusion under CERCLA, but

12  obviously there's no parallel exclusions under MTCA.   So the

13  extent we are talking about the mixing issues and the other

14  issues you addressed earlier.   You know, that --

15          THE COURT:   And there are attorneys' fees issue.

16          MR. PARKINSON:   And the attorneys' fees issue, that's

17  correct.

18      I want to start just talking about the legal framework.   I

19  guess just to point out it's one of the few things, at least

20  on the general level, we agree with, with Weyerhaeuser in this

21  case, and that is that it focuses on the intent of the parties

22  if you look at extrinsic evidence, but the extrinsic evidence

23  does not change unambiguous terms, it just informs the court

24  of the evaluation.

25          THE COURT:   Right.

1          MR. PARKINSON:   And the issue today is what does

2     matters addressed mean in the contribution protection

3     provision under the consent decree.   And we have two lines of

4     argument that support that that we've laid out.

5        The first is there's unambiguous language in the consent

6     decree itself that demonstrates the contribution protection

7     does not extend to the HHCG cleanup and I'm going to walk

8     through that language.

9          THE COURT:   You had better walk very slowly.

10         MR. PARKINSON:   Okay.

11         THE COURT:   Because from a contract interpretation

12    standpoint, you know, I understand the Akzo decision, that --

13    where you've got a contract that defines matters addressed one

14    paragraph away from the ultimate paragraph, I -- nothing that

15    I read in the document itself convinced me of your argument

16    that the four corners of the document convince a reasonable

17    person that the intent of the parties was to exclude from

18    contribution protection those areas that were remediated by

19    the HHCG.

20         MR. PARKINSON:   We will go through that.

21         THE COURT:   Take me through very slowly.

22         MR. PARKINSON:   I will take you through very slowly.

23       First, the scope of the contribution protection, and this

24    is, I think, both sides agree, is based on the site

25    definition.   So when we go to the site definition, the first

1  sentence of it reads:

2      "The Site referred to as Hylebos Wood Debris Site ... is

3  located at the upper reaches of the Hylebos Waterway, Tacoma,

4  Pierce County, Washington, and includes the intertidal areas

5  except where non-Wood Debris Group parties are cleaning up the

6  chemically contaminated sediments."

7      So right in the very site definition itself, you have a

8  clear explicit exception to the areas where non-Wood Debris

9  Group parties are cleaning up chemically contaminated

10 sediments.

11     Now, I will grant the court that this isn't the world's

12 best constructed sentence, but I think when you look at it in

13 light of the other clauses in this consent decree that I'm

14 going to go through and the extrinsic evidence I'm going to go

15 through, the clear meaning of that sentence is not meant

16 simply to apply to this weird, random, from low tied to high

17 tied, as the plaintiffs claim, which wasn't the focus of any

18 of the work, there's no rational reason for that to be carved

19 out, but to apply, in fact, to the whole sentence.

20         THE COURT:  But wouldn't Weyerhaeuser say we

21 didn't -- our work didn't just consist of cleaning up in the

22 upper tidal basin, it also included studying and

23 investigating, which included the neck, so that our work

24 really does cover the entire site?

25         MR. PARKINSON:  Let me address that because part of

1    that is the context here.

2        All of the investigation work was done under an agreed

3    order that did not have contribution protection provisions.

4    There are kind of two phases to this project.

5            THE COURT:   Right.

6            MR. PARKINSON:   So they went in and they did this

7    agreed order without any contribution protection.   Studied,

8    and they came back to Ecology and they made a proposal.   They

9    said, based on our study we propose entering a consent decree

10   to just clean up these delineated areas in the upper turning

11   basin.

12       Ecology agreed to them entering that order, and so they

13   entered an order with contribution protection.   But that

14   investigation work was done, but the consent decree that they

15   entered addressed was clean up of the polluted areas in the

16   upper turning basin.

17       I think that's what this site definition reflects, is that

18   we're talking about the site that has been previously defined,

19   but we're only talking about the parts that you're cleaning

20   up.   And therefore we're accepting where the non-Wood Debris

21   Group parties are cleaning up ---

22           THE COURT:   So work now becomes synonymous with

23   cleaning up?

24           MR. PARKINSON:   Work becomes synonymous with matters

25   addressed, because it basically says here's the site that

1  excludes out parts that we're cleaning up, here's matters

2  addressed.  Okay, here's the work performed.  That's, you

3  know, in typical fashion where you look to for matters

4  addressed for water work, what are you doing, and it basically

5  says we're cleaning up these delineated areas in the upper

6  turning basin.  And, in fact, that work section referred to it

7  as what's addressed.  It says you will address this, you will

8  not address that.

9      And so when you look at, you know, that historical context

10  and the language here, it becomes really clear.

11      I think the other thing, and now we're kind of moving on

12  to the extrinsic evidence, is, unlike the SEPTA case, which

13  they like to cite, there was no allocation or even a thought

14  of an equitable allocation that was part of this consent

15  decree.  Except, as the judge will recall, you know, the

16  parties said, we want all of you to clean this up.  One party

17  said, no, we will just pay ten per- -- 20 percent.  EPA

18  thought that was unfair, so they said, fine, we're going to

19  enter a consent decree with you that relieves you of all

20  liability.  We're going to go after the other party for what's

21  left.

22      It's completely opposite to what happened here.  What

23  happened here is there was no equitable allocation.  Instead

24  they said, we have two different disposal methodologies.  And

25  this isn't --

1        (Reporter asks Mr. Parkinson to slow down.)

2            MR. PARKINSON:  I'm sorry.

3      We have two different disposal approaches.  The first, you

4    know, is to do the end water disposal at the site.  The second

5    is to dispose of stuff upland.

6      So there was no discussion of who was liable for what.

7    The question of where is the rational line to draw between

8    these two cleanups so that the work that's being done by one

9    goes to this upland disposal facility and the work that's

10   being done by the other goes to this other site.

11       And in fact that's reflected in further extrinsic

12   evidence --

13       (Reporter again asks Mr. Parkinson to slow down.)

14           MR. PARKINSON:  In fact, that's further reflected in

15   the fact that the Wood Debris Group cleanup and their costs

16   and those types of information were provided to the allocator,

17   because as you will recall there was an independently hired

18   allocator for the whole waterway and EPA coordinated with

19   them, in fact did all their cashout settlements based on the

20   allocator's determination of the shares of the various folks.

21       (Reporter again asks Mr. Parkinson to slow down and to

22   repeat.)

23           THE COURT:  Do you need a break?

24       (Reporter indicates if Mr. Parkinson is going to talk as

25   fast as he is speaking, she does.)

1          MR. PARKINSON:  I will slow down.  I apologize.

2      So the information about the Wood Debris Group consent

3  decree was provided to the allocator, not as an argument on

4  behalf of the other Wood Debris Group members, what they had

5  done.  You know, Ecology had done an equitable allocation and

6  therefore they paid their fair share so please, you know, sign

7  the consent decree for zero dollars and we will walk away, but

8  acknowledging that this was a split that wasn't done on an

9  equitable basis, it was done on a convenience basis based on

10  the cleanup approaches.

11      The allocator considered that for all three parties,

12  Weyerhaeuser, Manke, and Louisiana Pacific, provided an

13  allocation share after having considered that information.

14  Two of the parties stepped up to the plate and paid their

15  cashout share, and we received the proceeds from that, and one

16  party, Weyerhaeuser, did not.

17      I think if you also just look at the nature of the Wood

18  Debris Group cleanup, you will see why it's not an equitable

19  allocation because essentially what happened was Weyerhaeuser

20  property was split.

21      You know, one of the points they make is, well, gosh, this

22  is unfair because Louisiana Pacific and Manke received small

23  shares.  Well, that's because their whole properties were in

24  the upper turning basin so that work was done.  It was just,

25  you know, the instant log rafting that was done in the neck

1   that was the basis of their residual liability.

2       Weyerhaeuser's is expediential higher under the allocation

3   formula because a significant piece of their property is in

4   the neck, so it's a little apples to orange --

5               THE COURT:  And the neck is where the chemicals are.

6               MR. PARKINSON:  So again, when you look at the

7   contract itself, and again just focusing on the site

8   definition that excludes the work that we're doing, you look

9   at the definition of work that excludes what we're doing, you

10  look at the extrinsic evidence that all the parties behaved

11  like it was not meant to be an equitable allocation.

12              THE COURT:  Let me ask you this.

13              MR. PARKINSON:  Uh-huh.

14              THE COURT:  Is there any reason to suggest that --

15  and it hasn't been argued, so I'm pretty sure I'm probably

16  wrong, that LP and Manke paid a cashout to take care of CERCLA

17  and MTCA liability, and so their cashout is not evidence of

18  anything regarding their belief as to the extent to which this

19  contribution protection under MTCA extended?

20              MR. PARKINSON:  I think that the argument that we're

21  making, Your Honor -- or let me back up.

22      What Weyerhaeuser is saying in its papers, if we

23  understand it correctly, is that they've kind of paid their

24  fair share and therefore they should get contribution

25  protection from the neck.

1    So our response was simply that that is not the perception

2  of the people who also signed that consent decree.

3    Again getting back to the intent of the parties is driving

4  participation.

5        THE COURT:  I think they do make a point, and I've

6  got it in my note that they think they've paid their fair

7  share, but that's not the -- that's not the basis,

8  necessarily, of their contribution protection claim.  They

9  claim they've got a piece of paper that says they get

10  contribution for matters addressed in the site, and matters

11  addressed include not only the work that they did to clean up

12  the upper turning basin, but also the investigative work that

13  they did in the neck.

14    Do you have a reason -- why was MTCA willing to give

15  Weyerhaeuser a covenant not to sue on the neck, with regard to

16  the neck?

17        MR. PARKINSON:  I think it's -- yes, I do have a

18  response to that.  I think it's, when you look at the whole

19  record, Ecology and EPA were working together hand in hand on

20  this.  In fact, that process went back quite a ways --

21        THE COURT:  Right.

22        MR. PARKINSON:  -- on source control and some other

23  issues.

24    So when Ecology was negotiating this consent decree, this

25  carve out in the upper turning basin, they understood that EPA

1    was having a consent decree with HHCG to clean up the neck.

2        So I think the reason they were willing to make that

3    covenant not to sue more broad is because they knew EPA was

4    taking care of the other piece, you know.  They didn't need

5    two hammers; they already had one.

6        And that's reflected in the Akzo case as well.

7            THE COURT:  Oddly enough, I mean, as it turned out,

8    there were -- there used to be four or five in that group and

9    several of them declared bankruptcy, and so it's hard for me

10   to accept that an administrative agency with as big a club as

11   DOE has or EPA not taking a belts and suspenders approach or a

12   Dick Butcuss approach and grabbing the entire backfield and

13   throwing them out until they found the one with the ball -- or

14   the money in this case.

15       So I understand you can say, well, they had some level of

16   confidence that EPA was going to take care of the neck, so

17   they were going to let Weyerhaeuser, arguably a deep pocket

18   with property that extends not just to the upper turning basin

19   but to the neck as well, they are going to let them go from

20   any direct action by DOE.

21       I guess the response would be, well, that didn't prevent

22   EPA from coming after them, if in fact everybody in the HHCG

23   went belly up.

24           MR. PARKINSON:  And there were memorandums of

25   understanding between EPA and Ecology about, you know,

1   dividing things up and dividing it up on the site.  To be

2   honest with you, I wasn't in the room when those discussions

3   took place.

4           THE COURT:  Right.  Right.  Okay.

5       All right.  I don't have any other questions.  If you've

6   got anything you want to add, now's the time to do it.

7           MR. PARKINSON:  Okay.  No, Your Honor, unless you

8   have questions.

9           THE COURT:  Thanks very much.

10          MR. PARKINSON:  Thank you.

11          MR. KLEIN:  Your Honor, I think I can shed light on

12  that intertidal issue that you asked about.

13          THE COURT:  Yes.

14          MR. KLEIN:  I think the reason for that was that the

15  model that the agency was working with at that time was that

16  the individual property owners around the site were going to

17  do that intertidal cleanup themselves.

18      Now, that may or may not later have been the case, but

19  that was -- at the time it was entered into, that was what was

20  contemplated, so that's why the intertidal area could have

21  been carved out, and that wouldn't affect the contribution

22  protection matters addressed analysis as to the work the

23  plaintiffs did in the subtidal area.

24      And frankly, it wouldn't even have affected it if the

25  plaintiffs also had extended work later on, had been extended

1   to the intertidal areas.

2       Your Honor, the plaintiffs seemed to think that the agreed

3   order has no relevance, but -- and that it does not generate

4   or inform the terms of the consent decree, but there is that

5   document which I mentioned earlier, the cleanup action plan,

6   which is in both the agreed order and the consent decree, and

7   so it's a transition carry-through document that required the

8   investigative work earlier, and then it required the remedies

9   later on.

10      I would like to read one sentence out of the Akzo case,

11  which I think really cinches it, is that the rail -- it says:

12  The rail companies agreed to take on the remedies necessary to

13  clean up the railyard in order to resolve their liability for

14  contamination throughout the site.

15      That's what the Wood Debris Group companies did.  They

16  agreed to perform these remedies that are called for in the

17  consent decree and upper turning basin to resolve their

18  liability, at least for MTCA contribution protection,

19  throughout the whole site.  And that was what was contemplated

20  by the parties, and that is really the intent of the parties

21  to the consent decree is what controls, as determined by

22  contract interpretation, as you pointed out.

23      And just one final comment about the investigation costs.

24  We would like the court to understand that that Wood Debris

25  Group allocation that was talked about reallocated

1  investigation costs only.  It did not -- each party paid its

2  own costs for the work that was done in the upper turning

3  basin.

4      And we don't find anything to be relevant about how LP or

5  Manke behaved with regard to small amounts that you could

6  regard as nuisance value in settling, you know, any sort of

7  case, you know, considering the overall costs involved here

8  and the amount the plaintiffs are claiming against us.

9          THE COURT:  I know that Mankes fairly well, and I

10  could tell you that a couple hundred thousand bucks coming

11  from them is not nuisance value.  You probably all know them

12  as well.  They had to dig deep in the backyard to come up with

13  that money, I'm sure.

14          MR. KLEIN:  All right, Your Honor.  That's all we

15  have.

16          THE COURT:  I'm aware of the admonition in the Akzo

17  case, that one should not place too much emphasis -- perhaps

18  the plaintiffs would say any emphasis -- upon the definitions

19  described in the covenant not to sue, and transfer that to the

20  language in the contribution protection applicable to third

21  parties.

22      I have looked at the four corners of the document trying

23  to discern whether or not the contribution provision and

24  protection was intended by the parties to be limited in some

25  way to the areas where there was actual remediation by the

1   parties or whether it extended to the entire site or some

2   subpart thereof.

3       As I have looked at the document, I have found nothing to

4   indicate in my judgment that the contribution protection was

5   not -- was to be limited to the specific area of the cleanup.

6   I am told here today, not if I'm correct, that the upper

7   turning basin, the debris removal was -- or the removal, the

8   dredging work was done exclusively by the Wood Debris Group.

9   Is that correct?

10          MR. KLEIN:   Yes, Your Honor.

11          THE COURT:   Contribution under that circumstance --

12          MR. PARKINSON:   Your Honor, could I say something?

13          THE COURT:   Go ahead.

14          MR. PARKINSON:   Did the Port of Tacoma do some work?

15          MS. HUGHES:   No, not per se.

16          THE COURT:   Contribution under that scenario appears

17  to make little sense, there being no other party incurring

18  response costs in connection with the cleanup.  And I will say

19  for the record, and for the Ninth Circuit, if this matter gets

20  to that point, that I do find the definition of matters

21  addressed in the covenant not to sue to be persuasive,

22  although not dispositive.  Matters addressed in the consent

23  decree indicated that all matters relating to -- included all

24  matters relating to sediments with chemical contamination

25  levels exceeding the values set forth in Section 6(a) of the

1    decree, i.e., the highly chemically contaminated sediments.

2         And I looked for evidence in the document that would

3    suggest that a different definition of matters addressed in

4    the consent decree was intended for the covenant not to sue as

5    opposed to the contribution protection afforded and found no

6    evidence that the parties made any effort to draw such a

7    distinction.

8         I understand that this is a boilerplate provision that is

9    probably taken off the shelf and prepared in a -- not in the

10   same fashion, for example, that HHCG negotiated their contract

11   with Bean for the dredging.  It is a less formal, less precise

12   procedure.

13        Nevertheless, the document is a binding contract signed by

14   parties who have authority, DOE by statute, to enter into this

15   kind of a deal, and DOE has statutory authority to give

16   contribution protection to people who step up and settle.

17        There is a fairness issue here that I think does enter in

18   here, and I have looked to see whether or not I can discern

19   some fundamental unfairness to providing MTCA protection here

20   to Weyerhaeuser.  It does have significant -- it has a

21   significant impact on the issue of attorney fees, but I

22   cannot, based on what I now know, reach a conclusion that the

23   contribution protection afforded does not include the site,

24   the entire site of the wood debris -- Hylebos wood debris

25   site, HWDS, which includes the neck, and the motion for

1    partial summary judgment per MTCA contribution protection,

2    docket 196, will be granted.

3        All right, anything further on this matter?  I have under

4    advisement the motion regarding wood as a hazardous substance.

5    I still have your motions with regard to the experts.

6    Frankly, it's going to be a little while before I get to those

7    two matters just because of the crush of business and our

8    docket.

9        Right now we've got seven -- I think we've got seven, now

10   six -- one case just settled -- six civil trials in May, along

11   with about seven or eight criminal trials.  So you're

12   currently scheduled for May 7.  We've got one starting on

13   April 30th which should be over.  They've got a mediation

14   coming up, but that one should be over in time to start yours,

15   and yours is a priority.  There are two other cases with May

16   7th trial dates.

17       So yours is the priority civil case, but I cannot say that

18   some criminal case might not bump you, and we're going to have

19   to be in close contact as that trial date approaches to see

20   whether or not we've got a slot for you.

21       Right now, looking only at the civil cases, it looks like

22   we should be able to start on May 7.  But you need to be aware

23   of just how clogged the docket is right now.  A number of

24   criminal cases were filed recently and their speedy trial

25   requirement placed them in that window of May for trial dates.

1   Oftentimes continuances are requested by one side or the

2   other, but right now it's a dicy proposition, and we're

3   hopeful that we can get you out on the 7th.

4        Okay, anything further?

5           MR. PARKINSON:  Just one question, Your Honor.  In

6   the amended case management order it provided for either

7   pretrial order or a witness and exhibits lists.

8           THE COURT:  If you think that the provisions of Local

9   Rule 16 are going to be too burdensome, all I need, really, is

10  the witness list and the exhibit list.  And I'm going to want

11  exhibits.  Hopefully not in the number that we had in the

12  trial just past with HHCG.  But get your exhibits into

13  booklets, try to work together to determine which ones are

14  stipulated so we don't have to spend a lot of time

15  authenticating documents and so forth.  But witness list and

16  exhibit list will suffice.

17       With all of this, I think I understand what your various

18  allegations and contentions are, and trying to get in a room

19  and wordsmith this stuff is harder than coming up with a

20  consent decree.  So I don't want to put you through that if I

21  don't have to.

22       Mr. Coldiron.

23          MR. COLDIRON:  When can we expect the Daubert motions

24  to be ruled upon?

25          THE COURT:  I'm looking -- my guess is within a

1    couple of weeks.  I've got a trial starting -- yeah, I think

2    we've got -- Jean, I think we've got it for --

3              THE CLERK:  15.

4              THE COURT:  Did we have it for 15 days?

5              THE CLERK:  I did.  But I just wanted an update.

6              MR. COLDIRON:  Your Honor, excuse me.  Are you

7    expecting any argument on the Daubert motions?

8              THE COURT:  Probably not.  You know, and

9    Weyerhaeuser's new to the party, but with regard to the HHCG

10   matter, I will tell you that there is a high probability that

11   the motions will be denied and that I will hear the testimony.

12   That's a bench trial, and, you know, that makes almost -- that

13   makes motions in limine almost dead on arrival when you've got

14   a bench trial.

15      I'm looking for my April date.  How many days -- the

16   August order that I had looked at 15 days as the trial

17   schedule.  Is that what you're looking at?

18             MR. MYERS:  Yes, Your Honor.

19             THE COURT:  Okay.  All right.

20             MR. MYERS:  That gives us all the way up to Memorial

21   Day.

22             THE CLERK:  More than that.

23             THE COURT:  Oh, boy.

24      Yeah, there it is.  It is still set for 15 days.

25      Anything further?

1        All right.  We will see you on May 7.

2            MR. MYERS:  Thank you.

3        (Recessed at 11:50 a.m.)

4

5

6

7                    C E R T I F I C A T E

8

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.

11

12

13   /s/  Julaine V. Ryen          April 23, 2007
         JULAINE V. RYEN                Date
14

15

16

17

18

19

20

21

22

23

24

25