```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                          AT TACOMA


 3
     ARKEMA, et al.,              )  Case No. CV05-5087 RBL
 4                                )
             Plaintiffs,          )  Tacoma, Washington
 5                                )  June 13, 2007
         vs.                      )
 6                                )
     ASARCO, INC., et al.,        )
 7                                )
             Defendants.          )
 8                                )
     _____ )
 9


10


11                   CLOSING ARGUMENTS OF COUNSEL
                     TRANSCRIPT OF PROCEEDINGS
12            BEFORE THE HONORABLE RONALD B. LEIGHTON
                    UNITED STATES DISTRICT JUDGE

13


14


15


16
     Court Reporter:             Nichole Rhynard, CCR, CRR, RMR
17                               Union Station Courthouse, #3100
                                 1717 Pacific Avenue
18                               Tacoma, Washington 98402
                                 206.370.8504
19


20
     Proceedings recorded by mechanical stenography, transcript
21   produced by Reporter on computer.

22


23


24


25
```

```
 1   APPEARANCES:

 2

 3      For the Plaintiff General Metals:
        Mark M. Myers
 4      Timothy Ashcraft
        Williams, Kastner & Gibbs
 5      601 Union Street, #4100
        Seattle, Washington 98101
 6      206.628.6611

 7

        For the Plaintiff Arkema:
 8      John D. McCarthy
        Holme Roberts & Owen
 9      1700 Lincoln, #4100
        Denver, Colorado 80203
10      303.861.7000

11      Stephen T. Parkinson
        Groff Murphy Trachtenberg & Everard
12      300 East Pine Street
        Seattle, Washington 98122
13      206.832.1484

14
        For the Defendant Weyerhaeuser:
15      Mark D. Coldiron
        Keith J. Klein
16      Ryan, Whaley & Coldiron
        900 Robinson Renaissance
17      119 North Robinson
        Oklahoma City, Oklahoma 73102
18      405.239.6040

19

20

21   Also present: Kimberly Hughes, Weyerhaeuser

22

23

24

25
```

1                          June 13, 2007 - 9:00 a.m.

2

3                                  * * *

4

5

6          THE COURT:  Please be seated.  Good morning.

7     Okay.  Anything we need to take up before we start with

8     closing arguments?

9          MR. MYERS:  Not that I'm aware of.

10          THE COURT:  How do you want to split it or are you

11     going to split it?

12          MR. MYERS:  Mr. McCarthy and I are going to Oreo the

13     first part of our opening -- closing, excuse me.

14          THE COURT:  That was mean.

15          MR. MYERS:  Then we're hopefully going to take less

16     than two hours in ours, if necessary.

17     Your Honor, while things are getting warmed up here I

18     guess I can start.  I'll hand up, just for the Court's

19     courtesy, a copy of the PowerPoint Mr. McCarthy and I are

20     going to go through.

21     I would like to start out just by giving a

22     40,000-foot-level look of the case, although here it's more

23     like a $40-million look at the case.  We have an allocation,

24     CERCLA costs, we have Arkema and General Metals and we have

25     Weyerhaeuser.

1          For cost paid, $41,141,753.  That's the net dollar amount.

2     Weyerhaeuser, zero.  The proposal that we made in our case is

3     to break it between the two, Arkema and General Metals,

4     $33,350,000; Weyerhaeuser, $7,792,000, or 81.06 percent and

5     18.94 percent.  Weyerhaeuser's allocation, zero.

6          One of the major issues in this case is orphan share.

7     There has been a tremendous amount of testimony about Kaiser,

8     their other orphans, such as Asarco, that were significant

9     polluters to the waterway.

10          So, orphan share, Arkema and General Metals' proposal is

11     fair share.  Probably more accurately, equally unfair.

12     Weyerhaeuser proposal on orphan share, zero.

13          To go back, low these many weeks ago, when we first

14     started I discussed CERCLA's objectives.  They are to clean

15     up the environment at the liable party's expense, to be

16     equally unfair to all liable parties or share the pain, and

17     to allocate based on rough justice.

18          Questions to answer in this case:  One, is Weyerhaeuser a

19     liable party under CERCLA and or MTCA?  Number two, is wood

20     waste a hazardous substance under CERCLA or MTCA?  Three,

21     what are the sources of wood waste in chemicals in CO-14 and

22     Weyerhaeuser's property?  And lastly, how much of the $41

23     million in response costs incurred by Arkema and General

24     Metals should be allocated to Weyerhaeuser in fairness, in

25     equity and rough justice.

1      Weyerhaeuser is a liable party.  This Court has already

2    determined that Weyerhaeuser is liable under CERCLA.  And

3    because of this, the remainder of the Court's determination

4    under CERCLA is based on equity, fairness.  Weyerhaeuser is

5    also liable party under MTCA.  I think that's undisputed,

6    though I may be wrong on that.

7      So let's talk about allocation and equity.  Plaintiffs'

8    allocation is to seek an allocation of cost based on property

9    ownership and property use, the CO-14 issue, the release and

10   threatened release of hazardous substances from

11   Weyerhaeuser's property and operations, its own contribution

12   to the problem and the costs that were incurred.  And then,

13   number 3, an equitable share of the orphans.

14     Weyerhaeuser's allocation, on the other hand, is based

15   upon it paying nothing for wood waste in CO-12 or 13 where

16   its log rafts were parked every day or almost every day for

17   14 years.  It pays nothing for any of the orphans, even

18   though they are a sizable, if it not predominant, share.  And

19   they pay -- and they're responsible only for wood fibers in

20   CO-14 not the associated dirt, junk, pilings, or any

21   chemicals on their own property.

22     So out of the $41 million in unreimbursed costs to Arkema

23   and General Metals they seek to have Weyerhaeuser pay the

24   cost to clean up their property, CO-14, and the cost to clean

25   up wood waste in CO-9, 12, 13 as testified by Dr. Floyd and

1   Mr. Fuglevand.  Therefore, the dollar amount that has been

2   computed is the 792,000 figure we've discussed in testimony.

3        Now, Weyerhaeuser's strategy in this case is to argue for

4   every loophole, every legal exception they can think of,

5   every nuisance they can argue under the law to get out of

6   paying anything, anything for the thousands and thousands of

7   tons of wood waste as well as chemicals that they deposited

8   on their own property and elsewhere that Arkema and General

9   Metals have paid huge costs to clean up.  They take no

10  responsibility for their own property.

11       They argue chemicals caused everything, wood waste caused

12  nothing.  They take no share of the orphan parties and they

13  argue that their expert's revised trial opinions given here

14  in court today should be given more weight than the

15  information they gave to EPA and Ecology back at the time

16  when decisions were made.

17       Yet at the time cleanup decisions were made, and at the

18  time substantial work was done and at the time millions of

19  dollars were spent to clean up their waste as well as the

20  waste of others, everyone acknowledged, everyone acknowledged

21  that wood waste was damaging the environment and had to go.

22       My client, Mr. McCarthy's client, paid millions of dollars

23  to clean up Weyerhaeuser's waste.  Weyerhaeuser did not pay

24  anything.  Again, millions of dollars were spent dredging

25  wood waste and PAH contaminated sediments on Weyerhaeuser's

1    front and elsewhere.   Arkema and General Metals were not the
2    source of the wood waste and PAHs.   Kaiser is bankrupt.
3    Weyerhaeuser has paid nothing.
4        So going to Question No. 1:   Is Weyerhaeuser a liable
5    party?   The answer is yes under both CERCLA and MTCA.
6    Weyerhaeuser is liable because they purchased contaminated
7    property, property that had already been impacted by Kaiser.
8    They purchased the property from Kaiser.   Weyerhaeuser is a
9    source of hazardous substances.   They were designated a PRP
10   by Ecology -- or by EPA in 1989.   They were designated a PLP
11   by Ecology in 1997.   They were found liable by this Court.
12   CERCLA remedial action costs were incurred.   Again,
13   Weyerhaeuser has paid nothing towards those.
14       Weyerhaeuser is liable -- is the liable party for CO-14.
15   There is no dispute that CO-14 is Weyerhaeuser's property
16   both through ownership and exclusive operation.   There is no
17   dispute that Weyerhaeuser disposed of tons and tons of wood
18   waste in CO-14 that caused environmental damage.   And there
19   is no dispute that Weyerhaeuser released hazardous substances
20   from its wood waste piles, from its operations, and from the
21   pilings, the creosote pilings in CO-14.
22       The dispute that we've spent six weeks focusing on is more
23   the amount of the releases, not whether releases occurred.
24   In CO-s 12 and 13 there is wood waste from Weyerhaeuser's log
25   rafts.   They were the last standing wood waste parties.

1   Everyone else has settled out or gone out of business and is

2   an orphan.

3        From the testimony of Foss Maritime and the rafting folks,

4   Weyerhaeuser log rafts were tied up in those areas on an

5   almost daily basis from at least 1988 to 2002.  From

6   Weyerhaeuser's own study in 1979 they found that log rafting

7   and storage caused environmental damage, disposed of wood

8   waste on the bottom can environmental damage.

9        Lastly, Dr. Floyd's conflicting testimony, in July of 2006

10  she claimed that 5 percent share should be attribute to

11  people towing log rafts by.  Now she's changed her story and

12  she says log rafting doesn't deposit anything.

13       THE COURT:  Let me interrupt you for a second.  I'll

14  probably do this with some frequency.  You indicated in

15  answer to Question 1 that there is no dispute that

16  Weyerhaeuser released hazardous substances from its wood

17  waste.  Explain that, if you would.  I know the issue of the

18  PAHs being attached to the wood.

19       MR. MYERS:  Correct.

20       THE COURT:  That may be what you're talking about.

21  Or Mr. Farlow talked about, I think, liken on the wood that

22  is with it when it's live when it's cut and so forth.

23       What is it you're talking about that there is no dispute

24  that Weyerhaeuser released hazardous substance from its wood

25  waste?

1      MR. MYERS:  What I'm focusing on is the data showing

2  that in these huge wood waste piles there were releases of

3  hydrogen sulfide --

4      THE COURT:  Okay.

5      MR. MYERS:  -- on Weyerhaeuser's property that

6  Dr. Floyd testified and admitted on cross-examination that

7  those -- that that substance was the result of the

8  decomposition of the wood.  That is a release of a hazardous

9  substance.

10      THE COURT:  Well, the question -- you know, I spent a

11  lot of time reading cases and re-reading cases.  And we talk

12  about hazardous substances within the material -- I mean,

13  they focus on whether or not the material is contained within

14  the PVC cases, even the sludge in the Motorola case.

15      What is contained within the material?  And I guess that

16  is where we're -- you know, that is where we're at.  As I

17  indicated yesterday, my sense is that if wood debris is going

18  to be regulated as a hazardous substance, the issue ought to

19  be taken on frontally by EPA in a rule-making process so that

20  the best wood scientists in the country can be heard.

21      I don't think we heard the best wood waste -- wood

22  chemists.  I think Dr. Floyd may qualify as a wood chemist

23  given her experience, et cetera, et cetera.  Basically I'm

24  not saying that wood doesn't contain hazardous substances,

25  what I'm saying is I don't think any evidence produced at

1    this trial it can be said by a preponderance of the evidence

2    that would contain hazardous substances which leads us to

3    nibble around the edges, so to speak.

4        There is no question that these hazardous substances that

5    are produced are dependent upon the wood debris.  What I'm

6    trying to do is avoid naming the alfalfa farmer a PRP because

7    ultimately that alfalfa gets turned into methane.

8        And that's kind of what I've been wrestling with on this

9    issue of whether or not Weyerhaeuser released hazardous

10    substances --

11        MR. MYERS:  Here is the distinction that I think is

12    important here.  The cases that I think you're referring to,

13    and the cases that I certainly looked at in preparation for

14    summary judgment, those cases looked at somebody generating a

15    waste, depositing it someplace else, and then the issue is if

16    it's on someone else's property and it does things, was the

17    release, the disposal of that material initially that went on

18    somebody else's property?  Here you have Weyerhaeuser owning

19    and operating the property.  They have deposited these piles

20    of wood waste, volume of wood waste knowing at least since

21    1979 that that has the likelihood of creating hydrogen

22    sulfide and other adverse environmental effects and from that

23    waste material on their property there have been releases of

24    hazardous substances.

25        There is nothing in the statute that says the original

1    material has to be a hazardous substance or anything

2    generated from that later on is not a hazardous substance.

3    That's not what the law says.

4         THE COURT:  I understand that, but I've read ALR

5    articles and every case I've seen, every case that Mr. Lane

6    has found for me, the hazardous substance has been something

7    that was contained within the waste material, not something

8    that attach -- and clearly, even then the debate is over

9    whether or not it's inert or not inert.  That's the argument

10   Asarco kept making.  The issue was whether or not -- and the

11   word "generate," then, is associated with that debate.

12       Is it foreseeable that through some chemical reaction the

13   hazardous substance that is already contained within the PVC,

14   or whatever it is, can dissociate from the material and be

15   released or leached or whatever?  That may be a conservative

16   interpretation of the language.  I know that the statute is

17   to be viewed liberally with its broad remedial purposes in

18   mind, but surely there should be some thread that the Court

19   can rely upon in reaching the conclusion that a substance

20   that is not hazardous in and of itself and contains, or at

21   least the evidence doesn't convince me that it contains

22   hazardous substances, nevertheless can be a hazardous

23   substance at some later time when microbial action results.

24   I get the foreseeability.  I mean, I understand that.  And

25   that is why I was wrestling with the Well, could it be a

1   threatened release?

2        MR. MYERS:  It certainly could be a threatened

3   release, Your Honor.  I harken back to my earlier days

4   practicing environmental law when I had more hair and less

5   gray, and the primary sites at that time were landfill sites

6   where we dealt with this issue of dealing with garbage,

7   municipal solid waste, that is not a hazardous substance, yet

8   when it's placed into a particular environment on somebody's

9   property it does generate a hazardous substance.  Generates

10  leachate, it generates methane, and under those circumstances

11  there are a laundry list of Superfund sites in Western

12  Washington that are landfill sites.

13       This basically is a solid waterway landfill.  It may not

14  have been intended that way, but what you have over the years

15  Weyerhaeuser operated, you have -- you have feet and feet and

16  feet of wood waste that is deposited through these industrial

17  business activities in the waterway.  And by doing so, that

18  activity has resulted in a process that generates hazardous

19  substances and releases them to the environment.  And they're

20  released at a facility which is Weyerhaeuser's property.

21       And I found nothing in the statute that requires the

22  initial action to be a hazardous substance.  What they focus

23  on is:  What is the result?  what is the result to the

24  environment?  what is happening on someone's property?  And

25  here on Weyerhaeuser's property you have the generation of

1    the substances through an industrial process --

2         THE COURT:  You would say at CO-14 basically

3    Weyerhaeuser is the owner and operator of a landfill.

4         MR. MYERS:  Correct.

5         THE COURT:  That would be your argument?

6         MR. MYERS:  Correct.  It's fully consistent with

7    Dr. Michelsen's testimony that wood waste in these

8    concentrations is solid waste.  Solid waste falls under the

9    regulations that -- for a landfill.

10        THE COURT:  I remember her argument is everybody was

11   scared to death it was going to be regulated as solid waste

12   and they choose not to do that.

13        MR. MYERS:  They wanted to have it regulated under

14   the SMS so they would have options to look at whether, in

15   fact, it was causing environmental damage or not causing

16   environmental damage.  Nonetheless, if wood waste comprises a

17   certain volume, it was Dr. Michelsen's testimony that is a

18   solid waste under Washington law.

19        Where were we?

20        THE COURT:  You had more hair and less gray.

21        MR. MYERS:  You're very omniscient.

22        That is my next slide, talking exactly this subject about

23   there being a release or threatened release of a hazardous

24   substance and there being nothing in the statute that

25   requires the initial source to be a hazardous substance.

1    Instead, it looks at Are hazardous substances being released?

2    Is it being released from a facility?  "Facility" is defined

3    very broadly as anywhere hazardous substances otherwise come

4    to be located.  Very broad definition.

5        And lastly, the term "release" is also very broad.

6    Spilling, leaking, pumping, emitting, escaping, leaching,

7    dumping, all those activities.

8        And here we have in our case, we have PAHs from creosote

9    piles that were admittedly released.  There is a dispute as

10   to how much, but the evidence is that there were widespread

11   creosote smell, there is a creosote sheen when sediments were

12   dredged, and so it's not molecules as Dr. Floyd testified.

13   You couldn't smell it if it was molecules.  This is a

14   pervasive widespread problem in the sediments.

15       You have hydrogen sulfide from the wood waste in

16   porewater.  You have a hydrogen sulfide smell documented

17   clearly.  Phenols and methyl phenols from wood waste, it's

18   our continuing position that the science says there is --

19   there are phenols and methyl phenols.  That certainly is the

20   DOE and EPA's position on that issue.

21       There is a threat of ammonia.  It may or may not happen

22   under certain circumstances, but there is certainly a threat.

23       Lastly, there is threat of other chemicals, those listed

24   in the famous Footnote 2 to Allison Hiltner's November 3,

25   1998, letter Exhibit No. 418.  There's a few exhibits I have

1  memorized.

2  We showed this exhibit and walked through its importance

3  with the witnesses and how it was prepared.  This shows where

4  those smells were noted when the dredging was underway.  And

5  it shows significant areas of strong hydrogen sulfide,

6  particularly around the wood waste deposits.  It shows

7  creosote smells in the sediment.  There is no testimony that

8  wet scrubber sludge smells like creosote.  Creosote is a

9  unique smell.  For those of us who have lived here all our

10  lives, we know the smell.  The witnesses that have testified,

11  they know the creosote smell.

12  THE COURT:  Problem is we don't know what wet

13  scrubber sludge smells like.

14  MR. MYERS:  Thing is, though, if wet scrubber sludge

15  did have a smell wouldn't it be documented someplace?  If it

16  had a unique smell wouldn't it have been in the Landau

17  report?

18  THE COURT:  One exhibit where they had it had a

19  petroleum odor.

20  MR. MYERS:  But if it had a creosote odor, wouldn't

21  someone, a professional in that area living in the Pacific

22  Northwest, note it has a creosote odor?  Of course they

23  would.  There is nobody who has testified that it has a

24  creosote smell.  In fact, I think our experts -- Mr. Dalton

25  testified he spoke to Paul Skillingstad at the DOE, he spoke

1   to the folks at Kaiser, and both of them said it doesn't have

2   a creosote smell.  Weyerhaeuser's experts, they didn't talk

3   to anybody.  They had no idea what it smelled like.

4       This exhibit number is Figure 513 from the cleanup study

5   report that documents the release of hydrogen sulfide from

6   the wood waste into the porewater to release into the

7   environment.  Dr. Floyd admitted as much.

8       Now, Weyerhaeuser, in our opinion, argues only half the

9   story.  Their case focuses only on the wood itself, not on

10  what happens on their property after the wood waste is

11  disposed of.  Weyerhaeuser ignores the known hazardous

12  substances that are released from wood waste in a low oxygen

13  environment.

14      It's undisputed that CERCLA and MTCA hazardous substances

15  have been released to the environment on Weyerhaeuser's

16  property or facility.  And it's undisputed that the hydrogen

17  sulfide concentrations on Weyerhaeuser's property were above

18  toxic levels.  They weren't at insignificant minor levels.

19  They were above toxic levels that the Wood Debris Group

20  documented in their own report.

21

22      Question No. 2:  Is wood waste a hazardous substance?

23  What is Weyerhaeuser's position?  Well, Weyerhaeuser for 20

24  plus years has known that wood waste from log storage caused

25  environmental damage.  It's EPA's position that wood waste

1   does cause environmental damage and is a hazardous substance

2   and that is certainly the Department of Ecology's position.

3         THE COURT:  Aren't those two separate questions?  I

4   dealt with regulators -- I tried to avoid it as much as I

5   possibly could and just deal with the trial work.  That's

6   what I enjoy.

7         But, you know, I have to tell you, I look at this evidence

8   through a lens that asked the question first, what is it that

9   is motivating these people at the time they're making these

10  determinations?  And oftentimes it seems to me that the

11  regulators, and I've used this phrase in chambers, sort of

12  make these decisions the same way Dick Butkus searched out

13  the guy with ball.  They tackled the whole back field and

14  drove the ones until they find the ball.

15        I'm sure you've experienced that in your career as well.

16  My ultimate conclusion is this is an important enough issue

17  to lots of regions in the country that it ought to be dealt

18  with in a forthright manner, not with somebody writing a

19  letter here referencing a secret memo that we can't let you

20  have and so forth and so on.  I find that almost a little

21  offensive.

22        MR. MYERS:  Your Honor, in 1998 I found that

23  offensive too.  We fought that.

24        THE COURT:  I am sure you did.

25        MR. MYERS:  We were under an order where we had to

1   comply with EPA's directives.  That's part of the
2   administrative order on consent.  I remember as a young
3   lawyer meeting with EPA on one of the early sites I worked on
4   and I argued with them that's unfair, it's incorrect, it's
5   not proper, it's not legal.  And their lawyer looked me right
6   in the eye and said, Mark, some days it's good to be king.
7        THE COURT:  That was the phrase that I was thinking
8   of.  You and I are on the same wavelength.  The problem is
9   that -- you know, we're in a different forum right now.  And
10  we're at the forum where widespread precedent could be set.
11  I'm not ignoring the likelihood that the Ninth Circuit at
12  least will probably be the final arbitrator of this decision.
13  And at least where I come from it isn't always good to be
14  king.  And some rational process needs to be followed in
15  order for such important conclusions to be reached.  I've
16  said my peace.
17        MR. MYERS:  One comment on that as a private here in
18  the courtroom is that there was an opportunity to address
19  this by the Wood Debris Group in the late 1990s.  They were
20  being told that's an important issue, huge issue for them, an
21  issue that they have spent six weeks litigating over.
22      In mid to late 1996 what did they do to address this
23  issue?  They ran to the Department of Ecology and said,
24  Please regulate us separately so we don't have to go through
25  the EPA process.  Make somebody else go through the EPA

1   process but regulate us separately.

2      You heard Mr. Fuglevand's testimony.  He said when this

3   issues came up, This is crazy, this is nuts.  We fought it.

4   EPA had a reason.  They had a reason that, at that time

5   anyway, was logical, although disputed, and they had a reason

6   that had scientific basis behind it.  Although now it's

7   disputed at trial here, Weyerhaeuser disputes that that

8   sign --

9           THE COURT:  It seems they came up with the perfect

10   compromise and said, We've got the ability to regulate wood

11   under a separate state standard.  Let's separate them.

12   Problem is when you mix chemicals and wood you've got a large

13   disputed territory.

14          MR. MYERS:  That's assuming that this split was asked

15   for or planned by the regulators.  That's not the case.  That

16   wasn't the testimony of Mr. McMillan --

17          THE COURT:  I don't know if it was found by

18   regulators.

19          MR. MYERS:  -- Dr. Michelsen, it's the wood debris

20   folks that went to Ecology after they knew they were going to

21   get wrapped into in.  They went to Ecology and said, Please

22   regulate us separately.  This was not an allocation that was

23   done by the regulatory agencies.

24          THE COURT:  I fully assume it was the regulated

25   committee that took the initiative in trying to find some

1    appropriate resolution other than where EPA was leading them.

2         MR. MYERS:  Had they not done so, what were the

3    documents saying by EPA -- saying, If you don't do it as you

4    want to with Ecology, you're going to do it with us.

5         THE COURT:  Then EPA could have started this process

6    and been here in a cost recovery action.

7         MR. MYERS:  The problem with our position, the

8    position our companies are put into is at the time we had no

9    right to challenge -- there is no pre-enforcement review.

10   When EPA tells you to do something, you do it or you face

11   stipulated penalties at three times the cost.  That is

12   unfortunate unfair position our clients were put in.

13       And at the time what did the wood waste folks do?  They

14   said, Regulate us.  They didn't say, No, this is wrong.  No,

15   this science is wrong.  No, you're legally wrong.  No, we're

16   going to fight it, it's not right.  They said, Fine, we'll do

17   it.  Regulate us.

18       Weyerhaeuser's knowledge of problems, this document from

19   their own files, Weyerhaeuser research and development

20   department, studying intertidal log raft storage impacts in

21   Coos Bay, Oregon, in March of 1979.  What did they say?  This

22   report says, Significant organic material increases in the

23   substrate from bark or other losses from stored logs.  Also

24   depresses the benthic infauna from biological community.  Log

25   rafting, log storage causes those problems.  It's not just

1    hauling logs in and out of the water as Weyerhaeuser is

2    claiming.

3        It says, Neither dissolved oxygen nor hydrogen sulfide

4    were measured, but these parameters are often effected by log

5    storage and benthic wood deposits in areas of porewater

6    circulation just like the Hylebos Waterway.

7        It goes on further to say, "While part of this shift seems

8    attributable to debris accumulations covering infauna sites,

9    the above authors and Bella also indicate anaerobic

10   decomposition products as hydrogen sulfide from the wood

11   material in the mud depress the infauna."  So by 1979 they

12   knew the exact problem that was being dealt with in the 1990s

13   and 2000.

14       Lastly it says, The hypothesis that chronic toxicity of

15   leachates from bark and wood incorporated into the substrate

16   and their breakdown products can contribute to the

17   different -- to the different -- to the difference appears to

18   have some validity.  So Here they're agreeing with these

19   other studies about the effects of wood waste in the marine

20   environment.

21       And so I guess they're technical legal arguments being

22   made, they're real world arguments, real world science.  What

23   is the real world science that motivated the environmental

24   regulators?  That was wood waste was a bad thing, had to go.

25            THE COURT:  Well, it doesn't have to go because

1    they're still operating.  I drive by there.  There is still

2    lots of log rafts out there.  Some are out in the bay where

3    there is deeper, cooler, stronger current, whatever.  But, I

4    mean, they're still operating.

5         MR. MYERS:  But the testimony is that if they

6    accumulate a certain amount --

7         THE COURT:  Clean it up.

8         MR. MYERS:  -- it has to go.  You have to handle your

9    logs in a certain way so you minimize now the amount of

10   release.

11       Again, the focus is, What was the real world impact being

12   done?  The real world impact was the biological community was

13   being adversely affected by wood waste.

14       What is EPA's position on wood waste?  Their position is

15   hazardous to the environment, contains hazardous substances,

16   it generates and releases hazardous substances and it must be

17   cleaned up under CERCLA.

18       Kristin Flint from EPA testified that was not only EPA's

19   policy at the time, it's EPA Region 10's policy now.

20       What was EPA's directive to the HCC?  It was to remediate

21   wood waste.  We've gone through this letter.  Everyone is

22   tired of reading it.  I know I am.  The November 3, 1998,

23   letter from Allison Hiltner to Paul Fuglevand, it covers --

24   covers important points -- I know we've read them before --

25   that EPA in February of 1996 started this process.  It was

1    EPA starting the process, not Arkema and General Metals, not

2    the HCC.  This was EPA's process to declare wood waste a

3    problem.

4        It says the HCC had to address wood waste in these

5    upcoming reports.  It said that EPA considers wood waste

6    areas to be appropriate for cleanup under CERCLA for two

7    reasons:  one, mixture with chemicals; other reason is it

8    releases chemicals, it generates chemicals.

9        And we have the famous Footnote No. 2 that Dr. Floyd

10   testified she believed was true until she testified here on

11   the witness stand.  Her testimony before that was

12   consistently, This is true.  This is what everyone believed.

13       And so based on that, EPA -- EPA found that wood does

14   cause environmental problems.  It needed to be cleaned up.

15       And then in this paragraph No. 3, that the cleanup is

16   consistent with the ROD.  It's not inconsistent with the ROD.

17   It doesn't require an explanation of significant differences.

18   It's consistent with the ROD.  They require that that be

19   done.

20       Now, what is the impact of EPA's decision on the HCC and

21   the cleanup that was done in the head and neck?  The top of

22   this same letter says, The enclosed map shows areas where the

23   Wood Debris Group found wood debris accumulations which will

24   require remediation.  Some of these areas are already shown

25   as remediation areas in the HCC's technical memorandum, but

1    much of it is not currently slated for remediation in the

2    HCC's report.  Both the area shown in yellow and gray and the

3    attached map will require remediation.

4        Now, what were those areas?  Again, we've used this

5    colored map, which more clearly shows yellow and gray rather

6    than the black and white map that was attached.  It shows

7    sizable areas along the shoreline that had to be added to the

8    cleanup being investigated by the HCC and ultimately

9    performed by Arkema and General Metals.

10       Now, as Your Honor notes, words matter.  Here, this letter

11   and what was written was not written for this lawsuit.  It

12   was not written by anyone having a stake in this lawsuit.  It

13   states EPA's position then, and according to Kris Flint,

14   EPA's position now.  What does it say?  "Much of it" --

15   meaning wood waste -- "Much of it is not currently slated for

16   remediation in the HCC's reports."  Then it says, "Areas

17   shown in yellow and gray in the attached will require

18   remediation."

19       Now, what is Ecology's position on wood waste?  Ecology

20   has the same statutory language, regulatory language that is

21   based on, under MTCA, releases or threatened releases of

22   hazardous substances.  MTCA defines "hazardous substance" in

23   subpart E as "any substance or category of substances,

24   including solid waste decomposition products, determined by

25   the director by rule to present a threat to human health or

1    the environment if released into the environment."

2       The MTCA regulations enforce sediment cleanups under the

3    SMS.  I have the citation there.  The Wood Debris Group did

4    its cleanup under the MTCA statute not under other statutes.

5    It was under the MTCA statute that regulates releases or

6    threatened releases of hazardous substances.

7       Now, let's talk about the SMS.  The testimony has been,

8    and it's obvious from the regulatory language and process,

9    that the SMS is the directors' rule defining deleterious

10   substances as hazardous substances.  SMS was enacted under

11   MTCA and Water Pollution Control Act.  It defines these other

12   toxic, radioactive, biological, or deleterious substances as

13   meaning various things, including organic debris.  Dr. Floyd

14   admitted wood waste is organic debris.

15      Log storage activities, meaning wood waste generating

16   activities, were known to be part of this definition before

17   the SMS regulations were enacted.  Weyerhaeuser claimed that

18   the wood products industry never knew about this and they're

19   flat wrong.

20      The wood products industry was involved in the sediment

21   advisory group that was formed years before the enactment of

22   the SMS and that participated in all phases of the enactment

23   of the SMS.  It was a sediment advisory group that proposed

24   this deleterious substance language.  The responsiveness

25   summary before enactment of the SMS specifically referenced

1  log storage.  Weyerhaeuser participated in annual reviews

2  thereafter.

3       And here, Your Honor, the proof is in the pudding.  When

4  it was blatantly obvious to everyone that wood waste was

5  regulated under the SMS and MTCA as a hazardous substance,

6  the wood products industry never objected.  When the

7  Michelsen-Kendall paper was presented that specifically

8  referenced wood waste, deleterious substance as being a

9  MTCA -- falling in the definition of a MTCA hazardous

10 substance, the wood products industry never objected.  Why

11 didn't they object?  Because they already knew it and they

12 had known it for a long time.

13      So what did wood products companies do?  What did the wood

14 waste companies do?  I talked about it a little bit

15 previously.  They went to Ecology to regulate them to avoid

16 EPA.  This wasn't the agency's decision to allocate or to

17 break up the work, it was request of the wood waste

18 companies.  Why did they do that?  They offered to do wood

19 waste faster.  And Ecology agreed because of expediency and

20 because of the assumption that much of the material, if not

21 all the material, would be PSDDA eligible.

22      So the wood debris companies signed an agreement.  They

23 signed an agreed order and consent decree under MTCA, not

24 under other statutes.  They cleaned up wood waste as a

25 regulated substance under MTCA.  And MTCA, of course, only

1   regulates hazardous substances as so stated in the statute

2   and in the regulations.

3       Now, what was Russ McMillan's testimony?  I know it was a

4   long time ago.  Mr. McMillan is a long-time Ecology sediment

5   specialist.  He testified that Weyerhaeuser was named a PLP

6   because of the wood waste, not because of other substances

7   but because of wood waste.  He also testified that Ecology

8   named Weyerhaeuser and Ecology named the two other wood waste

9   companies as PLPs in order to get their promised expedited

10  cleanup.

11      He testified that wood waste is a MTCA hazardous substance

12  because it reduces dissolved oxygen levels, it

13  contains phenolic compounds that leach the sediments, it

14  decays and produces ammonia sulfides, and it can be regulated

15  if it causes adverse biological conditions.  And here there

16  certainly were adverse biological conditions.

17      Mr. McMillan's testimony confirmed that of Dr. Michelsen.

18  He confirmed wood waste is a MTCA hazardous substance, that

19  Ecology agreed to take on the wood waste cleanup for

20  expediency, not as an allocation, but for expediency

21  purposes.

22      The SMS, she testified, had extensive pre-enactment public

23  review and comment.  The sediment advisory group included the

24  wood products industry, that log storage was one of the

25  unique discharges that was discussed and referenced in the

1   responsiveness summary; that it was recognized that bark

2   accumulations were an environmental problem in log storage

3   areas; that when referring to hazardous substances in the

4   Wood Debris Group documents, Ecology is referring to wood

5   waste; lastly, that deleterious substance is a MTCA hazardous

6   substance.

7        Then we have as an exhibit, one of the many that I can't

8   remember the exhibit number, which is the Kendall and

9   Michelsen paper that discusses the regulatory approach by the

10  Department of Ecology and the Army Corps in dealing with wood

11  waste in sediments.  And it's in this paper where they flat

12  out say wood waste is a MTCA hazardous substance, after which

13  the wood products industry never objected, never objected

14  because they knew that.

15       Now, agency determinations are given, should be given --

16  agency determinations of their own regulations are to be

17  given great deference.  That is certainly the situation here.

18  Parties are placed under a burden, as you know, Your Honor,

19  when dealing with the agencies.  And sometimes their

20  interpretations are fair, sometimes they're unfair.  But yet

21  their interpretations, their determinations under their own

22  regulations are to be given great deference and great weight.

23  It's certainly what happened here.

24       And what were those determinations?  By both EPA and

25  Ecology they declared wood waste to be a hazardous substance.

1    Why did they do so?  Because it is.

2        In fairness, that is what we're seeking is fairness, wood

3    waste drove substantial cleanup costs.  From that November

4    1998 letter there were large areas that now require

5    remediation because of wood waste.  Mr. Fuglevand went

6    through very carefully yesterday the data that shows what

7    drove the cleanup of various areas, and the cleanup of big

8    areas was wood waste.

9        Had EPA not required that wood waste be cleaned up, the

10   Department of Ecology certainly would have.  Wood waste also

11   substantially increased the cleanup cost.  It limited cleanup

12   options.  Low cost options such as capping and natural

13   recovery are not available, were not available in wood waste

14   areas.  All you could do is dredge.  Once you start dredging

15   you don't stop, you go to the bottom.  That is required.

16       That is what the Wood Debris Group did too.  It resulted

17   in a huge volume increase, 80,000 to 100,000 cubic yards,

18   approximately 20 percent of the total dredged.  Logs and

19   debris stirred up the sediments forcing re-dredging.  This

20   wasn't an unanticipated condition, but it was a condition

21   that had to be dealt with that resulted in more sediment

22   being dredged, more cost being incurred.

23       Abandoned creosote pile stubs and logs certainly slowed

24   the work, made it less efficient.  Logs required special

25   handling at greater cost, and the spikes -- hopefully I'll

1  get my spike back one of these days -- flattened tires,

2  again, added more costs, all of which put together, wood

3  waste caused not only more to be dredged but cost more money

4  to dredge.

5       With that, I will gladly pass the time to Mr. McCarthy.

6            THE COURT:  Thank you.

7       You got some histograms with you?

8            MR. McCARTHY:  I do.

9            THE COURT:  I would be disappointed if you didn't.

10           MR. McCARTHY:  I knew you would.

11      Your Honor, although Mr. Myers and I work closely together

12  on this, there are many hours in the morning probably where

13  we didn't quite avoid all overlap.  I'll try to avoid it.

14  Your Honor's questions got into some of the materials I was

15  going to discuss.  I'll try to focus it on what Mr. Myers has

16  not already addressed.

17      What we're going to start out with now is this third

18  question that this court has to address, plaintiffs believe

19  the Court has to address in order to make its allocation

20  determination in the case.

21      And that is:  What are the sources of wood waste and

22  chemicals to CO-14?  We think that the answer to the first

23  question is pretty easy.  What is the source of wood waste to

24  CO-14?  We think Weyerhaeuser is the sole source of wood

25  waste to CO-14, owned and operated CO-14.  Literally no

1   dispute about that.

2       More difficult is:  What is the source of the chemicals?

3   Let's start with chemicals that experts on both sides have

4   admitted are associated with wood waste.

5       We believe there is no dispute that wood waste causes

6   releases or threatened releases of hazardous substances.  The

7   Court should remember, although there is a dispute among the

8   experts about what the literature says, about what is

9   contained in wood and wood waste, samples taken at this site,

10  data generated by Dr. Boehm on behalf of Weyerhaeuser, found

11  4-methyl phenol in the wood waste sitting on the TEF yard

12  before it was ever disposed of in the waterway.

13      The presence of wood waste causes the release of hydrogen

14  sulfide and ammonia to marine sediments.  That is undisputed.

15  And the release of hazardous substances is a normal expected

16  consequence of dumping wood waste into the anaerobic

17  sediments of the Hylebos.

18      Now, there has been lots of debate about the presence of

19  4-methyl phenol.  There has been a lot of debate about the

20  presence of 4-methyl phenol in living wood.  However, it's

21  undeniable that Weyerhaeuser's consultants found it in the

22  massive piles of wood waste that accumulated on

23  Weyerhaeuser's property.

24      There is really no debate that trees themselves produce

25  the substituted phenols which are the 4-methyl phenol

1  precursors and that the biological and chemical processes

2  that generate 4-methyl phenol from those compounds are

3  present, including the bacteria and the microbes that act on

4  them, they're present in the living trees, and they're also

5  present in the trees after they're cut and sorted on a log

6  sort yard.  They're present in both living and dead wood.

7      The question of whether or not methyl phenols is present

8  in a living tree, however, we believe is somewhat of a red

9  herring.  The more relevant question is:  Does the dumping of

10  tons of wood waste into the sediments in this anaerobic

11  environment causes the release or threat of release of

12  4-methyl phenol?  because, remember, CERCLA liability is

13  based on the release or threatened release from a facility.

14  As Mr. Myers said, that is what we have here.

15      THE COURT:  You want me to shift the question from

16  whether or not the depositing of the wood into the

17  waterway -- into water, into still water, constitutes a

18  release or threatened release, and you want me to focus on

19  the Weyerhaeuser property as a facility itself that

20  unquestionably has these hazardous substances emitted into

21  the environment?

22      MR. McCARTHY:  Right, Your Honor.  We don't want to

23  lose --

24      THE COURT:  We can go back to midway or we can go

25  back to a number of them, what people -- what the regulators

1   did, from my recollection, is that they had sources that

2   related to Boeing chemicals -- they didn't go to Mr. and

3   Mrs. Smith down the road and said, You've got garbage there

4   so you've got one one-thousandths percent of the -- they look

5   at the chemical known hazardous substances, but the owner of

6   the facility is on the hook for whatever is leaching into the

7   environment.

8        MR. McCARTHY:  That is certainly an alternative

9   basis.  We can't lose track of the fact the only testimony of

10  the wood waste found 4-methyl phenol.  Dr. Boehm speculated

11  maybe it's coming from Kaiser air emissions.  But the air

12  emissions that Dr. Boehm tested on the TEF, he pointed those

13  air samplers, they didn't find any 4-methyl phenol.

14       THE COURT:  I'm not questioning the association of

15  4-methyl phenol with wood and its decay.  That is not the

16  issue with me.  The issue is whether or not -- all I answered

17  yesterday in my own mind is wood debris itself does not

18  contain -- wood does not contain a hazardous substance that

19  is released into the environment.

20       Now, I had questions remaining for today as to whether or

21  not the focus on a shift at some point from release of the

22  wood itself, dropping a piece of bark into water, still

23  water, versus what liability is there that derives from

24  simply owning the facility where this stuff has come to rest

25  and where all this stuff is happening.

1          MR. McCARTHY:  Your Honor, we do want to focus on

2     that issue, but we would like the Court to focus on the

3     evidence that was produced in this trial that when we sampled

4     the wood on Weyerhaeuser's facility -- I'm sorry, when

5     Dr. Boehm sampled the wood on Weyerhaeuser's property he

6     found 4-methyl phenol in the wood at levels up to 1400 parts

7     per billion, which are not insignificant.

8        Then Dr. Boehm sampled Kaiser Ditch sediments.  There is

9     testimony that wood waste got into the sediments through the

10    storm water at similar levels, slightly lower, and then again

11    in the dredge sediments found by the HHCG.  Mr. Farlow showed

12    that 4-methyl phenol demonstrated a strong statistical

13    correlation with resin acids, which is a chemical that --

14    there really is no dispute that is specifically associated

15    with wood.  We don't want the Court to lose track of that.

16          THE COURT:  I heard all of that.

17          MR. McCARTHY:  Getting back to the issues about the

18    facility and the release from the facility.  Industrial log

19    handling and related generation of wood waste does not

20    naturally occur.  Like mining waste, generation of wood waste

21    in an industrial marine log handling operation is an

22    artifical alteration rather than a naturally occurring

23    process or phenomenon, very similar to mining waste discussed

24    in the Iron Mountain case.

25        It's undisputed that Weyerhaeuser's operations disposed

1    massive quantities on its own facility.  We're not talking
2    about an alfalfa farmer here, Your Honor.  This is more akin
3    to a large industrial cattle or pig operation.  We're not
4    talking about someone throwing sticks for their dogs in the
5    Hylebos.  There is a large operation generating massive
6    quantities of waste.
7        And we think we can distinguish this from the *Serafini*
8    case, the PVC case.  What you have is you're throwing these
9    into an environment -- it's like turning -- throwing it into
10   an industrial chemical facility that manufactures at least
11   ammonia and hydrogen sulfide when you throw the wood in that
12   environment.
13       I would like to turn to the PAHs issue.  Although the
14   chemistry experts agreed on very little in this case, I think
15   they did agree that pyrogenic PAHs were the drivers as far as
16   chemistry was concerned in CO-14 and that there were really
17   only three potentially significant sources and those were
18   Kaiser, Weyerhaeuser TEF and the creosote dock, and storm
19   water.
20       Plaintiffs have never denied that Kaiser is the
21   predominant source of PAHs throughout the head of the
22   Hylebos.  I said that in the opening statement.  Your Honor
23   asked me the question when we were going through the
24   histograms, if you'll recall.  We've never denied that.
25           THE COURT:  I think Mr. Farlow testified the other

1   way.  He said that creosote was the predominant -- the

2   predominant source of PAHs in the waterway.  That was

3   counterintuitive to me.

4          MR. McCARTHY:  In CO-14, that was Mr. Farlow's

5   opinion.  We have no contest.  They generated wet scrubber

6   sludge from '47 to '74.  There is no question that the ponds

7   discharged to the ditch as a primary pathway.

8          THE COURT:  Here is the problem I have with this case

9   and the thing I think makes it so difficult.  Everybody is

10  looking for hooks to get wood debris into the calculus.  But

11  the real world reality is that PAHs were driving the cleanup,

12  as you've just said.  And wood was simply the nuisance.  Wood

13  is an enemy because of its volume.

14         MR. McCARTHY:  That's part of the problem, Your

15  Honor.

16         THE COURT:  Its chemistry is so small a part of this

17  problem.  It looms large because of its volume, simply by

18  virtue of -- and as Mr. Myers has indicated, junk and

19  everything that goes with it, tires and -- I mean, you know,

20  I sat through the first -- I know the wood debris was a pain

21  in the ass for the dredgers to have to deal with.  There is

22  no question.  It did drive the cost.  But we're talking

23  about -- we're talking about chemistry over here.  And if you

24  were -- if you were to put a scale and put chemicals

25  emanating from the wood versus the other things that are the,

1   quote/unquote, drivers, I mean, it's not a fair fight.

2           MR. McCARTHY:  Your Honor, in CO-14 in particular,

3   because of the biological issues, toxicity associated with

4   wood waste, not only did it drive costs because of volume,

5   but remedial options.

6           THE COURT:  Right.  And I should have said that too.

7   It limited your abilities to do a lot of things.  But what

8   we're trying to do is apply a scientifically oriented statute

9   to -- we're dealing with a side issue in order to get to what

10  the -- to have an excuse to get to the real issue, which was:

11  Your stuff, Weyerhaeuser, caused us a lot of pain and agony

12  and we think you ought to -- you ought to pay for it.

13      Reality is that in terms of what I've seen as the evidence

14  and applying this scientifically based statute, we're going

15  to find them liable for chemistry that they didn't create and

16  then look for -- try to translate that into clean up the mess

17  which is yours, which is the wood.

18      And they're dissociated.

19          MR. McCARTHY:  Well, Your Honor --

20          THE COURT:  I'm not saying it's not going to be the

21  ultimate outcome, it's just that --

22          MR. McCARTHY:  What is relevant about the chemistry,

23  though, Your Honor, is you have the CO-14 that is owned and

24  operated by Weyerhaeuser.  And assuming that Kaiser is the

25  predominant source, Weyerhaeuser is also a source of that

1    same chemical, the pyrogenic PAHs.  And as Mr. Myers said,

2    it's not molecules, it's measurable, you can see it.  You can

3    see it in the fingerprints.  Whether those are representative

4    samples, whether samples taken during remediation give you an

5    idea of how to quantitatively allocate, perhaps not.

6         THE COURT:  How should the Court evaluate where the

7    piles are themselves?  There hasn't been any subsequent

8    dredging after the work was put in.  And the solution has

9    apparently been natural recovery.  I noticed with interest

10   whenever we were talking about exceedances of SQOs, we were

11   talking about it without a document and without a

12   quantitative comparison to the plume, for example.  I took

13   that to mean the SQOs or exceedances are relatively modest.

14   I don't know that.  I assume that if they were huge that you

15   would had a moving van move the exhibit in to demonstrate it.

16        MR. McCARTHY:  You bet, Your Honor.  We were limited

17   to limited data.  You remember when Battelle did their study

18   under the dock they took very, very shallow samples near the

19   shore where you have to believe they were hoping they would

20   get something that looked like storm water.  One of those

21   samples --

22        THE COURT:  Regulators bought it, apparently.

23        MR. MYERS:  No.

24        MR. McCARTHY:  Mr. Myers is closer to the regulatory,

25   but if you look at 1700 piling dock, why do the regulators

1    say not to dredge in that area when you could keep it from

2    being disturbed again?  Well, I would --

3         THE COURT:  Marina --

4         MR. McCARTHY:  The marina was not 1700 pilings.  And

5    it was a commercial facility, not -- I'm sorry, it was a

6    pleasure boat facility, not a commercial operating log sort

7    yard.

8    To move 1700 pilings, what do you want to bet happens when

9    Weyerhaeuser ceases operations and that dock has to come

10   down?  Will another creosote piling dock go up there?  Will

11   there be remediation in the PAHs in the sediments?

12   But, again, with the sampling we are limited by the data.

13   They went six inches deep.  And -- but there was one core

14   there at P 400, which had SQO exceedances.  As you went down

15   in depth, they went up.  But they only went down a meter when

16   it -- you know, several meters to get down to where you would

17   expect to find the creosote that was deposited there in 1977

18   during the construction.

19        THE COURT:  But the reality is that the costs we're

20   fighting over here do not include costs related to underneath

21   the Weyerhaeuser dock.

22        MR. McCARTHY:  That's right.  They're right next to

23   the dock.

24        THE COURT:  I understand.  But in terms of the

25   concentration gradients, wouldn't -- doesn't science suggest

1    to us that there ought to be a -- the farther away you get

2    from the source, the lower the concentrations and not vice

3    versa?

4         MR. McCARTHY:  I perfectly agree, Your Honor.  I'm

5    from Colorado, so most of my cases are groundwater cases.

6    You don't have people disturbing the aquifer.  It's 10, 30

7    feet below.  You can see the perfect gradients.  You don't

8    have tugboats coming in, you don't have people dredging, you

9    don't have people diluting with tons of wood waste.

10        So as I think Mr. Dalton testified in this situation, the

11   concentration gradients, although you would like that to be

12   the simple answer, even in the red blob area, Dr. Boehm's red

13   blob, where were the lowest concentrations?  They were at the

14   top of Dr. Floyd's hill of Kaiser sediment.  Does that make

15   sense?

16        THE COURT:  I was surprised nobody dealt head-on with

17   the peanut until we got to the very end.

18        MR. McCARTHY:  I was hoping Mr. Coldiron would bring

19   up Dr. Floyd's figure and he didn't.

20        We talked about Kaiser.  Maybe we can skip through a few

21   of these.

22        Your Honor, this is the point that has to deal with the

23   orphan sharing and equity.  You remember that prior to 1960

24   Kaiser's discharge was to the Middle Turning Basin.  And as

25   Kaiser -- it was to the Middle Turning Basin and the

1    plaintiffs have born 100 percent of those cleanup costs of

2    the Middle Turning Basin.

3        And after 1960 the discharge changed to that area between

4    CO-14 and CO-13.  And as Kaiser is an orphan, the discharges

5    in that area have to be equitably apportioned too.  Bearing

6    in mind that the plaintiffs have born the cost of Kaiser's

7    waste discharge other places and the discharge of other

8    orphans at the site.

9        I think we talked about this.  I can go through this, but

10   simply the point here is that Weyerhaeuser is also a -- we

11   believe the significant source -- Your Honor had asked Are

12   there any other creosote sites around?  And Mr. Fuglevand

13   testified yesterday that creosote pilings are driving the

14   environmental investigation by the DNR at what just happens

15   to be a former Weyerhaeuser facility in Woodard Bay.  So this

16   really isn't an issue just unique to this site.

17       I'm going to talk briefly about fingerprinting and why it

18   matters in this case.  And as I stated a little bit earlier,

19   although the plaintiffs' chemical fingerprinting was based

20   upon sampling that was designed from environmental

21   remediation or environmental investigation and not for

22   forensics, it's the data that we have available.  And we can

23   see it limits its usefulness for quantitative allocation, but

24   it does provide useful information in identifying whether a

25   specific source, such as creosoted dock at the TEF, has had

1   an impact that you can see out there in the sediments.

2        Your Honor knows what we're doing with fingerprinting.  It

3   allows us to compare different patterns to make these

4   identifications.  And there are not many histograms.  I want

5   to go through this one more time.

6        The plaintiffs are seeking cost for dredging sediments in

7   CO-14.  And here we have -- here we have fingerprints of the

8   three culprits here.  We have, first of all, the sediments.

9   This is what we're trying to find out:  What releases caused

10  this?  Now, we know this is limited sampling, but every

11  sample that we took from the dredge barges -- and, again, it

12  wasn't scientifically designed to be representative, it's

13  just the ones that got samples -- but they were fairly well

14  distributed.  Every single one looked like this figure in the

15  upper left-hand corner where you had high fluoranthene to

16  pyrene ratios and you had the ski-slope pattern, as much as

17  Dr. Boehm hates that terminology.

18       We compare that to weathered creosote from Sooke Basin,

19  which is the lower left-hand histogram.  This was a

20  controlled scientific study that was looking at What does

21  creosote look like in a cold marine, still marine sediments?

22  And the Court can make its own comparison.

23            THE COURT:  Again, the histograms and the bi-plots

24  and all of that seem to be aimed at establishing that it's

25  creosote, not wet scrubber sludge out there that is being

1    remediated.  I mean, that's what I think -- what they're

2    doing.  And, you know, you're right at the -- everybody --

3    you have indicated in opening and closing that throughout the

4    waterway, the PAHs, it's wet scrubber sludge.  There is lots

5    of it.  Where did it come out?  It came right out of the

6    Kaiser Ditch in large -- there is also some air emissions,

7    perhaps, but came out --

8        So you've got -- the predominant source of PAHs is wet

9    scrubber sludge and it comes out the Kaiser Ditch right at

10   CO-14 or right there.  And it has -- and it has that plume.

11   Then you've got what you acknowledge to be a lesser

12   component, which is creosote.

13           MR. McCARTHY:  Right.

14           THE COURT:  And I guess I've never understood why

15   anybody is trying to prove it's one and not the other and we

16   don't simply -- again, it's part of humble decision-making.

17   You got one predominant; you've got one lesser.  And it seems

18   to me that, you know, this has been a useful exercise for

19   somebody in an academic level, but nothing I saw in this or

20   anywhere else was going to convince me, or apparently you,

21   that creosote was the dominant source --

22           MR. McCARTHY:  What it does show, Your Honor, this is

23   humble lawyering, is that it's there.  We -- again, these

24   dredge samples, they were -- someone filled up a bucket.

25           THE COURT:  You're saying notwithstanding what you

1    would expect from the concentrations gradient, we can

2    establish that creosote did make it in to -- did migrate

3    significantly --

4            MR. McCARTHY:  It had to be more than -- Your Honor,

5    the creosote you would suspect is closer to the dock.  But

6    where is the most activity in the Weyerhaeuser facility?

7    It's right at the log haul-out area, which is just west of

8    the dock.  So is it surprising that those sediments get

9    stirred up and you find them, like wet scrubber sludge, you

10   find that mixed throughout.

11           Now, did we get lucky or something?  I don't know how they

12   did the sampling.  They did it while they were doing

13   remediation.  Was it representative?  Certainly wasn't

14   scientifically designed to be so, but this is what we find.

15           And the point that I think that the fingerprinting makes,

16   Your Honor, is simply that it's there.  Can you use it for

17   quantitative allocation?  That's up to you and I think I know

18   what you think about that, but just want to make the point

19   that it is there and it's not molecules.  It's in sufficient

20   quantities.  We find it in every sample.

21           THE COURT:  I think at the end of the day it is less

22   than helpful in terms of problem solving.

23           MR. McCARTHY:  Fair enough.

24           THE COURT:  1700, you don't know -- you may know a

25   little bit about what fate and transport -- is that the term?

1    -- see how far it got out, but if you're looking at CO-14 as

2    a unit, I mean, I think at the end of the day the evidence

3    is, with or without histograms, that there is PAHs out there.

4    They were a nuisance that caused the dredging to be more

5    costly and that wet scrubber sludge was a more dominant

6    and -- a more dominant influence than creosote, but creosote

7    was definitely present.  And -- you know, I don't know what

8    more you can conclude from any of this stuff.

9         MR. McCARTHY:  Fair enough.  Fair enough.

10        Well, I guess, Your Honor, what we can conclude from that

11   is simply that it's there.  There are only two parties that

12   are possible sources and one of them is an orphan.  So when

13   we're dividing PAHs it's an equitable decision.

14        THE COURT:  Right, and the argument is they bought

15   property, it was contaminated with PAHs from wet scrubber

16   sludge and plus they've got creosote, and at least as we're

17   looking at CO-14, it's theirs.  I assume that is the

18   argument.

19        Now, they're going to have a different argument that the

20   family ought not be broken up and the chemical family started

21   out, probably created the need for a Superfund site and we

22   ought to keep that family together.  And for good or for ill,

23   Kaiser was part of the chemical group's family.

24        MR. McCARTHY:  Thank goodness we live in America

25   where the father doesn't decide or the government doesn't

1    decide who you marry.

2         THE COURT:  We don't live in a society that keeps

3    families together that well either.

4         MR. McCARTHY:  That's too bad.

5      Your Honor, I will skip through the last histogram and I

6    want to talk about -- we talked about plaintiffs'

7    fingerprinting.  For a moment I want to talk about

8    Weyerhaeuser's fingerprinting.

9         Admittedly, plaintiffs' experts relied upon the existing

10   data that was generated, not for forensic purposes, for

11   remediation.  Weyerhaeuser, however, specifically

12   commissioned a forensic study that was part of a $2 million

13   study to generate new data specifically for the purpose of

14   identifying sources, or should I say a source.

15        The Battelle study conducted in 1999 to 2000 was intended

16   for adversarial proceeding.  It was not for remedial

17   investigation or research.  And as part of that, Weyerhaeuser

18   chose to sample storm water impacted sediments in the Kaiser

19   Ditch to drive its fingerprint for wet scrubber sludge, and

20   then it chose to sample hydraulic fluid to fingerprint its

21   own site, in which I believe Dr. Boehm stated hydraulic fluid

22   readily degrades in the environment, so it was probably not

23   expected to be found in the sediments.

24        What is interesting -- as interesting as what Weyerhaeuser

25   chose to sample to set up its fingerprinting exercise, it's

1    just as interesting to see what they chose not to sample.

2    They didn't sample any wet scrubber sludge from the ponds,

3    never even asked if they could do it.  They chose not to

4    review Ecology files that had sampling data from the wet

5    scrubber sludge ponds that would enable them to establish a

6    fingerprint.

7         As I've discussed earlier, they chose not to sample the

8    deeper sediments, particularly under the dock.  And we

9    believe that if that had done we would have had much clearer

10   picture on what was going on as far as contamination sources.

11        Similarly, Weyerhaeuser did not sample the obvious TEF

12   sources of PAHs from other sources, the storm water catch

13   basins and the oil water separator sludge.  If you'll

14   remember, Mr. Wrecker and Mr. Shields, when they did their

15   analysis of other potential sources, one of the -- they --

16   especially Mr. Shields, he talked at great length.  That is

17   what you look at.  When you're -- outside of litigation

18   context, when these environmental consultants do a site

19   evaluation, that is one of the first things they look at,

20   catch water basins.  You get the signatures of all the

21   chemicals that are being used on the site spilled on the

22   site.

23        But there is really no mystery why Weyerhaeuser avoided

24   these obvious places.  It's because the $2 million study was

25   technical advocacy and not objective science.

1          KD-100, we all know where it is.  I told you this was the
2    last histogram so I will skip this one.  But KD-100, again,
3    it's a storm water source, a storm water signature.  And I
4    guess the presentation to EPA when they presented the
5    Battelle study was Oh, look, we'll call this wet scrubber
6    sludge which is in the shallow sediments storm water and
7    let's follow the breadcrumb trail.  Suffice to say, you find
8    the same signature in the shallow sediments everywhere.
9          I'll conclude on fingerprinting restating the obvious.
10   There is really no dispute Kaiser is a large source, but the
11   Weyerhaeuser's choices of what to sample and what not to
12   sample was designed to minimize its PAH contributions to the
13   water and to maximize Kaiser's.  And I think that
14   Weyerhaeuser's fingerprinting demonstrates a more complete
15   study would probably show that while it's not the sole source
16   or the predominant source, it certainly is a significant
17   source in this area of CO-14.
18          THE COURT:  Why don't we take our midmorning break
19   now.  Court will be in recess for 15 minutes.
20   (Court in recess.)
21          THE COURT:  Please be seated.
22      Mr. McCarthy, you may continue.
23          MR. McCARTHY:  We had a few more histograms, but I
24   think we'll move on to the fourth question.  And Question 4,
25   which is really why we're all here, is:  What is the

1      appropriate allocation?  And I'll be sharing a discussion of

2      this topic with Mr. Myers, but I'm going to start it off with

3      plaintiffs.

4          The Court has already decided that Weyerhaeuser is a

5      liable party.  And as everyone here knows, the Court has

6      broad discretion to equitably allocate the cost.  The

7      question here is:  What is the fair and equitable share that

8      Weyerhaeuser should bear given that the plaintiffs have

9      already born 100 percent of the costs thus far?

10         When we started out this case six weeks ago we put up the

11     slide, equity equals fairness.  And what we want to look at

12     are the views that the various parties have taken on what is

13     fair.

14         Weyerhaeuser's definition of fairness is -- today is

15     similar to what it was six weeks ago:  It pays nothing for

16     the cleanup of its own property, CO-14; it's responsible for

17     the wood fibers only, not the surrounding sediments that have

18     to be removed to dredge and remediate those wood fibers;

19     nothing for any of the orphans:  Kaiser, Asarco, Tacoma Boat;

20     Arkema and General Metals gets to pay 10 percent of the cost

21     of cleaning up CO-14, even though Arkema and General Metals

22     were not sources of wood waste or PAHs that drove the

23     cleanup; and Weyerhaeuser gets contribution protection under

24     MTCA for the wood waste cleanup even though it claims that

25     wood waste is not a MTCA hazardous substance.

1       Not only does Weyerhaeuser pay nothing, Weyerhaeuser

2   claims an offset in this case for investigating its own wood

3   waste problem, for cleaning up wood waste in front of its own

4   dock that was long designated for anticipated maintenance

5   dredging.  As part of Weyerhaeuser's view of the world,

6   plaintiffs also get to pay for Dr. Boehm's fees for blaming

7   Kaiser in the private allocation dispute.  And plaintiffs

8   also get to pay for the costs that Weyerhaeuser incurred

9   disposing of some PAH contaminated sediments in front of its

10   1700 creosote piling dock.

11       If we compare Weyerhaeuser's version to that of the

12   plaintiffs of what fairness would be in this case, we propose

13   that we allocate to Weyerhaeuser only a share of the net

14   costs, which as we stated before, that equals project cost

15   through the first season, dredging season, of 2004, not the

16   2005 costs, less the settlements received.  Weyerhaeuser

17   should be responsible for the cost of cleaning up its own

18   property and its log pen.

19       Arkema and General Metals have already paid a sizable

20   unfunded orphan share outside of CO-14.  We believe the

21   Weyerhaeuser should pay the unfunded orphan share inside.

22   CO-14 was its exclusive area of operations.

23       Weyerhaeuser should be responsible for the costs on

24   adjacent properties it impacted through its log rafting

25   operations in CO-12 and 13.  Weyerhaeuser should not get an

1   offset for investigating and cleaning up its own wood waste

2   problems or for the private allocation dispute with Kaiser.

3       And finally, we believe that Weyerhaeuser should pay its

4   fair share of future site-related costs based on the

5   proportion of it the Court decides is fair for the past costs

6   here.

7       THE COURT:  What do you mean by "site-related costs"?

8   Is that just any cost related to CO-12, CO-13, CO-14 in the

9   same proportion that the Court --

10      MR. McCARTHY:  No.  We believe if you decide, as we

11  propose, that 18.94 percent is their fair share of the cost,

12  if we have to do additional activities OM, et cetera, that's

13  their share.  We decide that right now.  What is their fair

14  share in terms of a percentage and apply that forward.

15      THE COURT:  Okay.

16      MR. McCARTHY:  Now, in deciding what a fair share is

17  the courts normally -- after they recite the Gore factors,

18  they typically --

19      THE COURT:  They ignore them, but you got to cite

20  them first.

21      MR. McCARTHY:  Even though they're not statute and

22  Congress decided not to put them in the statute.

23      THE COURT:  They did invent the Internet, after all.

24      MR. McCARTHY:  You look at -- what were the remedy

25  drivers?  Who benefitted from the cleanup?  We think it's

1    important here to note that Weyerhaeuser and the Wood Debris

2    Group determined the areas that the HHCG were going to have

3    to dredge.  Remember, they handed that map to EPA.  EPA

4    handed it to us.

5        Looking a little more detail at the specific factors, EPA

6    identified both the plaintiffs and Weyerhaeuser as PRPs at

7    this site.  The plaintiffs cooperated, conducted cleanup,

8    conducted all the investigations, have chased all the parties

9    that didn't participate.

10       Weyerhaeuser, on the other hand, declined to participate

11   in the CERCLA action.  And although you really can't avoid

12   them -- you can't -- you can't criticize them for trying to

13   avoid the CERCLA mess, they really have to sleep in the bed

14   that they made in allocation for making that decision to

15   avoid all these costs.  That has to be a consideration.

16       They made special efforts to avoid the CERCLA allocation

17   cost or, you know, the process, which is, Your Honor, as the

18   private attorney, I take it you've been involved in it, it's

19   more than the cost that we can quantify here.  It's more than

20   the invoices.  It's Mr. Cusma's time.  Mr. Lotsen has been on

21   the case since the '80s.  They have avoided all that and that

22   was their choice, but they should be held to account for that

23   in allocation.

24       It should also be remembered that although EPA didn't

25   pursue Weyerhaeuser because it had deep pockets that could do

1   the cleanup, that is what happens in my experience in CERCLA

2   because they expect us to go chase them.

3       We probably said this too often, but not often enough for

4   us or our clients, we paid 100 percent of the costs here.  In

5   CO-14, Weyerhaeuser's received 100 percent of the benefit and

6   paid nothing.

7       It's undisputed, or should be undisputed, that wood waste

8   in PAHs were the CO-14 remedy drivers.  And for those two

9   remedy drivers Weyerhaeuser is the last man standing and they

10  were the remedy drivers on its own property.

11      The evidence has also shown that Weyerhaeuser released

12  wood waste in CO-12, CO-13.  The operations on the Dunlap

13  property went from approximately 1966 to 1986, 20 years.

14  Weyerhaeuser began their operations as soon as Dunlap stopped

15  operating there, which is 21 years.  There is some impact and

16  we think they should bear responsibility for the wood waste

17  we removed in those areas.

18      Kaiser orphan share, how do we equitably apportion the

19  Kaiser orphan share?  Plaintiffs' proposal is based on the

20  fact that we cleaned up all orphan shares in the head of the

21  Hylebos, including Kaiser's.  They weren't just in CO-14.  We

22  recall Kaiser was discharging to the Middle Turning Basin for

23  at least 13 years before the waterway was extended.  Whatever

24  PAHs were left when we got around to the cleanup, 2004, we

25  cleaned that up.  And we got no help from anyone else other

1    than those who settled through EPA or settling out of this

2    lawsuit.

3        Weyerhaeuser was the sole beneficiary of plaintiffs'

4    cleanup of Kaiser's orphan share in Weyerhaeuser's property.

5        Now, the Court has noted that the parties should be held

6    to their agreements.  You've said that several times.  When

7    we agreed to conduct this cleanup, we did not agree to act as

8    Kaiser's indemnitor for Weyerhaeuser's benefit.  We're not

9    part of the same team.  Our operations are responsible for

10   different types of chemicals in different areas.

11       THE COURT:  Here -- just to sort of lay out some of

12   the options available to the Court.  Maybe these are things

13   Mr. Myers is going to touch upon.  For example, I think

14   Mr. Fuglevand made the point that Weyerhaeuser ought to be

15   responsible for all the wood because they're the last wood

16   debris group standing.

17       The Court could say Weyerhaeuser cleaned up the wood --

18   create a mythical world and say all that is out there is wood

19   and assume that it would have had to have been cleaned up on

20   the same basis that the other Wood Debris Group areas were

21   cleaned up, how much would that have cost, write a check, and

22   have a nice life, in which case, the same analysis applies to

23   the chemical groups saying you're the last two chemical

24   companies standing and you're responsible for Kaiser.  That

25   is one approach that could be taken.

1    The other approach could be that, Look, you've got

2    creosote, you've bought contaminated property that has got

3    wet scrubber sludge, there is -- seems to be a symmetry here

4    that CO-14 is most affected by both of those things.  You get

5    the total cost of cleaning up CO-14, because you benefit from

6    having the clean area in front of your property, and oh, by

7    the way, you get the deduction from that, a portion of the

8    total settlements that were made also.  That's an approach

9    that could be taken.

10    So, I mean -- when I say that plaintiffs, you know, stick

11    to your agreements, I'm aware of -- that neither side bought

12    in to Kaiser having any -- taking responsibility for

13    Kaiser's -- for Kaiser's property.  But, you know, those are

14    the -- I've got a number of options that I sort of tried to

15    figure out in terms of what would be a fair allocation of

16    responsibility.  But that's what I'm -- that's what I'm --

17    MR. McCARTHY:  We understand that, Your Honor.  And

18    believe me, on our side we thought:  What is a fair way to do

19    this?  And we came up with the proposal that we thought of

20    the most fair.  Is it the only way to divide up this pie?  By

21    no means.

22    THE COURT:  The problem that I have is the

23    plaintiffs' approach is that -- and Mr. Fuglevand is very,

24    very good at staying on message, I think, at least from a

25    bottom dollar standpoint -- and that is that we keep coming

1    back to basically a percentage that is roughly the cost of

2    removing all of the wood in the neck area.  And, you know,

3    that doesn't seem -- that doesn't seem entirely fair to

4    Weyerhaeuser either.

5         MR. McCARTHY:  Your Honor, I guess the way I look at

6    it is I don't quite see the mythical world where Weyerhaeuser

7    isn't a chemical contributor to CO-14.  And maybe that's my

8    staying on message.  I don't know.  I just don't see that.  I

9    don't see the evidence pointing to that.

10        And I think you start with CO-14 when you're talking about

11   dividing orphan shares -- if you're going to divide orphan

12   shares you would have to go, What is the total orphan share?

13   You don't have us share in their orphan shares and they don't

14   share in ours.  We cleaned up the orphans through the entire

15   waterway.  And under CERCLA, under Pinal Creek, even though

16   it's several liability, you share in all the orphans.

17        The Court can decide what is a fair way to do this.  If

18   you're going to divide CO-14 you say, Well, we should share

19   part of the chemical share for CO-14, we believe under Pinal

20   Creek that they have to share in the orphans beyond Kaiser

21   that we've been cleaning up.  We thought for simplicity to

22   deal with the orphan issues is let them take care of the

23   orphans on their property and have them share in the wood.

24        THE COURT:  All right.  I hear you.

25        MR. McCARTHY:  With Kaiser an important

1    consideration -- there is a dispute about it being an orphan,

2    but it bears repeating that they are in bankruptcy.  And as

3    far as we know, as of today, as of 11:00 Pacific time, we

4    haven't received a penny.

5         Although not directly part of the equitable consideration,

6    I want to talk a little bit about contribution protection

7    under MTCA.

8         Your Honor has made his preliminary thoughts on this issue

9    clear.  I would like to focus your attention to evidence that

10   was produced for the first time last Thursday, that 1999

11   draft of the consent decree that was drafted -- or -- either

12   by Weyerhaeuser or through -- came through Weyerhaeuser's

13   legal department, but the draft that the Wood Debris Group

14   presented to Ecology as their idea of contribution

15   protection.

16        And Weyerhaeuser specifically sought broad contribution in

17   the consent decree.  And that was to cover all the areas

18   where wood had been deposited in the waterway.  They didn't

19   seek contribution protection for an area-wide release for

20   everything.  They were looking for contribution protection in

21   those areas where wood had been deposited.

22        Where has wood been deposited in the waterway that

23   required cleanup?  The Upper Turning Basin and the neck.

24   Weyerhaeuser was aware we were cleaning up the their wood

25   debris in the neck and they were trying to get contribution

1    protection from the parties who were cleaning up wood debris

2    or parties who were cleaning up areas where wood had been

3    deposited.  That was us.

4         They sent that proposal to Ecology.  And what did Ecology

5    do?  Let's look at that.  I'm sorry, I didn't have time last

6    night -- I don't know how to blow it up.  If we look at the

7    language, Your Honor, the key language is Matters Addressed.

8    They tried to put into specific definition that applied to

9    contribution protection.

10        And it was, "Matters addressed in this decree shall

11   include all claims based on past and future remedial action

12   costs incurred by Ecology or any other entity in connection

13   with wood debris deposition in the Hylebos Waterway."  They

14   weren't seeking area-wide release, they were trying to get

15   contribution protection against us.

16        And what did Ecology do?  They crossed it out.

17        What was the compromise that Ecology suggested?  We are

18   not going to dump on the HHCG, or the HCC at that time.  We

19   were not going to cut off third-party rights who are not part

20   of this agreement.  But here is what we'll do for you.

21   Although you're only cleaning up wood waste in the Upper

22   Turning Basin, we'll give you a covenant not to sue.  The

23   State will not come after you for any matters related to

24   sediments for chemical contamination at levels exceeding

25   values set forth in --

1          THE COURT:  So your interpretation is that the

2     parties intended that matters addressed would have two

3     completely different meanings in two successive paragraphs?

4          MR. McCARTHY:  Yes, because they deal with two

5     separate issues.  You have one issue that is affecting

6     third-party rights, people who are not part of this

7     process --

8          THE COURT:  Matters addressed remains undefined in

9     contribution protection and it is specifically defined in

10    covenant not to sue, and they're totally and mutually

11    exclusive.

12         MR. McCARTHY:  Yes.  Your Honor, they crossed it out.

13    How difficult would --

14         THE COURT:  No question.  They could have solved this

15    problem very easily if they want to.  Harken back -- it's

16    consistent with secret memos, Let's do what we need to do to

17    get everybody in so that we can get this cleaned up.  If we

18    rely on ambiguity and maintain deniability, then who cares?

19    Curious process that is followed.

20         MR. McCARTHY:  Your Honor, where Ecology put the

21    period, this is the model language, this is the language of

22    the statute.  They didn't want to change it.  They said, No,

23    but here is what we'll do for you.  We're not going to burden

24    third party, you have to deal with that, but what we'll give

25    you is a broader release from the State than just the work

1    that you did.

2         One more issue on this, Your Honor, this is all about the

3    intent of the parties.  And Greg Jacoby on the stand admitted

4    that the Wood Debris Group's intent after they tried that

5    sally to get contribution protection against people cleaning

6    up other areas where there was wood debris, Mr. Jacoby said

7    his position never changed.  That is what he wanted and that

8    is what he thought the agreement meant.

9         After sending the 1999 proposed language to Ecology and

10   having Ecology reject it, he testified he never again told

11   them that this was their intent.  The only expressed intent

12   by either party is that draft 1990 consent decree.  That was

13   a proposal by the Wood Debris Group that was rejected.

14        THE COURT:  You think Mr. Jacoby misapprehended the

15   significance of that language and came forward with -- handed

16   you the argument that proves your point?  So he didn't

17   understand it?

18        MR. McCARTHY:  When we received that at, I think it

19   was 10:32, that's what an e-mail said.  Last Wednesday night

20   when we thought Mr. Jacoby was going to testify Thursday, we

21   received that at 10:32 and surprise, surprise, we were all

22   up.  When we read that there were some high fives going

23   around.

24        But to close on this issue, we do not feel there is any

25   evidence in the record of any express intent by the parties

1    to have the contribution protection extend to the work that

2    the plaintiffs performed in this case.

3         And with that, I would like to pass the closing of the

4    closing to Mr. Myers.  Thank you.

5         MR. MYERS:  One last point on the contribution

6    protection issue.  What Mr. McCarthy is talking about is also

7    directly consistent with the testimony of Russ McMillan who

8    said that it was never his intent as the negotiator for

9    Ecology to provide the Wood Debris Group with this broad

10   release --

11        THE COURT:  And the reason for my questions is I'm

12   not sure DOE had a dog in the fight.  I'm not sure they cared

13   whether -- it's one thing if Arkema and General Metals were

14   going to negotiate things.  You would expect when somebody

15   makes a proposal that's unacceptable, somebody else to flinch

16   and that's the way you get things done.  I have a hard

17   time -- if it were not for case law that said you can't

18   necessarily take a definition from the covenant not to sue

19   and apply it to contribution protection, standard rules of

20   contract instruction would say matters addressed in one --

21   defined in one area apply to other unless it's specifically

22   altered.  There is no -- you know, and so -- I'm not sure

23   these negotiators were aware of that quirk in the law.

24        MR. McCARTHY:  I think, Your Honor, these negotiators

25   were aware that the Wood Debris Group in the -- when they

1   negotiated in 2001 the Wood Debris Group had handed us that

2   map that said, You have to clean up these areas.  Everybody

3   was aware of that.

4       And I think that although -- with rules of construction I

5   agree with Your Honor.  But here I think at the very least

6   this is an ambiguous phrase.  Then you look outside the

7   contract, what was proposed and what was rejected and what

8   was agreed to.

9           THE COURT:  Okay.

10          MR. MYERS:  What was testified to by Mister --

11          THE COURT:  That's one -- but I mean, he needed some

12  help too.  I mean, he traveled in the wilderness for a little

13  while.  And that's not a criticism of him.  I'm sure he's

14  been involved in a lot of these and there has been a lot of

15  water under the bridge.  This is difficult to remember.  But

16  he needed some help.

17          MR. MYERS:  True.  But on that issue he said it was

18  never his intent -- it was never the DOE's intent to provide

19  the broad contribution protection that Weyerhaeuser is

20  claiming in this case.

21      And if Your Honor finds that there is an ambiguity it has

22  to be construed against the drafters of the document should

23  be to the detriment of Arkema and General Metals.

24      With that, I'll get back on topic.

25      Certainly through six weeks of trial, as lawyers we get

1   mired in the trees.  We get mired in the details.  We get

2   mired in the nitty-gritty of back and forth.  When doing

3   equity and fairness, when doing rough justice, it's

4   appropriate to look from the 40,000-foot level, or here the

5   $40-million level.  And that is what I would like to do.

6        What is fair?  What is fair is determined by the

7   circumstances.  The joy of reading CERCLA cases over the

8   years is that you can find a case that stands for almost any

9   proposition, and most opposing propositions because the

10  circumstances of each case is unique and so the equities and

11  the fairness are unique.

12       And here, you know, what is fair?  What is unique?  When

13  regulatory decisions were made by EPA and Ecology, when

14  cleanup work was done, when millions of dollars were spent,

15  everyone believed the same thing.  They believed wood waste

16  was bad for the marine environment.  They believed wood waste

17  contained and released phenols and methyl phenol that gave

18  the regulatory agencies a direct hook to regulate that.

19       It generated and released ammonia and hydrogen sulfide

20  giving them another hook as well as a biological hook to

21  regulate it.  Weyerhaeuser's arguments in 2007 had no impact

22  on the decisions made to clean up and the tremendous cost

23  incurred from 1998 to 2005.  And it's not fair for

24  Weyerhaeuser to get the benefit now of some new scientific or

25  legal argument that it never raised back then.  It laid in

 1    the weeds rather than standing in sunshine.

 2         THE COURT:  But doesn't the Court have to make a

 3    decision, especially on an issue with -- as profound a

 4    consequences as I think declaring wood debris to be a CERCLA

 5    hazardous substance, doesn't the Court have an obligation to

 6    the best of its ability to get it right?

 7         MR. MYERS:  I absolutely do, Your Honor.

 8         THE COURT:  This is not an estoppel argument that

 9    Louisiana Pacific in Georgia now is going to have to pay the

10    price for some nitwit in Washington who said, I don't believe

11    wood debris has any, contains any hazardous substances, but

12    when the decisions were being made these people did think

13    that was the case.  So I'm going to follow the

14    they-made-their-bed-let-them-lie-in-it approach.

15         MR. MYERS:  Your Honor, we think you get it right if

16    you rule that because this waste is placed under certain

17    conditions on their property it generates and releases

18    hazardous substances to the environment, that is a release of

19    a hazardous substance from its facility that Arkema and

20    General Metals spend millions of dollars to address.

21         Continuing on.  There is no logical reason for Arkema and

22    General Metals to pay to clean up Weyerhaeuser's property.

23    Arkema and General Metals cleaned up not only their own

24    property but all the other properties in that area.  Arkema

25    and General Metals paid the orphan share, as Mr. McCarthy

1  noted, everywhere.  Arkema and General Metals complied with

2  EPA's wood waste directive, 100,000 or so cubic yards, even

3  though neither was a wood waste party.

4       Let's look at the project cost.  I'll blast through these

5  quickly so we have a little time for rebuttal.  You heard

6  Mr. Ross, you heard the work that he did.  The legal standard

7  for project cost is, quote/unquote, accurate accounting.  He

8  looked at all the -- he determined that the costs were

9  incurred under the AOC and the consent decree.  He verified

10 assessment payments made by the companies.  He verified

11 invoice payments to the contractor by the HCC and PCW.  He

12 reviewed the oldest software used by the HCC from days gone

13 by and verified invoices from the fourth largest vendors.  He

14 did an accurate accounting.  That's not been disputed.

15      What did he come up with for Arkema and General Metals?

16 Their costs through the first season of dredging were over

17 $48 million.  That's how much these two companies spent, $48

18 million.  For that they've received less than 10 million in

19 settlements from various parties.  Major ones are bankrupt.

20      Legal support, this is -- CERCLA is not just a

21 consultant-driven process, it's also a legal-driven process,

22 as you're well aware.  Substantial legal fees over the ten

23 years to go through the different -- the AOC and the

24 different work schedules and the cleanup.

25      There were questions of Mr. Ross about legal invoices.

1    It's curious when Mr. Cusma testified, the client, the person

2    with knowledge of the work being done who reviewed the

3    invoices, how many questions did Weyerhaeuser ask him about

4    those invoices?  Zero.  I should add that to the zero column

5    on my chart.

6        All these -- his testimony was from his review of the

7    invoices.  It related to moving the project forward, getting

8    work done under the consent decree and the AOC.  They were

9    tied to doing work in the remediation.

10       Are there some errors in there?  I had the pleasure of

11   admitting to two in the Bean case totalling 1.2 hours, I

12   think, out of $100,000 in legal fees.

13       So the bottom line is the net cost incurred by the

14   clients, the plaintiffs, over $41 million they've spent to

15   clean up this entire mess.

16       Now the allocation to Weyerhaeuser, we propose 100 percent

17   of CO-14 goes to Weyerhaeuser because it's the long-time

18   property owner, long-time facility operator.  It purchased

19   the property already contaminated by Kaiser, used the

20   property for over 30 years, dumped thousands of tons of wood

21   waste.  Both Dr. Floyd and Mr. Fuglevand agreed 100 percent

22   of that is Weyerhaeuser's responsibility.  It was required to

23   be cleaned up because of high wood waste and PAHs, not just

24   PAHs.  This isn't just chemistry, Your Honor.  This is

25   biological effect from wood that drove the cleanup.

1       Arkema and General Metals were not a source of either.

2   The other PAH source is bankrupt, Kaiser.  There is no

3   evidence that this high wood waste would have qualified for

4   PSDDA open water disposal.  In fact, for the dredge

5   management units that Weyerhaeuser dredged closest to CO-14,

6   all four of those failed the PSDDA testing, but only one of

7   those had any chemical exceedances.

8       We've got the cost that Mr. Fuglevand tabulated if looking

9   at, What was the actual cost to dredge these different areas,

10   CO-12, 13, 14?  $4.6 million just to dredge CO-14 itself for

11   the reasons I stated earlier.  He allocated based on

12   contributions doing 50 percent for CO-13, 50 percent between

13   net wood and net chemical contributions; CO-12, 25 percent

14   for the wet wood, 75 percent for the chemical contributions

15   to come up with his percentage, which he multiplied by

16   41-million-dollar figure to come up with $7.792 million for

17   impacts on all three properties.

18       The results of the plaintiffs' allocation, as I've written

19   here, Arkema and General Metals are three properties

20   remaining are a combined 81 -- over 81 percent.  Weyerhaeuser

21   is 18.94 percent.  This allocation accounts for net -- actual

22   net cleanup costs, accounts for the last man standing.

23   Weyerhaeuser could have settled before Kaiser and Asarco went

24   bankrupt.  They didn't do so.  All the settlements that

25   predated that have no bearing on what we're doing here.  This

1   also accounts for the huge orphan share that is the elephant

2   standing in the courtroom that everybody does see.

3        Visually if you look at what the allocation is, it shows

4   that in CO-14 Weyerhaeuser gets responsibility of that -- for

5   that.  They get half of the net cost in CO-13, quarter of the

6   cost in CO-12.  Everything else is Arkema and General Metals.

7   All those other net costs are paid by Arkema and General

8   Metals.  You can see there are large areas where they had no

9   involvement whatsoever.

10       I'll go through a couple things on this slide.  If there

11  is no rational basis for divisibility, the Ninth Circuit said

12  you allocate pro rata, one-third, one-third, one-third.  Here

13  we've tried to present an option to that pro rata that seemed

14  to make more sense.  It focuses on who did what to whom, who

15  should pay for what.

16       You can look at property operations on a geographic basis.

17  That doesn't seem logical.  You could try to determine who

18  were the various sources of different things, but there is

19  not the data to do so.  That is a hopeless exercise, Your

20  Honor, we think, anyway.

21       And lastly, you have to take into account, again, the

22  elephant in the room.  These large orphan shares that are not

23  only Kaiser, but they're also Asarco and these other parties.

24       You've seen the map before showing the blue areas that

25  were designated because of wood waste.  You asked for cost to

1   dredge that are associated with wood removal, wood waste

2   removal.  We've given you those costs looking at both PSDDA

3   and landfill disposal.  Undoubtedly material would have gone

4   to both.  Mr. Fuglevand took 50 percent of the Dunlap

5   settlements and deducted that from the wood total to come up

6   with the 7-million-dollar cost figure, $7 million that does

7   not include Weyerhaeuser's chemical contribution.  It does

8   not include orphan shares, and it does not include all the

9   CERCLA transactional costs that the companies have had to pay

10  to get to the process of cleaning up.

11      Weyerhaeuser's allocation, on the flip side, is wood

12  fibers only.  It's a claim that it's paid enough because it

13  dredged in front of its own dock and that it spent $2 million

14  blaming Kaiser.

15      To go through Dr. Floyd's testimony, she was a key witness

16  for Weyerhaeuser.  Again, the flaws in her testimony are

17  number one, she focused on wood fiber only and ignored

18  everything else even though she admitted it's impossible to

19  remove wood fiber.  She doesn't assign Weyerhaeuser any

20  liability for chemical even though she admitted PAHs and

21  hydrogen sulfide were from Weyerhaeuser's property.  She

22  constantly changed her opinions as to wood fiber volume.  One

23  day it's 13,000, next time it's 7000 to 8800, then it's 5500,

24  then it's 5000.  Pretty soon we'll be adding wood waste in.

25      She changed her opinions on whether log rafts generate

1    waste.   At first it was 5 percent in CO-14, now it's nothing.

2    She changed her opinion on whether Weyerhaeuser was liable in

3    CO-9 and 13.   Between her export reports and testimony her

4    opinions have turned 180 degrees.

5         She misuses bathymetry data to come up with estimates of

6    releases and volumes that are completely erroneous and

7    inappropriate.   She, in fact, claimed that one to two feet of

8    Kaiser sludge remained in the waterway in the navigation

9    channel following the Army Corps dredging in 1972 when, in

10   fact, the Army Corps dredged below that -- dredged below the

11   1969 line, several feet below the 1969 mud line that predated

12   any of those releases.

13        Her testimony -- in her testimony she claimed EPA and

14   Ecology met or did one thing when the EPA and Ecology

15   witnesses testified to the opposite.   She claims sediment was

16   resuspended by ships floating by at low tide when the cleanup

17   study report documented the resuspension happened once in a

18   while and was caused by propeller thrust.   She failed to

19   assign Weyerhaeuser any portion of the huge orphan share.

20   And lastly, she claimed that chemicals influenced

21   Weyerhaeuser's dock maintenance dredging when the evidence

22   showed chemicals had nothing to do with that.   They decided

23   where to dredge well beforehand.   The chemicals didn't drive

24   anything.

25        Lastly, Your Honor, to conclude, we believe Weyerhaeuser

1    should pay the cost to clean up its own property, to pay the

2    cost to clean up adjacent properties that it impacted.  We

3    believe that allocation is fair or at least equally unfair

4    under the circumstances.  We believe it's reasonable.  We

5    believe it shares the pain.

6              THE COURT:  Thank you very much.

7              MR. KLEIN:  Your Honor, on behalf of Weyerhaeuser

8    Mr. Coldiron and I would like to say that it has been a

9    privilege to present this case to you.

10         Now, Mr. Coldiron alluded yesterday to the tremendous

11   amount of time, effort, and expense that Weyerhaeuser has

12   gone to in order to defend itself against these claims that

13   creosote was the predominant source of PAHs in CO-14 and that

14   Kaiser wet scrubber sludge wasn't there, which turned out to

15   be a huge issue in preparing the defense of this case and

16   fortunately appears it's been recognized that not be the

17   issue that the plaintiffs tried to make it out to be.

18         But that's the chief example of extreme attempts the

19   plaintiffs have gone to blame Weyerhaeuser in this case while

20   ignoring that Weyerhaeuser was a performing party in the same

21   geographical area, neck and Upper Turning Basin, which

22   comprises a large part of the plaintiffs' site.

23         Now, Your Honor, I'm going to present -- we divided this

24   in two parts.  I'm going first.  I've got a list of the

25   topics that I'm going to present here.  I'm not going to read

1   them to the Court, but basically I'm going to deal with some

2   of the legal issues, including the construction protection

3   and hazardous substance issue and also talk about the cleanup

4   driver and Mr. Fuglevand's allocation.

5       Then Mr. Coldiron, later, will be talking about some of

6   the more factual issues as well as some of the legal issues.

7   He's going to finish up with a very nice, we think, very

8   cogent explanation or recommendation to the Court about how

9   the allocation should be done in this case.

10      So let me start with the contribution protection.  I

11  wasn't sure how to go about this, Your Honor.  I have a

12  presentation with a lot more slides, but I didn't know what

13  the plaintiffs would do.  They couldn't let it rest.  So I've

14  got to address it briefly.

15      Let me try and do it this way.  I have slides with Russ

16  McMillan testimony on it to remind the Court about a few

17  things.  Maybe we'll start first with this slide here, and

18  what we have here addresses that intertidal area exception

19  argument that the plaintiffs were originally making, haven't

20  raised here today, and seem to have decided to drop.

21      But, you know, when you talk about what matters addressed

22  means, you do look at the definition of "site" in this

23  document.  And we originally said site means the whole HWDS

24  except the intertidal areas where the non-Wood Debris Group

25  parties are cleaning up chemically contaminated sediment.

1   They said, Oh, no, the exception clause modifies site, takes

2   out the neck where we cleaned up chemically contaminated and

3   it doesn't modify intertidal areas.

4       Then they got the Court to open the issue again with their

5   motion to reconsider, in part by promising that Russ McMillan

6   would come in shed light on this.  Here is what Russ McMillan

7   actually said.  After we first asked him about the

8   understandings about who was going to do what, then I asked

9   him, "Wasn't it also believed that individual property owners

10  were going to do intertidal cleanups?

11      "Answer:  Yes.

12      "And that is because they could reach those areas from

13  their upland sites, right?

14      "Yes."

15      In other words, he perfectly supported what we had said

16  was the reason for that intertidal area exception.  And he

17  agreed that the site at issue for the -- even for the

18  contribution protection is the Upper Turning Basin and the

19  neck.  So we frankly can't understand why the plaintiffs

20  still are contesting this issue.

21      But let's go on to some more of Mr. McMillan's testimony.

22  Mr. McMillan testified about the intent of the parties.  And

23  in three different ways he said that the intent was to

24  protect Wood Debris Group against contributions for its own

25  actions.  But that makes no sense, as we've argued

1    previously.

2         He said that would apply to both characterization and

3    cleanup, but the primary threat at the time the consent

4    decree was entered in to and the negotiations occurred, as

5    people knew, was the HCC and the work that they would be

6    doing in the neck.

7         And furthermore, Your Honor, I would also like to point

8    out that it's not the intent of Ecology that controls here,

9    it's the intent of the parties.  And Mr. McMillan was

10   extremely weak on what Ecology's intent was and it made no

11   sense.

12        And then, furthermore, we had those -- that attempt by the

13   plaintiffs when they reopened on the motion to reconsider to

14   talk about the four small areas in the Upper Turning Basin

15   and to say that contribution protection is limited to the

16   geographic area, the Upper Turning Basin, because that's

17   where those -- that little bit of work was done.

18        Well, we asked Russ McMillan about that and he said, just

19   summarizing his answers here, that wasn't even part of the

20   consideration, didn't even play a factor into it.

21        We've shown through affidavit and response to our motion

22   that -- as well as evidence at the trial that J and G area

23   was intertidal so it is excepted out.  Two other areas, which

24   were Puyallup tribe and Port of Tacoma, had no wood debris so

25   there was no threat there.  Other areas, small natural

1   attenuation area at Weyerhaeuser's dock which only had

2   monitoring costs in the future which has now been dredged.

3         So we get to this document, Your Honor, which is provided

4   by Mr. Jacoby.  And we looked at that as cinching the deal.

5   It shows that the Wood Debris Group was asking for

6   contribution protection for the entire waterway and Ecology

7   is coming back and saying no, but they're taking -- what

8   they're doing with matters addressed in the covenant, even

9   though they took it out of the contribution protection, it's

10  saying the same thing.  It's saying matters addressed

11  include -- it doesn't say it's all they are, it says it

12  includes all matters related to chemically contaminated

13  sediments which has to be at the site, which has to include

14  the neck as well as the Upper Turning Basin and includes work

15  done by the Wood Debris Group -- excuse me, by the HCC, now

16  HHCG.

17        And furthermore, when it says in connection with wood

18  debris deposition, the work that the HHCG did was in

19  connection with wood debris deposition.  That's why they have

20  a contribution claim.

21        So, Your Honor, we think it's clear from the document that

22  we do have contribution protection, and hopefully enough said

23  about that.

24        Now, Your Honor, to kind of gently balance the equation

25  here, where we're constantly being accused of not being a

1    performing party at this site, let's talk a little bit about,

2    as we tried to do at the start of our case, the plaintiffs'

3    responsibilities.

4         We know they spent the money.  But there does seem to be

5    attempt at trial to minimize their shares here, particularly

6    on the part of General Metals.  When I was cross-examining

7    Mr. Fuglevand and we talked about:  Is a 30/30/30 split fair

8    among General Metals, Arkema and Kaiser?  Mr. Fuglevand is

9    not going there, didn't think about that.  But we want the

10   Court to think about that.

11        Now, it may not be exactly 30/30/30, but if you're talking

12   about rough justice that seems about as good to us as

13   anything else based on evidence.  And I'm going to go through

14   that quickly.  That leaves 10 percent for Weyerhaeuser and

15   the other parties.  You know, it doesn't -- it doesn't

16   remotely approach the 18.94 percent that the plaintiffs have

17   attributed to Weyerhaeuser.

18        I think what you'll show and what we'll see is that

19   Weyerhaeuser's share is a whole lot less than 10 percent.  I

20   don't in any way indicate that we're accepting 10 percent by

21   that example that I'm giving about how to divide up the

22   shares.

23        But the ROD told us that, of course, Kaiser was a major

24   source of PAHs; that Pennwalt, now Arkema, is a major source

25   of arsenic; that General Metals, in time here it said, was an

1    ongoing source, I believe is what it says, of PCBs.  They

2    were the only party identified in the ROD relating to PCBs.

3    Of course, Weyerhaeuser was not included in here.

4         Then when we get to the 2000 ESD, we have it confirmed

5    again, Ecology is saying both Dunlap yard and Arkema are

6    sources, General Metals is a source, and Weyerhaeuser is not

7    on there.

8         Arkema operated on the waterway for many years.

9    Dr. Shields only calculated a loading of arsenic to the

10   waterway from 1965 to 1993, but it was 225,000 pounds.

11        When you talk about what dwarfs what, surely Arkema's

12   manufacturing facility dwarfs all other sources of arsenic,

13   even the log yards that had Asarco slag, which Weyerhaeuser

14   did not.  That 225,000 pounds of arsenic is largely

15   attributable to this pesticide or herbicide named Penite that

16   the Arkema facility manufactured, I think it was starting

17   back in the 1940s.

18        So all we ask is that the Court not lose sight of the fact

19   that there is a reason that the plaintiffs were the

20   performing parties.

21        THE COURT:  Let me tell you, I understand that

22   historical genesis of all of this.  I've jokingly said that

23   our senators were so strong in those days that they thought

24   this was another -- they saw Superfund, they saw the word

25   "fund" and thought, What a great deal for bringing money to

1   Washington.  And Maggie and Scoop just said, Here we are,

2   here we are, and the rest is history.  Everybody starts

3   looking at Commencement Bay and here we go.  I understand

4   that this -- that is why I made the point yesterday.

5       I think Weyerhaeuser moved to a Superfund site; they

6   didn't create it.  But I think you need to deal with the

7   issue at some point, and I'm sure you will, of the facility

8   and coming up with a -- you know, a loose percentage of the

9   total neck costs and so forth is less appealing to me than

10  trying to look at what is going on in the area.  And the

11  facility argument is something that needs to be dealt with.

12  Maybe Mr. Coldiron will deal with it.  I'm focussing on

13  CO-14.

14          MR. KLEIN:  We're definitely going to get there.  I

15  wanted to stress General Metals a little bit under PCBs,

16  particularly because it leads into my Weyerhaeuser's

17  contribution claim discussion.

18      Here we see with regard to General Metals -- I guess I

19  should preface this by saying the Court has had some things

20  brought to its attention regarding whether there might be

21  other sources, like Kaiser PCBs, instead of General Metals.

22  There was some questions asked about, What about this

23  five-exceedance factor in front of the Kaiser Ditch when

24  there is a natural attenuation area for PCBs in front of

25  General Metals?  And I did want to address that.

1      Dr. Shields showed with this exhibit an inspection

2  summary, and I'm going to go to the next one which is blown

3  up here.  I think it was Mr. McCarthy just a little while ago

4  said that the best evidence of releases and concentrations is

5  in the catch basins.  Here you see in the catch basins at

6  General Metals PCB concentrations range from 21,000 to 31,000

7  parts per billion.  That is huge.  That dwarfs anything else.

8      The plaintiffs are trying to make it seem like Kaiser is

9  the source of those PCBs, but the one incident that was

10  anecdotally referred to in 1987, Mr. Recker showed that that

11  was identified quickly, managed, controlled by Kaiser,

12  sampled, and there was no -- there is no real evidence of

13  releases by Kaiser of PCBs to the waterway, but we do have

14  evidence of 162 solid pure pounds of PCBs that go a long way

15  from General Metals.  And, of course, this is conservative,

16  Your Honor.

17      Furthermore, on top of that we were the ones who brought

18  to the Court's attention that the berthing area in front of

19  General Metals' bulkhead, where they claimed natural

20  attenuation shows there is not really that significant of a

21  source of PCBs, was dredged in 1986 and 1988.  Before it was

22  dredged it had 4.9 parts per million or 4,900 parts per

23  billion of PCBs.  So there were PCBs there.

24      Yesterday I went through this document with Mr. Fuglevand

25  because it really did seem on his direct rebuttal testimony

1  that he was trying to also get the Court to believe that PCBs

2  were not an issue in CO-14 either, that they either weren't

3  there or if they were there, they were only there at an

4  exceedance factor below the SRAL, which was a complete red

5  herring we've heard about, so I want to deal with it right

6  now, which is, you know, if we're going to talk what really

7  happened in reality, not just in CO-14, but except for the

8  General Metals' area they didn't attempt to do natural

9  recovery in other areas of the waterway.  They had to go

10  through a process to do that.  Yes, there was a process, but

11  they didn't use it.

12      So they keep going back to what they could have done or

13  hypothetically what other areas could have been done with

14  natural recovery because the PCBs were above 300 but less

15  than 450.  But they have to make a demonstration that there

16  will be recovery within ten years and get EPA to buy off on

17  that and they never did that.  So that is a hollow claim.

18          THE COURT:  Their argument would be because of the

19  bioassay failures, because of wood, it would have done no

20  good to begin that process because the PCBs would have been

21  overshadowed by the bioassay failure.  I don't know if it's

22  the argument that would be made.

23          MR. KLEIN:  I think that might have been their

24  argument.  The bioassay thing, they didn't do bioassay

25  testing in CO-14.  So again, that's a hypothetical.  They

1    didn't do that in what they actually did.  Furthermore, if

2    you might be able to do natural recovery on a slope away from

3    the channel, you can't do it in the channel or near the

4    channel with these large ocean-going vessels.

5              THE COURT:  I know and I remember their approach was

6    once and done.  So they decided they were going to dredge --

7    when in doubt dredge.  I think was the approach they took.

8              MR. KLEIN:  That had nothing to do with Weyerhaeuser.

9         Just quickly, yesterday I showed that Mr. Fuglevand had

10   omitted, to make sure the Court did understand, that PCBs

11   were found at depth in CO-14.  PCBs were also found

12   throughout the waterway, as we show.  And I guess the

13   plaintiffs can claim, Well, those are Kaiser's.

14        But we think the evidence, the preponderance of evidence,

15   shows those PCBs are General Metals'.  And the regulatory

16   agencies didn't do anything to identify Kaiser as a source of

17   PCBs after years and years of study at this site and plenty

18   of opportunity for comment.  General Metals is the one that

19   was identified and General Metals is responsible for the

20   PCBs, which leads me to our contribution claim, Your Honor.

21        What we're talking about here -- is in the yellow area,

22   right there, as the Court knows, what we have put up here is

23   the cost related to Weyerhaeuser dredging that area.  There

24   was a PCB hit in there greater than SQOs.  It's

25   Weyerhaeuser's position that the only logical explanation for

1    that is General Metals.  There is no credible evidence were

2    they to get back up here and rebuttal and argue that it came

3    from Weyerhaeuser.  We didn't have PCB transformers.  That is

4    not a valid explanation.

5         And, you know, Your Honor, I should also maybe comment

6    that when you get to 300 parts per billion PCBs you've got a

7    significant amount there.  You know, it's not just trace or

8    as they've said, It's ubiquitous in the waterway.  That's not

9    background.  That is not what is out there in the

10   environment.  Something happened to put that much PCBs there.

11   And it had to come from somewhere.

12        Mr. Coldiron will talk some more about our evidence about

13   the measured net circulation pattern toward the head.  But

14   given what General Metals released in the waterway in their

15   area, how it spread, including into CO-14, it's reasonable to

16   conclude it did move up the waterway and those are General

17   Metals' PCBs.

18        We've a MTCA counterclaim for the amount that we dredged

19   there.  We've revised the exhibit based on -- Dr. Floyd's

20   generously given the plaintiffs a little bit of credit there

21   of 25 percent.  So we revised that counterclaim.

22        This next slide shows -- one you've already seen showing

23   that hit upon which this counterclaim is based.

24        Next slide summarizes what I've been saying, there was

25   1350 cubic yards of sediments with PCBs above the SQOs that

1   we dredged and disposed of and that we believe General Metals

2   is liable for those.

3       If you recollect that slide I just showed, we had the

4   three red shaded areas that had PAHs exceeding SQOs that

5   Weyerhaeuser dredged.  I think it's been made plain here if

6   Weyerhaeuser didn't dredge those areas then the plaintiffs

7   would have had to.

8       Now, we're not saying they're the plaintiffs' chemicals,

9   but the plaintiffs were required to clean them up or would

10  have been required to clean them up if we didn't.  That may

11  be a novel issue under MTCA that the Court needs to decide.

12  But we think that's a valid reason why under MTCA the

13  plaintiffs should be required to absorb those costs.

14      If the Court believes otherwise, then alternatively we

15  definitely think that Weyerhaeuser should receive credit when

16  you're discussing or thinking about orphan share credit for

17  those PAHs because they were Kaiser wet scrubber sludge.  And

18  it's not just in CO-14 that wet scrubber sludge existed.  We

19  showed how it moved up -- the Landau report showed how it

20  existed.  We showed how it moved up through CO-14.  There had

21  to be a reason that Weyerhaeuser had to do all that dredging

22  right after it began operations there and put in the floating

23  walkway.  That was the Kaiser wet scrubber sludge delta

24  moving up.  We took it out.

25      We should get some credit on the orphan share calculation

1   for that.  Mr. Coldiron will address that in a little more

2   detail.

3        So there is my slide.  I've already talked to this, Your

4   Honor.  Let me go into CO-12 and 13.  Because this one really

5   bothers us, Your Honor, that the plaintiffs would be saying

6   that we owe anything for wood in CO-12 or 13.  They seem to

7   have completely ignored the Dunlap yards operating for over

8   the half the time we're talking about.  I have a series of

9   aerials here that I want to go through.  Maybe I'll move over

10  here and keep my voice up to do that.

11       First one shows a pre-Weyerhaeuser and pre-Dunlap.  You

12  still got rafting in the waterway.  Next one -- I'm going to

13  go through these very quickly -- shows the same thing.  Next

14  one shows the Dunlap yard now starting to operate and still

15  Weyerhaeuser not operating.  Next one is showing the logs and

16  the rafting in the waterway in front of the Dunlap yard

17  pre-Weyerhaeuser.  Next one moves, I believe, to May 1970,

18  Weyerhaeuser still not in place and Dunlap operating in the

19  waterway.  And yet the plaintiffs are just ignoring this

20  evidence that the Dunlap tenants are responsible for wood

21  accumulation in these areas.

22       The next one is the May 1978 aerial photograph.  And here

23  Weyerhaeuser is up and running but so too is the Dunlap yard

24  extremely active.  Just as an aside, I would like to point

25  down here near the Wasser Winters yards where you see log

1   rafting because I have a comment or two to make about

2   Dr. Michelsen, who said, Well, that 1987 log rafting study

3   that didn't show a correlation between 4-methyl phenol and

4   log rafting that Ecology had done, well, that wasn't valid

5   because the samples were taken down at Wasser Winters where

6   they don't log raft.

7        Well, let's go to some more of these.  They sure do seem

8   to be log rafting down in that area now.  Again, Weyerhaeuser

9   in operation, Dunlap out of operation.  And this area is

10  being used a little bit, but not by very much.

11       Furthermore, Your Honor, we've showed that CO-13 is

12  distinct from CO-14.  Again, Dr. Floyd presented this

13  bathymetry to show the mound in front of CO-14 as you would

14  expect and the similar, perhaps lesser amount in front of the

15  Dunlap yard just as you would expect from the Dunlap yard

16  operations with the gap in between.

17       And, Your Honor, I know you've expressed some skepticism

18  about the bathymetry, and Mr. Coldiron and I would like to

19  address that.  And basically I'm going to show --

20       THE COURT:  I've expressed skepticism at the

21  criticism of the bathymetry because it has been used so

22  extensively by so many parties in two successive cases.  I

23  recognize the limitations and not everything is perfect.  And

24  that is -- that was the subject of my observation.  If

25  bathymetry is as bad as people argue, we sure are using it an

1   awful lot to make the various arguments on both sides.  That

2   was my comment.

3          MR. KLEIN:  Right.  And I appreciate that.  That ties

4   in to what I was going to say about it is that the experts

5   agree that it's reliable within plus or minus a foot.

6   Dr. Floyd testified how it's frequently used at a variety of

7   other sites to make decisions.  We're under water here.  We

8   need some evidence.  This is as good as it gets along with

9   the camera.

10     For this purpose it shows us that this -- this was

11  occurring as I just described.  I'll comment plaintiffs'

12  experts use bathymetry as I'll be showing in a bit.

13     I alluded to the cameras.  I think Dr. Floyd -- Dr. Floyd

14  talked about how there is really no wood in CO-12.  Here you

15  see one camera shots that she showed to that effect, which

16  actually I believe was originally a Striplin interpretation

17  with which Dr. Floyd agreed.

18     I'm not going to take a lot of time to do this.  I never

19  got around to it with Fuglevand.  If you look at the barge

20  loading logs, which I believe were Exhibit No. 389, it's a

21  multistep process.  I doubt that the Court's really going to

22  be wanting to do that.  But if you were to actually look at

23  that for CO-12 and you were to look at these different areas

24  in CO-12, such as H-20 and H-21, and you were to actually go

25  and look and see what the observations are, you would see

1    things like, you know, November 1, 2004, lane H, negligible

2    wood debris.  Same date, lane H further along, negligible

3    wood debris, dredged up log 14 by 40 feet.  11/1/2004,

4    negligible wood debris, one decomposed log.  11/7/2004,

5    negligible wood debris.  11/7/2004, negligible wood debris.

6    I'm not going to keep going on, but there isn't that much

7    wood there.

8         THE COURT:  Let me orient you because what I'm

9    looking at -- I'm not looking at raw percentages of the

10   total.  I'm not looking at CO-12 and CO-13.  I'm looking at

11   CO-14.  And what makes sense for Weyerhaeuser to be

12   responsible for as -- as buying a piece of property -- you

13   know, I outlined the bases of Weyerhaeuser liability.  I've

14   tried to express that I don't think you're upland operations

15   contributed very much to chemicals in the waterway.  I think

16   that your creosote pilings contributed some, but in relation

17   to wet scrubber sludge it contributed relatively minor

18   amounts of PAH.

19        And I tried to indicate you bought property that contained

20   an awful -- by, I think, your own testimony, a lot of wet

21   scrubber sludge that came from Kaiser and then was deposited

22   on your property.  It seems to me that those are the areas of

23   vulnerability at CO-14 that need to be dealt with.

24        And the question is:  Is it fair to say you pay the total

25   cost of dredging CO-14 and that takes care as a surrogate of

1    all -- any orphan share anywhere else because you're taking

2    the lion's share of the principal source entry point into the

3    waterway?  And that way whatever pilings did or did not

4    contribute you've taken care of.  Or is there something

5    other?

6         I'm really not looking at CO-12, I'm not looking at CO-13,

7    and I'm not looking very carefully, again, in an -- due

8    equity kind of a mode at -- I generally accept the

9    proposition that General Metals was the largest contributor

10   of PCBs to the waterway.

11        Give you all of that, what do we do about this CO-14 issue

12   which is a significant cost to clean it up?

13        MR. KLEIN:  Okay, Your Honor, let me skip the rest of

14   12 and 13, then.  I'll pass through Mr. Dalton's slide about

15   no accumulation there and my summary slide.  Let me go on to

16   the cleanup driver, and I think this will start to get into

17   some of what you're more interested in, at least from the

18   critique aspect.  And Mr. Coldiron will look at it more

19   affirmatively.

20        THE COURT:  I'm looking at several liability,

21   Weyerhaeuser ought to pay some fair portion, some fair amount

22   for what it is responsible for, what mess it made and, you

23   know, orphan share, the allocation are -- they say -- the law

24   says what they say, that is, Mr. Myers' argument that that is

25   just shared pain.  That's shared unfairness.  So that's what

1    I'm looking at.

2         MR. KLEIN:  Let me deviate from my slide just a

3    little to try and address that some and maybe with CO-14

4    convey the following way.  A lot of what I'm going to do in

5    the next part in talking about the cleanup driver and

6    criticizing Mr. Fuglevand's allocation is to talk about the

7    volume in CO-14 and the layer there.  Just keeping it very

8    simple, there is -- there is a layer there.  That is what

9    we've been trying to show.  It's not perfectly even.  It's up

10   and down.  It's the 1971, '72 bathymetry line where you've

11   got the Kaiser material below it.  And below even the Kaiser

12   material you've got dredging where the plaintiffs went down

13   below the deepest historical dredging.

14        In those areas there is no wood, it predates

15   Weyerhaeuser's operations.  There is one small area that the

16   plaintiffs brought to the Court's attention near our ramp

17   where we dredged and got down lower than the deepest

18   historical.  And there was -- Dr. Floyd said there was 500

19   cubic yards in there.  So I'm not talking about that.  It's

20   improper for the plaintiffs to act like that -- the way it

21   was there spreads across the entire CO-14.

22        But there is a layer there, there is 26,000 cubic yards,

23   approximately, below it, according to Floyd, and there is

24   16,000 cubic yards, something on that order, above it.  And

25   Mr. Gross has accepted responsibility for the wood, the

1    incidental wood, which depends a lot on what we think the

2    cleanup driver is here and how that's understood in that

3    upper layer.

4        We're saying we don't have a wood responsibility in that

5    lower layer.  We understand it's where the Kaiser stuff was.

6    Not all of it was Kaiser; a lot was the plaintiffs dredging

7    down below the deepest historical.  If it's put in the orphan

8    share pot, I want to say one thing before I agree to that, we

9    have a slide and an argument that Kaiser is not legally an

10   orphan.

11           THE COURT:  I want to hear that argument.

12           MR. KLEIN:  We think it's a legal issue that needs to

13   be decided.  But we understand what you're thinking.  In

14   arguing this, we understand there is an orphan share there.

15   We don't think it's fair to dump it all on Weyerhaeuser.  And

16   we have reasons for that.  And to the extent that

17   Weyerhaeuser is held liable for an orphan share we have these

18   offsets.  And Mr. Coldiron will be talking about

19   more about --

20           THE COURT:  It's noon.

21           MR. KLEIN:  -- how that works with actual concrete

22   numbers.

23           THE COURT:  We'll take our recess.

24   (Court in recess.)

25

1          THE COURT:  Please be seated.

2      Mr. Klein, are you ready to go.

3          MR. KLEIN:  I'm ready to go.

4      Your Honor, next I wanted to talk about the cleanup driver

5  in this case.  And there must be a reason why the plaintiffs

6  have so vigorously tried to convince the Court that wood is a

7  cleanup driver.  And that is because even if wood isn't a

8  hazardous substance they hope that will give them more than

9  they otherwise would be entitled to get.  It would allow them

10  to treat wood as more than incidental to the cleanup.

11      On that incidental point, Mr. Coldiron has a case he'll

12  show he when he argues that I think you'll find interesting

13  about the concept or remedy driver and what it means in terms

14  of the substances that are not the remedy driver, the

15  incidental to the cleanup.

16          THE COURT:  Is it in connection with the argument of

17  whether or not the substance caused the occurrence of the

18  response costs?

19          MR. KLEIN:  I think that's in there, but I don't

20  think it exclusively depends on that.

21          THE COURT:  Okay.

22          MR. KLEIN:  Anyway, if the Court will recall when we

23  started off with Mr. Fuglevand's testimony I believed that

24  there was an attempt to make it look like Weyerhaeuser's wood

25  went all the way down to the bottom.  And, you know, it took

1    some cross-examining to clarify that, Wait a minute, yeah

2    there is wood at the top, and some places it's 10 to 15 feet

3    thick, we haven't disputed that.  But after you get below

4    that, then it drops off, it diminishes.

5        There may be some wood in there, but certainly not at the

6    criteria that the Wood Debris Group would had have to clean

7    up, not at 15 percent TVS.  There may be some isolated wood

8    back from when you saw those log rafts in the waterway or log

9    operations from Dunlap or anyone else before Weyerhaeuser

10   came along.  I'm talking about just a little bit here and

11   there or maybe flowed down the Hylebos Creek.

12       But that layer I talked about earlier was not -- did not

13   contain wood.  It's an exclusionary zone for wood.  But the

14   plaintiffs were trying to make it seem otherwise.  We showed

15   Mr. Dalton's figure to try and correct the record on this.  I

16   don't know if I'm up yet.

17       Okay.  I had Mr. Dalton's figure.  You can see it.  I have

18   his trial testimony.

19           THE COURT:  Page 25?

20           MR. KLEIN:  Yes, Your Honor.  It's actually page 16

21   on my notes.

22       But Dalton's trial testimony he was asked about Exhibit

23   No. A-549, Station 142.

24       And the question was:  We talked in your deposition that

25   this white area was material that accumulated between 1965

1   and the 1972 accumulation line, the bathymetry that you

2   showed there, correct?

3       Answer:  That's correct.

4       Then, if you actually go to the next diagram for Dalton

5   and you see his cross section there, you see that large white

6   area that is under the accumulation from 1972 to 1999.  That

7   is what I'm talking about.  And that is an area where there

8   really wasn't any wood.

9       So as the plaintiffs dredge down through that area -- this

10  is a cross section.  So we understand it fluctuates to some

11  degree throughout CO-14.  As they went down through there

12  through the 1965 line and then they continued five feet

13  beyond that line, they weren't dredging because of wood.

14  And --

15          THE COURT:  Were they dredging because of PAHs?

16          MR. KLEIN:  Yes, and I would also submit based on the

17  exhibits we saw yesterday they were dredging for PCBs or

18  testing for PCBs down that low, but ultimately it was PAHs.

19  Agree with that.

20      Now, Mr. Dalton said in the follow-on slide, I don't know

21  specifically what is in that white area.  I think I said in

22  my deposition I wouldn't be surprised to find wet scrubber

23  sludge PAHs in that area, but we don't have data to show what

24  is specifically in that white area.

25      We have plenty of data to show what is in there.  Both

1    historical, commonsense, the Landau report, everything else

2    that you've already talked about.

3        Then my next slide or couple slides are devoted to just

4    recapping what Mr. Recker showed you about the progress as

5    they got down near the bottom and chasing PAHs and how on

6    October 27 of 2004 the last statement regarding wood debris

7    that you see in these weekly progress reports to EPA had been

8    made the week before.  On October 27 no mention was made of

9    wood debris cables, et cetera, as a problem.  And thereafter

10   wood debris was not mentioned as a problem.

11       I just realized you turned on the Elmo.  I can show my

12   slide there.

13       To quickly run through it, we showed subsequent reports.

14   I believe this is November 7 talking about the Type 4

15   sampling being conducted, which was for PAHs.  No mention of

16   wood.  Then in December 15, again, the Type 4 sampling being

17   conducted, no mention of wood.

18       And then we go on, Your Honor, to this issue about the

19   ROD, the ESD, the consent decree, statement of work, did they

20   cover wood or not?

21       And these constant -- this constant use of phrase biology

22   trumps chemistry.  First of all, we know that ROD, ESD, and

23   the statement of work don't mention wood.  Furthermore, we

24   know that there were opportunities where -- particularly with

25   the 2000 ESD where it could mention wood and wood can be

1    translated into the SQOs if the agency chose, but it didn't.

2        We think if the agency had required cleanup of wood

3    through the ROD that at the very least they were obligated to

4    do an ESD like the 2000 ESD was done to change the surface

5    requirements for the HCC to subsurface contamination.  That

6    was subsurface chemical contamination.

7        But EPA did not go through that process.  So formally

8    there has never been anything established to make wood a

9    cleanup driver.

10        THE COURT:  Would there have been a process if --

11    procedurally could -- could -- the ROD was followed by a

12    consent decree or was it?  We've got the ROD.  We've got the

13    ESD.

14        MR. KLEIN:  The 2000 ESD and the unilateral

15    administrative order in 2002 and the 2004 consent decree for

16    the HHCG, which contained a statement of work.

17        THE COURT:  The question is:  Was there a vehicle

18    available to the parties, the affected parties, to go into

19    court at the time of the 1997 or 1998 letter?  I guess we're

20    talking about the '98 letter.  There wasn't anything filed

21    with a superior court or a federal court by way of a consent

22    decree that needed modification.  A new lawsuit would have

23    had to have been initiated saying violation of some sort of

24    administrative procedures act by not having a formal and

25    public hearing to determine whether or not wood should be --

1    is required to be cleaned up.

2              MR. KLEIN:  I think either that if -- if --

3              THE COURT:  I'm trying to figure --

4              MR. KLEIN:  Right.  If they wanted to challenge some

5    supposed directive from EPA to clean up wood, that would have

6    been a vehicle to do it.  2000 ESD would have been another

7    vehicle.  They did submit comments.  If they were rejected, I

8    think they could have filed suit if they wanted to at that

9    time.  It hadn't appropriately been done.

10        I'm not going to go through these sections in the ROD or

11   the ESD.  We've been through them quite a few times.  But

12   we've heard biology trumps chemistry over and over again.

13   And we've even now heard the argument that, Oh, biology

14   was -- wood through some biology failures was driving the

15   cleanup in CO-14.  I must admit, I'm not sure what is being

16   said there.

17        Yesterday with Plaintiffs' Exhibit 780 the plaintiffs were

18   showing these biological exceedances here in these two

19   stations, HY 24 and 1143 S, in CO-14.  And I pointed out in

20   cross of Mr. Fuglevand, there is only 6.15 percent TVS at

21   Station HY 24.  Wood is not causing that biological failure.

22   Furthermore, that failure is the at the surface.

23        Second of all, this Station 1143, which does have a

24   chemical exceedance, wood is also not causing a problem

25   there, or at least for the plaintiffs to claim that wood is

1    causing that problem, that is speculation.

2        Furthermore, these samples are only at the surface.

3    They're during the investigation phase.  There is no

4    biological cores, I don't think, in CO-14 during the

5    investigation phase, and there certainly is no biological

6    testing during remediation when the actual work was

7    conducted.

8        THE COURT:  Can we fairly conclude from all that

9    information, however, that something is causing bioassay

10   failures which require clean up, and it is either wood

11   chemistry -- I'm not -- it is either -- the universe of

12   options are wood chemistry, maybe PCBs, and more probably --

13   and PAHs?  I mean --

14       MR. KLEIN:  Or combinations where there is multiple

15   chemicals.  I think one of the points is --

16       THE COURT:  But doesn't Weyerhaeuser because of the

17   proximity to its own property have a connection across

18   disciplines, as it were, wood and chemicals?

19       MR. KLEIN:  First of all, the biological tests are

20   not that reliable or that perfect.  They're not that good in

21   being able to figure out what the cause is.  I think we had

22   testimony from both sides.  It's hard to tell the cost.

23       There were failures in the Upper Turning Basin where there

24   was little wood, which we pointed out.  There sometimes has

25   been passes where there is chemistry and no wood.  So I'm

1    really not sure what it tells you.

2         And as far as us being connected to whatever was happening

3    in CO-14, I guess my point was they weren't testing for

4    biology as they went down, so it couldn't be a driver

5    regardless of what -- you know, if we were able to go back

6    and do it again and see what was going on there, they just

7    weren't using that as a device.

8         And furthermore, you know, we understand that there was

9    wood there, but there was also chemically contaminated

10   sediment mixed in with that wood.  If the Court is going

11   to -- as may have been suggested by one of the questions you

12   asked for more information, if the Court was going to look at

13   that 16,000 cubic yards above the '71, '72 layer and charge

14   Weyerhaeuser for the disposal of that, we would be talking

15   about a benefit to the plaintiffs because that wood, although

16   yes, there's sediment around it, it's chemically contaminated

17   sediment that didn't come from Weyerhaeuser.

18        You know, as Mr. Coldiron will argue, we're a de minimus

19   chemical party.  Maybe there are some trace amounts, minor

20   amounts, molecules based on which you've held us liable, but

21   certainly nothing compared to the magnitude of the Kaiser

22   PAHs and the plaintiffs' PCBs and arsenic that would have

23   been in that layer above 16,000.  So they would get a benefit

24   if we were charged for all that.

25        Now, Your Honor, I'm going to continue a little bit in the

1   critiquing mode.  Like I said, Mr. Coldiron will be more the

2   affirmative side.

3        I want to address Mr. Fuglevand's allocation.  You know,

4   we just don't buy into it at all, as I hope my

5   cross-examination made clear regarding that.  We're not going

6   to quibble about too many of the details with it.  It just

7   doesn't make a lot of sense to us.

8        The plaintiffs want Weyerhaeuser to pay for the work in

9   the Middle Turning Basin.  They want us to pay for all of

10  Kaiser's share in CO-14.  They want us to pay for

11  investigation of the entire waterway, for all the wood in

12  CO-12 and 13.  And they're just ignoring us as a Wood Debris

13  Group performing party.

14       I have a comment about that, Your Honor, because I've

15  looked in the cases and I really haven't seen this kind of a

16  situation.  I'm sure there is other sites around the country

17  where there is a federal and state component, but here we

18  have the CERCLA federal site that the plaintiffs are

19  operating under, which is the head of the Hylebos, Upper

20  Turning Basin, Middle Turning Basin, and the neck.

21       At the same we have this -- I said on the side a

22  handshake, but it's more a formal agreement between EPA and

23  Ecology as to how they're going to treat this area,

24  particularly the neck that we're talking about.  And so we

25  have a separate site, the Hylebos wood debris site.

1      This creates a unique situation when the Court is thinking

2   about who the performing parties are here.  We definitely

3   believe that, as I'm showing in this slide, but I think you

4   have a bigger one, it's just showing the two sites, top and

5   bottom together.  There is overlap there.  There were

6   performing parties at the Wood Debris Group site, Manke,

7   Louisiana Pacific, and Weyerhaeuser, whose property straddles

8   the Upper Turning Basin and portion of the neck.

9      We think that the fact that there is these two sites and

10   who the performing parties needs to be factored in that and

11   considered in the equitable allocation.

12      THE COURT:  You know, in terms of the Gore factors or

13   whatever, I don't view either party as a recalcitrant party.

14   I don't view Weyerhaeuser as not performing -- I think the

15   contribution of the Wood Debris Group is extensive.  Clearly

16   there is a battle going on, sort of a subterranean battle,

17   between chemicals and wood to see who gets stuck with orphan

18   shares and so forth.

19      As I said earlier -- I can't identify a bad corporate

20   citizen here.  That's not going to be a basis for the

21   decision.

22      MR. KLEIN:  We appreciate that, Your Honor.

23      As I said, Mr. Fuglevand's allocation, it's clearly biased

24   against Weyerhaeuser, made no effort to determine other

25   parties' shares, it shifts investigative costs, shifts the

1    Kaiser orphan share to us.  And one of the things that
2    Mr. Fuglevand said was that, Well, you can't quantify wood
3    volume in CO-14, claims that it couldn't be done because logs
4    and large pieces of wood don't fit into a jar for TVS.

5         I have a comment about that.  First of all, if the Court
6    thinks that that has some merit, then add to whatever the
7    Court decides the cost, a couple truck loads of cost for
8    disposing of the logs that were found.  That is what
9    Weyerhaeuser did.  You pick the logs up and you -- they're
10   big objects and they're discrete and you manage them
11   separately.  If there is a cost, then charge us for that.  If
12   there is a cost for spikes and cables, you know, Dr. Floyd
13   said that could amount to a couple cubic yards, we can add
14   that to what we should be charged for.

15        But TVS is the regulatorily accepted and most used and
16   best understood method for determining the volume of wood.
17   Dr. Floyd was able to use it.  In documents that have been
18   public comment noticed and reviewed, EPA and Ecology has
19   signed off on the cleanup study report.  Work was done using
20   TVS as a criteria by the Wood Debris Group where we had to
21   clean up.  It's definitely a scientific method to determine
22   volume.  We've determined volume.  We've determined volume
23   two ways with Dr. Floyd, both through the bathymetry
24   calculation and through the plaintiffs' barge loading logs
25   and combined with TVS samples.  So it can be done.  You asked

1    us to give you more on that.  We gave you more on that.  Shy

2    away from that.  There is a reason, because it doesn't

3    benefit.

4         Mr. Fuglevand's allocation contains a variety of

5    conceptual errors.  One is this mathematical error that

6    Mr. Dovell pointed out that amounts to $781,000.  And it all

7    springs from how you play around with the denominator.  I'm

8    not going into it in great detail.

9         There was another error that Mr. Dovell talked about in

10   connection with this slide.  If you add the Bean cost back

11   in, and you're in effect taking credit for those by

12   increasing your bottom line total net cost against

13   Weyerhaeuser, then you need to do something to also account

14   for the extra time that was spent.

15        And Mr. Dovell explained that you take the 65 days of

16   dredging time and you reduce it by -- if you're staying with

17   the 2004 construction season, you reduce it by an amount that

18   he couldn't quantify because he doesn't have that

19   information.  But the plaintiffs didn't do that.

20        Another way -- I had a little trouble with that

21   conceptually.  Another way to look at it, instead of reducing

22   65, we look at the 227 days and if the -- if the original

23   costs are based on 227 days and then you have the 2005

24   construction season and you put -- do another -- just for

25   example, another 120 days to do work, you add it to the 227,

1   you get about 340,350, you make that your denominator.  Then

2   your percentage from 10.9 will decrease to something on the

3   order of 7.1.

4       I could get a calculator and play with these percentages

5   quite a bit and it would have a dramatic effect on the bottom

6   line here.  That is another reason why the Fuglevand

7   allocation doesn't work.

8       Another reason, Your Honor, I guess I don't really need to

9   address this too much anymore, but -- because CO-12 and CO-13

10  of your remarks earlier, but these were subjective judgments

11  by Mr. Fuglevand, but I will point out when he made those he

12  sure didn't take into account that Arkema was the property

13  owner along that stretch, yet property ownership is used

14  against us in CO-14.  Maybe I'll use this time to touch on

15  that again, reserving something for Mr. Coldiron on that.

16      Just to correct the record, let's make sure it's clear

17  here that in CO-14 we're the property owner for half of it,

18  not the whole thing.  It's only out to the pier head, which

19  is half of CO-14.  The Port of Tacoma owns the rest.

20      Do we use some of that area in CO-9?  Yes.  I'm not saying

21  we didn't use it, but we're not the property owner out beyond

22  here.  When the plaintiffs talk about all of CO-14, that

23  cleanup benefitting us, well, that's not really the case.

24      And furthermore, you know, we just don't see property

25  owner because of our accidental location near Kaiser or our

1   having bought that property from Kaiser as being a really --

2       THE COURT:  You understand you wouldn't be the first

3   PRP to be stuck with a bill based on the prior owner --

4   somebody else's activity during prior ownership?

5    Again, that's one of those distasteful realities

6   afflicting CERCLA enforcement.  That is just a fact of life

7   in these kinds of proceedings, any more than it's their

8   responsibility for PAHs if they didn't -- you know, and

9   they're cleaning up a lot of PAHs that they're not

10   responsible for.

11    So, I mean, perfect justice is not going to be -- is a

12   bridge too far from here, it seems to me.

13       MR. KLEIN:  Okay.  I understand that, Your Honor, but

14   I guess our point is at this site we don't think it's that

15   good of a metric to use.  You know, Kaiser stuff is a long, a

16   broader area of the waterway than just CO-14.  And as

17   example, when I was talking earlier, we cleaned up some of it

18   in front of our dock.

19    And while we're on the subject of the property

20   ownership -- I was going to do this later under the

21   third-party defenses, but I may as well take it up now since

22   we've been talking about our buying the contaminated

23   property.  I know the plaintiffs at the end of yesterday

24   offered Plaintiffs' Exhibit 11, which is the deed.

25    Now, this is in 1970.  The third-party defense says both

1    for Kaiser air emissions as well as Kaiser wet scrubber

2    sludge that came out and ended up on our property that the

3    release of those hazardous substances doesn't make

4    Weyerhaeuser liable if it's attributable to the act or

5    omission of a third party, which is Kaiser.

6        Now, there is a exception if there's a contractual

7    relationship, which is why the plaintiffs are showing this

8    deed.  I don't know exactly what they're going to argue from

9    it, but anticipating.

10       Case law, Your Honor, has said that it's more than a

11   contractual relationship.  The contact between the land owner

12   and third party somehow has to be connected with the handling

13   of hazardous substances.  And a case on that point, which we

14   think is a leading case, is *Westwood Pharmaceuticals*, 965

15   F.2d 85 (2d Cir. 1992).  We don't see this contract as one

16   for the handling of hazardous substances.

17       I don't know if you've read it yet, but the plaintiffs

18   undoubtedly may point out there is an easement for the Kaiser

19   Ditch.  And there is also an interesting provision that is an

20   easement for the unrestricted right to permit air particles

21   to be carried over on our property, such as dust, smoke, et

22   cetera.

23       What I would like to say with regard to that, Your Honor,

24   is that deed was entered into, that contract, at the time

25   when the parties didn't conduct due diligence under

1   environmental law like they do now.  We can't be held to

2   today's standards for what we did back then.  We didn't know

3   wet scrubber sludge was on the property.  We didn't know

4   Kaiser air particles contained hazardous substances.

5           THE COURT:  That's the problem -- that's the

6   difficulty I'm talking about with CERCLA.  Serendipity

7   becomes a principle of law.  That is just the reality of what

8   happens.  I think for a variety of reasons that's been

9   necessary, felt necessary for parties to beat up on one

10  another.  I view all of you as the good guys.  You're

11  neighbors.

12      And these folks, their clients, were doing God's work in

13  the '20s, according to our ability to know God's work.  And

14  you've toiled in these vineyards long enough to know and see

15  a lot of these folks, I was a hero in World War II when I was

16  turning out aluminum for the war effort and now I'm the goat.

17  That's just -- the reality in the world that we live in.

18  Certainly you have to argue against any unjust result

19  affecting your client.

20      But right now we're not looking for justice.  We're trying

21  to avoid our share of injustice being visited upon us.  This

22  is much like the old game of hot potato here.

23          MR. KLEIN:  We're giving you our view of the orphan

24  share in kind of --

25          THE COURT:  I appreciate that.

1          MR. KLEIN:  -- in drips and drabs.  I keep saying

2    Mr. Coldiron --

3          THE COURT:  He's the good cop; you're the bad cop.

4          MR. KLEIN:  What I want to say, since we're talking

5    about the third-party defense, is that even the plaintiffs

6    haven't argued we were liable by virtue of Kaiser's release

7    of PAHs on our property.  We're saying there is --

8    third-party defense does apply to that as well as the air

9    deposition.  When we bought the property we didn't know there

10   were hazardous substances involved.  It's not a contract for

11   hazardous substances.  And that easement doesn't change

12   anything.  It only applies to air, anyway.

13        So what that means is that 26,000-cubic-yards layer that

14   is underneath -- in CO-14 that is mostly attributable to

15   Kaiser, and the additional part the plaintiffs dredged as

16   they kept going down, if that's to be handled as orphan

17   share, at least Weyerhaeuser doesn't get tagged with it as an

18   equitable factor because of any liability we have for that

19   release.  We get involved because you found us liable for

20   CO-14 for the minor amounts, de minimus amounts, that we

21   released.

22        But since we are a de minimus chemical party and our wood

23   is incidental, then our equitable share of that Kaiser

24   orphan -- well, frankly, our argument is that we don't have

25   an equitable share.  To the extent you may think otherwise,

1    we've done other things like remove Kaiser sludge elsewhere

2    that compensate for that.

3        If I haven't explained that as well as it could be, the

4    good cop will get it.

5        THE COURT:  Thank God for senior partners.

6        MR. KLEIN:  Another criticism was this double-dipping

7    thing of Mr. Fuglevand.  I think that's gone by the wayside

8    given what you have said.  The only point was the Dunlap

9    tenants put that wood there, they recover settlements from

10   Dunlap and yet they're still coming after us.

11       Now we're into the orphan share part of this.  And I have

12   my slide here that Kaiser is not legally an orphan.  We just

13   wanted to point out that Kaiser was a member of the HCC

14   during an eight-year period, if I got those dates right.

15   They paid one-sixth share of the investigative cost at this

16   site.

17       And now they actually have settled their liability for

18   $8.9 million.  I know that the evidence has been that this is

19   not expected to be funded.  They settled their liability with

20   the trustees for $5.5 million, but it's a settlement with the

21   government in which they have contribution protection.  And

22   we think because of that and their previous participation

23   that legally they're not an orphan share.  The plaintiffs are

24   entitled to 60 percent of this $8.9 million if that money

25   becomes available.  We think it further needs to be

1   considered.

2       With regard to Asarco, the plaintiffs have each asserted a

3   66 million claim in the Asarco bankruptcy that we're hearing,

4   apparently, is going to be funded, depending on copper

5   prices.  At least at present it appears they'll be funded

6   dollar for dollar.  We don't see them as an orphan share.

7       Even if the Court concludes otherwise -- that is my next

8   slide here about, you know, even if they are orphans -- the

9   Pinal Creek case applies.  Under Section 113, "The cost of

10  orphan share is distributed equitably among all PRPs just as

11  cleanup costs are."

12      So we don't view that as allowing the plaintiffs to make

13  us take the whole thing.  They have to take a share of the

14  alleged orphan shares.  You know, it's not unfair to make

15  them do that even though they've done work at the rest of the

16  site, or at least in the neck part of it.

17      You know, while Weyerhaeuser took care of some Kaiser

18  stuff in Upper Turning Basin and so did Manke, if they're

19  30 percent liable, then they're 30 percent liable of the

20  30 percent Kaiser orphan share.  At some point there is a

21  rough percentage that would apply.

22          THE COURT:  Assume their argument would be, We took

23  care of all the wet scrubber sludge PAHs in 9 and 3 and 8 and

24  4 and 7 -- you know, and now the Court is looking at just

25  holding Weyerhaeuser responsible for the scrubber sludge in

1    one little -- not so little segment.

2           MR. KLEIN:  Sure.  But the plaintiffs also had

3    chemicals in CO-14 down -- even as we showed, down in the

4    level where the Kaiser PAHs were.  So there were PCBs.

5           THE COURT:  And they would say, You also had wood in

6    13 and 12.

7           MR. KLEIN:  Yep.

8           THE COURT:  I mean, it's been a fair fight.  You all

9    have very good arguments as to why you shouldn't be

10   responsible.  You know, in a perfect world neither one of you

11   would.

12          MR. KLEIN:  Well, Your Honor, I hate to rely too much

13   on whose burden it is, but it is the plaintiffs' burden to

14   follow Pinal Creek and show an equitable distribution among

15   all PRPs.  And they really haven't done that, particularly if

16   you overlap HWDS and performing parties there, including

17   Manke, not just us.  They haven't really done that.

18          THE COURT:  Given the standards to establish to do

19   equity, I think that the Court has more than enough

20   information, perhaps too much information, to get -- who

21   knows, maybe the Ninth Circuit will disagree -- has more than

22   enough information to fashion an equitable outcome.

23          The metals group has come up with their formula.  I'm not

24   buying it.  Mr. Coldiron's going to come up with a formula or

25   two because perhaps I view the facts and the evidence more

1    closely to what Weyerhaeuser has been arguing about wood and

2    PAHs and so forth that might be more persuasive.

3        But it seems to me that Weyerhaeuser has some

4    responsibility for chemicals and has some responsibility for

5    wood and that's why I've sort of abandoned my approach to

6    look at Weyerhaeuser as the last standing wood company, so

7    take care of all the wood in the neck.

8        And these folks here are the last standing of the

9    chemicals so for good or ill they get Kaiser.  I think the

10   data makes it difficult to do that in a perfect way as well.

11       MR. KLEIN:  I think Mr. Coldiron has some numbers

12   that may be helpful.  I'll leave it to that.

13       Then I did have a slide talking about effects of

14   settlements.  All I wanted to comment is there is a

15   proportionate approach and a pro tonto approach.

16   Mr. Fuglevand used the pro tonto where the actual amount of

17   settlements was used to reduce total net cost as though

18   that's each party's actual share.  I just wanted to remind

19   the Court, I think using the language the Court has followed

20   in approving previous settlements, that, you know, the

21   settlement does not -- the actual dollar amount does not

22   reflect that party's actual equitable share.

23       THE COURT:  Let me make sure we're along -- we're on

24   the same page here.  For example, to pick a number, we've got

25   roughly $40 million in total cost, more than 40, there is 48.

1   But for calculations purposes let's say there is $40 million

2   and there is $10 million of settlements and the cost to clean

3   up CO-14 was $4 million.

4       Would it be your argument if you're going to -- and please

5   don't do this, Judge, but if you were going to do $4 million

6   to Weyerhaeuser you should take the percentage of the same

7   ratio to which the settlements relate to the total cost and

8   that percentage should be deducted from the 4 million?

9           MR. KLEIN:  Absolutely we would feel that way.

10          THE COURT:  As opposed to taking it off the top and

11  dealing with that number?

12          MR. KLEIN:  We would absolutely.

13          THE COURT:  Do the math and figure out what the

14  percentage of settlements is to the total cost and ascribe

15  that to whatever bill Weyerhaeuser would get.

16          MR. KLEIN:  Right.  Wherever you put those

17  settlements and credit them in the model that Mr. Fuglevand

18  had does make a big difference.

19          THE COURT:  Right.

20          MR. KLEIN:  Yes, we would say that.

21      Very quickly, the allocation by Mr. Fuglevand didn't

22  consider that we really fall in the category of a de minimus

23  chemical party.  We didn't consider wood is not a hazardous

24  substance.  Our performing party, we dredged Kaiser wet

25  scrubber sludge and that we performed the Battelle Delta

1    study -- I'll let Mr. Coldiron talk about that.  Plaintiffs

2    have said that that was just to protect our own interests.

3    That was used by EPA for its benefit.  And we've already

4    talked about the bottom line here.

5        Let me go on and talk about the alternate allocation that

6    was presented by Mr. Fuglevand yesterday.  It clearly didn't

7    follow the Wood Debris Group consent decree criteria.

8    Instead it covered areas which, judging from the Court's

9    remarks, are not in play.  So that 100,000-cubic-yard figure

10   that was mentioned today, that's these blue areas that

11   Mr. Fuglevand showed yesterday, he's making Weyerhaeuser

12   100 percent responsible for those areas, which is totally off

13   base.

14       He said he didn't attempt to figure the volume in CO-14.

15   He didn't attempt to exclude the 1971 or lower layer, and he

16   tried to make it appear that if there were no chemicals the

17   HHCG would dredge this whole area.  I thought that is what he

18   was doing at one point.

19       Let me move to wood is not a CERCLA hazardous substance.

20   Maybe this very first slide is really important even though

21   we may tend to take it for granted.  You know, we know that

22   wood is not listed by EPA as a CERCLA hazardous substance nor

23   by the State.  Well, the reason that's significant is that

24   CERCLA has been around since 1978.  That hazardous substance

25   list has had things added to it from time to time.  EPA knows

 1   how to do that.  EPA has been around since before 1978.  EPA

 2   has never conducted a rule-making for woods.  And, you know,

 3   we submit there is some awfully good reasons for that and not

 4   the least of them being -- we're talking about a

 5   decomposition process that gets these chemicals the

 6   plaintiffs are talking about, and if that process was to be

 7   considered to list wood as a hazardous substance, then of

 8   course -- I mean, there is plenty of scenarios as to who that

 9   would draw into the net.

10       But one of them going to plaintiffs' argument regarding

11   landfills is everywhere there is wood buried in a landfill,

12   whether it's from industry, municipality, or from an

13   individual, are we then going to say that they're a potential

14   PRP?  That's obviously the kind of problem and the reason as

15   to why EPA hasn't done that.

16       If I could take --

17           THE COURT:  You're fine.  I know you feel burdened by

18   time.  You're fine.

19           MR. KLEIN:  If I could make a comment, there is some

20   cathartic value of being able to say this finally.  After

21   sitting and listening to all this testimony and the discovery

22   about how those -- the letters from Allison Hiltner and who

23   they were copied to, that that means something, that that

24   establishes an EPA position or that Weyerhaeuser is not

25   filing a lawsuit or writing a letter back to EPA when it

1    became aware of that '96 issue paper or in '98, you know, us

2    not picking certain actions or at the State, MTCA, SMS

3    triennial reviews, us being present and not objecting to what

4    was being conveyed, as if that's relevant, if that means

5    something.

6         Does that mean that if we had objected that that would

7    mean we win?  I think not.

8         Am I allowed to hold up the Exhibit A-46, the Trustees

9    Settlement Proposal where they, in effect, determine that

10   wood is not a hazardous substance, that they couldn't sign up

11   to that and consider it as a hazardous substance and say that

12   this proves anything?

13        You know, it's just been that difficult to have to deal

14   with that kind of line of reasoning because, as you said

15   earlier, it needs to be decided based on the legalities.  And

16   those things aren't relevant.

17        Another thing I want to say, Your Honor, is we've been

18   chasing a moving target here, which is some indication that

19   there is a real problem with making wood a hazardous

20   substance.  First it was ammonia and sulfides.  Then we show,

21   you know, that it's microbial activity.  Then switch the

22   emphasis to 4-methyl phenol.  We've talked about that in the

23   microbial activity.  Then it's the definition of release,

24   does "escaping," does that mean there is a release.  Then

25   it's threatened release.  I'm going to get into those.

1      But as it keeps moving around, that is some indication

2   that there isn't a consistent view here.  Those letters that

3   are support -- reportedly EPA's position, they're Allison

4   Hiltner's letter.  They weren't cleared at EPA headquarters

5   or by the regional administrator.  They're not proved.

6   They're not an EPA position.  They're the position of Allison

7   Hiltner.

8      You know, Your Honor, we've heard talk about why she might

9   have done that.  And I would submit that a very plausible

10   reason why she may have sent those letters was to make sure

11   that the HCC was cleaning up the neck and not leave out areas

12   because she wanted complete coverage of that waterway just

13   like Dick Butkus was going to tell the HCC, Here is what we

14   think, you've got to clean it up.  That's the most plausible

15   interpretation of why those letters came out.  And once the

16   2000 ESD went into effect there is silence from EPA.

17      And Kris Flint, who came in here and testified, did not

18   say that was EPA's position because the CFR -- the Touie

19   regulations, the ones that apply to EPA, say she's not

20   allowed to testify as to EPA's position unless she gets

21   approval.  She said it was her understanding, so she doesn't

22   establish a position.

23      Then we had, in this case -- we had the phenol thing with

24   Dr. Michelsen where the questions went so fast and the

25   answers were so clever that for a while it appeared that

1    Dr. Michelsen was saying phenol, which is an identifiable

2    chemical with its own CAS code, was in wood.

3    Cross-examination showed that was not the case.

4         But, you know, the plaintiffs have played a little fast

5    and loose with this terminology contained therein.  I'm not

6    going to go through this chart.  I think Dr. Floyd adequately

7    explained that and how that works.  And the substances, even

8    4-methyl phenol, are not contained in wood.

9         And this chart, though, is pretty good because it relates

10   to the release issue and the threatened release issue because

11   what it's talking about here is -- it's a multi-step process.

12   You got the worms go after the wood debris, they excrete the

13   wood fiber, then the aerobic bacteria come along, break it

14   down further, then the anaerobic bacteria, then you get the

15   sulfides and 4-methyl phenol.

16        Because it's a two times removed process, this idea that

17   because we have a waste pile of wood debris on our property

18   underwater, that there is a release of hazardous substances,

19   we don't think the term "release" was intended to go that

20   far.  I'm going to skip a slide.  I have definition of

21   release, regardless of what terminology is used there,

22   escaping, leaching, emitting, et cetera.

23        Now, the plaintiffs said something today about the

24   landfill cases.  And I would just like to point out, Your

25   Honor, that when municipal solid waste goes to a landfill

1   then it was -- I mean, it's a witch's brew.  It's got stuff

2   in it that is hazardous substances.  So if something gets

3   formed, that doesn't -- that doesn't analogize to the wood

4   debris situation where the decomposition process occurs in

5   several stages.

6        And I would also like to call the Court's attention, I

7   believe I'm correct about this, in 2002 Congress exempted

8   municipal solid waste from CERCLA because it could bring

9   within its purview entities that really didn't fairly deserve

10  to be considered having disposed of a hazardous substance.

11       So we don't view those landfill cases on point or the

12  waste pile situation.  The release has to be of a hazardous

13  substance from the wood debris.  It's not from the wood

14  debris.

15            THE COURT:  But -- their argument is, Wait a second,

16  you've got a facility there.  And we know from that facility

17  there is a release into the environment of various toxic

18  substances that are listed.  They happen to be associated

19  with wood.  And I think one of the reasons everybody has

20  danced around language here is that is the way we got started

21  down this road in 1996 and 1997 and 1998 with letters from

22  EPA.  Their language was loose.

23       And I think their argument is, You can look at the

24  *Serafini* case if you want, Your Honor, but we're not reading

25  *Serafini* from the standpoint -- we're not making accusations

1    that Weyerhaeuser -- at least to CO-14, as if Weyerhaeuser is

2    generator of the PVC.  We're looking at Weyerhaeuser as the

3    owner of the landfill that isn't a party to the *Serafini*

4    case.  And there isn't any doubt the owner of the landfill is

5    a responsible party because release is -- there is a release

6    of vinyl chloride from that facility.  I think that is -- I

7    think that is what they're going to argue.

8         So that is -- that is the argument, it seems to me, that

9    you -- I mean, I gave them lemons yesterday and they're

10   making lemonade out of it today.  That is what good lawyers

11   do.  If I would have done that to you guys yesterday you

12   would be doing -- making the best of it and we need to deal

13   with it.  Hopefully it's getting us closer to the truth and a

14   fair result.

15        MR. KLEIN:  Couple points about that.  First of all,

16   under the plaintiffs' evolving view the -- it still doesn't

17   make wood a hazardous substance.

18        THE COURT:  I agree with you.  I agree.  I'm not --

19   you know, like I said, somebody has to do a stand-up

20   proceeding where the best science is brought to bear and

21   somebody says yes or no, wood is a hazardous substance.  On

22   the evidence that I have, I'm not -- I'm not convinced that

23   wood is a hazardous substance.

24        But it's still begs the question of once it's in the water

25   on your property whether or not -- whatever is emanating from

1    that is on you.

2         MR. KLEIN:  Okay.  Just a sequence of points, then,

3    in addition to that one.  You know, we really don't think

4    that the cases support going so far when you have a natural

5    degradation process like that, that release was intended to

6    apply to the generation -- and the only thing we would agree

7    to really is hydrogen sulfide on our property as Dr. Floyd

8    testified.

9         And furthermore, if a release is going to be deemed to

10   occur when you have a pile of organic material like that, the

11   principal applies to all organic material, not just wood.  It

12   applies to leaves on somebody's property, at a golf course.

13        THE COURT:  You're right.  Exactly -- you're

14   basically back to the Doomsday concern that you had about the

15   landfill and the people who dump wood being a PRP.  It still

16   has the same dangerous implications from the wood industry

17   perspective.

18        MR. KLEIN:  Right.  But that sort of reasoning is

19   another reason why we think Congress does not intend release

20   to go so far as when you have the natural composition, even

21   if it may occur on somebody's property.

22        THE COURT:  Does Spano go so far to say that wood

23   dumped in a landfill which is -- wood which is not hazardous,

24   TB versus Spano Building Corporation, nonhazardous materials

25   placed in landfill that generated methane or hazardous

1   materials, 584 Atlantic 2d 583 (1990).

2   MR. COLDIRON:  Can I help here?

3   MR. KLEIN:  I think there were two Spano occasions.

4   MR. COLDIRON:  That was a state regulation that case

5   was talking about.  So everyone will know, methane is not a

6   hazardous substance under CERCLA.  I know that's shocking to

7   everybody.  The natural gas industry exited on that one.

8   Methane is not -- under the state statute it was, and I don't

9   know how they reasoned that.  That's the second Spano case.

10   THE COURT:  I've looked at it a couple of times.

11   I'll look at it one more time.

12   MR. COLDIRON:  That's the key twist.

13   THE COURT:  The issue for our purposes or analytical

14   purposes in relating it to this case is not whether methane

15   is a hazardous substance, it is whether or not a nonhazardous

16   substance can become a hazardous substance by virtue of it

17   being in a landfill where hazardous substance are, at least

18   in this case, closely associated.

19   Okay.

20   MR. KLEIN:  Couple more points.  Our hydrogen

21   sulfide, regardless of how it's viewed, was not a driver of

22   any cleanup.  I want to make sure that's understood.

23   THE COURT:  Right.  Neither was 4-methyl phenol or

24   ammonia.

25   MR. KLEIN:  4-methyl phenol -- I know the Court made

1    comments about that being associated with wood.  We tried to

2    show evidence that it's not really associated with wood with

3    the log rafting study done by Ecology.  It can be associated

4    with wood in pulp mills, but that's a completely different

5    process.

6         THE COURT:  The data to me is not convincing either

7    way.  But -- I put it in the category of the PCB release from

8    Kaiser as sort of a second tier or third tier in terms of

9    influencing where this decision is going to be made.

10        MR. KLEIN:  Your Honor, I'm going to skip over the

11   EPA letter because I think we've had enough discussion about

12   that except to point out this statement here which is

13   frequently overlooked when you're talking about what that

14   letter means.

15        On threatened release, I did have a couple points about

16   that.  This is just the language from which threatened

17   release is taken, which says, From which there is a release

18   or a threatened release which causes the incurrence of

19   response costs.

20        All I wanted to mention -- here is a case.  *City of New

21   York v. Exxon* where the Court actually said that the better

22   reading of the phrase -- and I'm over here -- is that a

23   threatened release must cause response costs.  The Court was

24   wrestling with the issue of whether release has to cause

25   response cost.

1       THE COURT:  That is why I asked the question earlier

2    in the morning.

3       MR. KLEIN:  Here it's definite because of the

4    language that I just read in this case that a threatened

5    release has to cause incurrence of response cost which goes

6    back it my point that hydrogen sulfide and methyl phenol did

7    not cause the occurrence of response cost because they

8    weren't drivers.

9       All those threatened release cases that plaintiffs have

10   cited, they're really talking about where the hazardous

11   substance that is the threat is contained in some product or

12   tanks, you've got corroding tanks or spills inside a

13   building, most of those cases found actual releases.  I don't

14   know to what extent threatened releases is dicta in the

15   causation requirements I've just talked about.

16      The wood is not a MTCA hazardous substance.  I hate to

17   spend a lot of time on that.  Let me just say, first of all,

18   that --

19      THE COURT:  Are you satisfied that if the Court finds

20   the contribution clause in the consent decree gives you MTCA

21   protection that MTCA is no longer a factor in this case?

22      MR. KLEIN:  Yes.  I think we are satisfied with that.

23   We are still concerned about this argument that wood is a

24   MTCA hazardous substance.

25      MR. COLDIRON:  And not regulated under SMS.

1          THE COURT:  I understand.

2          MR. KLEIN:  Real quick comments about that.  This

3   paper where Teresa Michelsen said it is a hazardous substance

4   is in '97.  In the original rule-making, there was no notice

5   that deleterious substance was intended to be hazardous.  The

6   notice and subsequent meetings were all about, It's a

7   deleterious substance.  Wood industry is not opposing that.

8   We're accepting regulation as a deleterious substance.  But

9   no one was told it was going to be a hazardous substance.

10          THE COURT:  Give me 30 seconds of why -- what the

11   functional difference is, ultimately, as to, in this case,

12   the wood industry between deleterious -- being regulated as a

13   deleterious substance or governed as a hazardous substance?

14          MR. KLEIN:  Well, as a --

15          THE COURT:  Real world --

16          MR. KLEIN:  Right.  Your Honor, as a deleterious

17   substance as this is intended to point out, Ecology has

18   independent authority under SMS to order clean up deleterious

19   substance, so we understand that.  That doesn't change

20   anything.  It changes the exposure to liability --

21          THE COURT:  The Wood Debris Group --

22          MR. KLINE:  -- around the timber industry.

23          THE COURT:  The Wood Debris Group, it affects -- the

24   principal issue is third-party liability --

25          MR. KLEIN:  Yes.

1        THE COURT:  -- as opposed to enforcement action by a

2  regulating agency?

3        MR. KLEIN:  I think that's --

4        MR. COLDIRON:  I would fairly say stigma, as well.

5        THE COURT:  I mean, yeah, I understand stigma issue.

6  What happened to the -- what happened between DOE and the

7  Wood Debris Group could have happened entirely independent of

8  a hazardous substance -- wood being declared a hazardous

9  substance.  It's a deleterious substance.  You got to clean

10  it up.  Okay, here we go.  I want to understand how the rule

11  works.

12    Is that right?

13        MR. KLEIN:  Yes, Your Honor.

14    I guess the Court -- the Court in the original hearing

15  that we held was skeptical of SMS qualifying as a rule by

16  which the director actually told people we're going to make

17  wood a hazardous substance.  No matter how the plaintiffs cut

18  it we don't think the SMS qualifies as that kind of a rule.

19        THE COURT:  In my notes I didn't think it qualified

20  as an appropriate procedure for rule-making given the lack of

21  notice.

22        MR. KLEIN:  This last slide had to do with

23  third-party defenses.  I have discussed these.  Mr. Coldiron

24  will get into the factual for the 4-methyl phenol for air

25  particles.

1    We have the tailpipe exemption for anything that we may

2    have emitted.  And all I want to say about that is there

3    is -- doesn't appear to be much long either way.  So

4    legislative history the plaintiffs cited, that is not

5    expanding it to different kinds of motor vehicles or other

6    rolling stock or whatever it was.  That doesn't change the

7    capability of the exemption.  Logically it's got to apply to

8    the releases regardless of where they land, and that is our

9    point regarding the tailpipe exempting.

10    I'm going to turn it over to Mr. Coldiron.

11    THE COURT:  Thank you, Mr. Klein.

12    MR. COLDIRON:  Good afternoon.  What I want to do,

13    Your Honor, is focus a little bit of time on why the

14    Weyerhaeuser facility as a source of chemicals is a de

15    minimus source.  The reason I want to do that is that has

16    significance in allocation, in equitable allocation.

17    After I do that I've got a couple of cases that I think

18    the Court will find instructive, probably the one most

19    instructive on how to deal with wood is a nonreported case,

20    but it's well reasoned and has a lot of logic in it and it

21    has a floor-ceiling concept that I got a sense the Court was

22    looking at, What do you do with wood?  This happens to be

23    foundry sand that had a little bit of hazardous substance in

24    it, so it's a little bit different than the wood.  But we've

25    got creosote with PAHs and some storm water, so it's a good

1  way to analyze how to -- how Weyerhaeuser -- how you can

2  allocate, in CO-14, the wood.  I want to talk about that.

3      The other case is Acushnet case out of the Second Circuit

4  that talks about de minimus allocation.  I want to spend some

5  time there.

6      Then I want to visit with you about the equitable factors

7  that we see here.  And then at the end of this, I've taken a

8  little time of my own to say this is a conundrum.  Is there

9  any metrics the Court can use to help him evaluate how fairly

10  he's balancing things?  I've created a simple chart as a way

11  to do it.  It can be modified by the Court.  It's not

12  intended to be something we're suggesting.  It's really a

13  template is what I'm --

14      THE COURT:  Has it been peer-reviewed?

15      MR. COLDIRON:  It has not.

16      There are a couple of key metrics you can use and change

17  and get a sense of how you want to set the equitable factors

18  and how that will play in being fair with everybody.  That is

19  what I want to try to do.

20      The Battelle study -- I only got a couple of spots here --

21  this goes to de minimus.  Dr. Boehm noted that the used

22  hydraulic oil -- this was a mass issue and gives you some

23  sense of how de minimus the TEF was from a runoff standpoint,

24  oil standpoint.  There is just hardly any PAHs in the oils,

25  the urban runoff, compared to Kaiser sludge and Kaiser

1    particulate.

2         Diesel fuel, he noted, had some PAHs but those were the

3    high petrogenic ones.  They weren't remedy drivers anyway.

4    What we found in the -- what he found in the urban runoff and

5    in the used hydraulic oil were really truly de minimus

6    quantity.  I want to remind the Court of that.

7              THE COURT:  Were they high diesel or low?

8              MR. COLDIRON:  These are the high.  That is the

9    highest one, the most volatile doesn't stay around very long.

10   All the drivers --

11             THE COURT:  That is why they're LPAHs.  All right.

12             MR. COLDIRON:  All drivers of the remedy were down

13   here.

14             THE COURT:  That's why your use of the word -- the

15   LPAHs are the ones that --

16             MR. COLDIRON:  Volatilize and weather the fastest.

17        This is the last slide.  It just found that the Wood

18   Debris Group petroleum dog pilings pavement, they were

19   insignificant sources of PAHs.  We were criticized after the

20   fact today by -- and during the trial for not thinking about

21   all the places to sample.  Well, they sampled right outside

22   of the sampling points for the permits but as close as you

23   could get to the discharge of those things.  And these sludge

24   things, that's being hauled off site and disposed of.  It

25   doesn't tell you anything about the storm water to sample the

1    sludge that has been picked up and managed properly.

2        You know, they pick at us on that.  The purpose of the

3    study -- it was an expensive study to deal with this thing

4    that got dropped on them that they were a big source of PAHs.

5    And they knew EPA was looking down the barrel at them through

6    this multi-party thing they'll use that to allocate and they

7    did.  Weyerhaeuser ends up being a higher percentage than

8    Kaiser.  Something was wrong.  They had to react.

9        And it -- they did react.  And it -- EPA understood it

10   when it was all said and done.  But it doesn't -- that wasn't

11   an easy curve to follow.  It took three years and a lot of

12   work, very complex, as the Court knows.

13       The point of this is the upland, I think the Court

14   acknowledged, it's not a significant source.  It's a de

15   minimus source.  We can't say there is not hazardous

16   substance, I'm not fussing with the Court about finding us

17   liable as a chemical source, that and the creosote pilings

18   because that's the bottom line.

19       There is -- in CERCLA concentration doesn't matter and

20   mass doesn't matter.  So we're there as a liable party.  I

21   don't know how that -- because we're a chemical party,

22   because of the -- because all of these sources are de minimus

23   in my view based on the evidence that we've heard, I don't

24   know how facility works into that any different -- how many

25   times can you be a de minimus liable party and it matter?

1      The Court -- the case I'm going to discuss with the Court

2  says that what is important is:  Does it drive the remedy or

3  not and does it cause any response costs?  That is the key

4  equitable factor to look at.

5      The sort yard, I've talked about it, log sort yard.  This

6  was testimony by Mr. Dalton agreeing in his trial transcript

7  that what ran off of it looked like urban storm water --

8  industrial storm water, nothing surprising.  And yeah, there

9  was an urban runoff storm water impact down in CO-14.

10      Mr. Farlow agreed with me, seems like yesterday, I hope it

11  was yesterday.  This trial has been going too long.  He

12  agreed what is driving the remedy in CO-14 is not the

13  petrogenic part of the chemicals here or the Ls, it's the Hs.

14  That is what everybody was focused on.  That is a concern

15  from Kaiser and so the -- my point here is what sources

16  Weyerhaeuser had dealing with petrogenic PAHs, they did not

17  cause any incurrence of response cost.  That's not the reason

18  they're out there digging.  And there is not enough mass

19  there to matter anyway.

20      This is another slide from Dr. Boehm confirming in the

21  Kaiser Ditch he couldn't find a TEF fingerprint dealing with

22  all the things they sampled at the ditch.  Again, from upland

23  arsenic was background or less, zinc the same.  The upland

24  facility is just a de minimus chemical party.  That is what

25  the upland is.

1        We'll talk about creosote in just a minute.

2        Wet scrubber sludge and the 4-methyl phenol.  I need to

3    remind the Court what Dr. Boehm offered regarding finding the

4    4-methyl phenol.  It was quite high, one point something part

5    per million on the outside of the wood.  That is a high hit.

6    Dr. Floyd said that all these sites he's worked on wood, they

7    hardly find 4-methyl phenol.  Even though she knows bugs can

8    make it, it's very little levels when they find it.  When

9    they otherwise find it it's related to pulp mill where the

10   chemicals are making it.

11       Honestly, where was that from?  What was the science and

12   the logic?  And I don't think we have to check our

13   commonsense here when we come in the courtroom and deal with

14   science.  Commonsense plays an important role in trying to

15   sort through all this.

16       And so Dr. Boehm -- he's the only one that really offered

17   evidence on it -- he reminded the Court that there was two

18   types of Kaiser emissions and they had different signatures.

19   And we sampled one of them and the State sampled the other

20   one.  And I'll flip through these real quickly.  Recent

21   literature, very recent literature gave him the ability to

22   identify these sources and make the comparison to the two

23   different sources.  And this was the last one that gave him

24   the comparison to the other source.  And so he was able to

25   conclude that what was on the wood chips was impacted by air

1  emissions and roof dust from the Kaiser facility consistent

2  with their multiple sources from these -- from the aluminum

3  smelters.

4      That is significant because there has been a lot said

5  about the wood creating it or somehow containing it or the

6  bugs doing it.  Bugs don't produce 4-methyl phenol at 1.2

7  parts per million.  Obvious conclusion is it came in there

8  from the air source.  The most logical place for that to be,

9  and he offered a lot of other testimony why he believed it

10  was from Kaiser, air emissions was doing that.  He noted it

11  wasn't a diesel emission.

12      He also said he found it over in the Taylor Way upgrading

13  from the Weyerhaeuser facility.  He found the same emissions

14  in that fingerprint.  And we had almost a 1.2 parts per

15  million 4-methyl phenol of p-cresol in those samples up there

16  under Taylor Way, the street.

17      So what do you deduct from that?  You've got some over at

18  Dunlap.  You've got a source from Kaiser.  It's blowing some

19  stuff around.  You know it's irregular.  That is why you see

20  different concentrations even on the Dunlap yard.  The dots

21  connect.  It's not from Weyerhaeuser wood.  It was landing on

22  all properties and waterway, as well.

23      I want to look at chemistry in 14.  We know Kaiser was a

24  continuous source from about '64 to '92.  Dr. Floyd testified

25  it wasn't just these two episodes.  That is why she testified

1   below the '69 dredge that counsel criticized her for there

2   was probably wet scrubber sludge down there because it had

3   been coming out since the mid-'60s, since they dredged in

4   there in '65, they had been putting it through the waterway.

5        And the '69 dredge, which they say is when it happened,

6   they left some stuff between the '72 and '69.  And that would

7   have come from these continuing earlier releases between '69

8   and '65.  I got the dates wrong.  That is an important issue.

9        We talked about the concentration gradient, the

10  bathymetry, the pilings and the wharf.  I want to move to the

11  slides.

12       By the way, let me say something about the bathymetry.

13  Superfund is hard enough without trying to beat up all your

14  science and say, I've got a tough job, this is rough justice,

15  give me some metrics.  I need something to put my hands on

16  here.

17       You know, everybody in the case used bathymetry.  And when

18  Dr. Floyd started using it for calculating volumes and it

19  became bad stuff, even though the Corps used it to pay their

20  contractors with, and Ecology and wood debris used it and

21  reported in all that massive documents you have, they used it

22  there.

23       So Dr. Floyd came in here and made a very -- and did a

24  very good job explaining what she did, how she used it, why

25  it was reasonable to say, We can figure out this claim for

1    you judge.  Obviously Weyerhaeuser didn't show up until 1971.

2    So we can figure out what is below '71 and we can figure out

3    what is above '71.  I can take the Kaiser sludge out of the

4    equation.  I can tell you how much wood is there.  So I don't

5    think it's a good idea to abandon Dr. Floyd's work here

6    because it's a good metric.

7         Now, the Court may want to adjust that metric because

8    you've heard testimony it was hard to get out and various

9    things.

10        But the table I'm going to offer at the end will allow the

11   Court to make an adjustment to see what happens if you do

12   that.

13        In terms of using bathymetry as Dr. Floyd has and her

14   tables that give you the volumes, I think it's very important

15   data for the judge to have and to use.

16        Here we merely see the pre-dredge Kaiser sludge deposits

17   and post-dredge.  You've seen that exhibit.  Here is that

18   comparative one where you have the chemicals and the -- and

19   Dr. Floyd's -- what is left there in CO-14 showing that

20   primarily -- now, I think we've made a good case there is

21   PCBs and arsenic mixed in with this stuff.  And you say, How

22   did it do that at depth?  Because it started going out there

23   before they had these two massive releases.

24        When the sludge started getting deposits in these ponds

25   and by the time the thing was dredged there was PCBs and

1    arsenic floating around in the waterway and getting moved

2    around after they got it dredged in '65 so it got intermixed.

3    So that is why you see these things at depth.  It was

4    deposited at depth at the time.

5         This is the basic chemistry that is driving remedy.

6    You've got Kaiser PAHs, you've got General Metals' PCBs and

7    arsenic from Arkema.  That is the chemistry of CO-14.

8         Now I want to talk about creosote.

9         First I want to go to CO-14.  Interestingly enough, this

10   second case I'm going to talk with you about was a Sullivan's

11   Ledge in New Bedford, Massachusetts.  It was an unpermitted

12   dump.  They had a bunch of telephone poles and butts from

13   telephone poles deposited that were loaded with PAHs.

14        So the Court looked at an interestingly fact situation

15   similar to this one and finding there was no -- while they

16   were a liable party, he didn't apply any response cost

17   because it was not measurable beyond background.

18        I think there was adequate testimony and evidence here on

19   the 30 to 50 poles and stubs that they just didn't contribute

20   anything.  Or did they trigger CERCLA and make us liable?

21   Absolutely.  Did they add anything to response cost?  Not a

22   penny.  They weren't -- maybe digging the poles out, whatever

23   few bucks that is, but the chemistry didn't add anything to

24   the plaintiff's cost.

25        Here is the concentration where the poles are.  They're

1    just not causing anything to happen.  They're not a source of

2    the PAHs in CO-14 in any significant way.  I'm not saying

3    they're not there, but any significant way.

4         And then this one he used, Dr. Boehm did, to describe what

5    is -- if the dock and 1700 pilings over there are a source,

6    why aren't we seeing it?  That is how scientists use these

7    kind of things.

8         You see the Kaiser Ditch but you don't see anything from

9    the TEF.  I have more on that.  But I want to remind the

10   Court of that.

11        Mr. Farlow, in his trial and deposition we read in the

12   trial, there was a couple of samples right next to the TEF

13   wharf going towards Hylebos Creek.  And I asked him in

14   deposition and he hadn't remembered it during the trial but

15   we pointed it out to him, I said, Did you find creosote

16   there?

17        And if the TEF is going to be a source for contaminated

18   sediments right behind where the ships were supposed to stir

19   it and push it out, you would expect, in all logic, to find

20   it there and they didn't find it.  Mr. Farlow says they

21   didn't contain any significant amounts of Weyerhaeuser

22   creosote.

23        So that should be telling us that the TEF wharf is not a

24   source of any significance here.  And there was a whole host

25   of other reasons as to why that is true.  But this is very

1  strong evidence that the TEF wharf is not a significant

2  source to anything, not to mention the conundrum of trying to

3  get it from there down and locate it right there in CO-14

4  somehow miraculously, which is counter to the net sediment

5  transfer which is toward the head.

6       There is all kinds of fate and transport mechanism

7  problems.  Even if you had a source, would it ever get down

8  there?  Mr. Cox reminded us that would be very difficult

9  given the stagnant nature of the Upper Turning Basin and the

10  fact that flows winter and summer and the bottom third to

11  half come into the Upper Turning Basin.  I thought his

12  evidence was very strong because it's measured data.  It's

13  not hypothetical data.  They took actual measurements.  We'll

14  talk about that in a minute.

15       Here is my summary on the TEF creosote.  The sediment

16  didn't require any cleanup.  That should be a red flag, may

17  not be the right thing to say.  First and foremost, I don't

18  think regulators miss very many sources at a Superfund site

19  like this.  There is thousands of creosote pilings.  As I've

20  driven around the last six weeks around Tacoma it's easy to

21  see them in the waterway.  Heaven's sake, there is probably

22  150,000 of them around Commencement Bay.  But they're not

23  logically -- regulators wouldn't have missed that.  Right off

24  the bat that should tell you that.

25       Literature doesn't support -- it supports limited creosote

1   impact very close to the immediate area of the treated

2   pilings.  I eliminated all those slides.  It just doesn't go

3   very far.  I think Mr. Dalton says there is steady state

4   biological or certain level of bugs that get in there.

5   Seemingly after a few years it reaches a steady state and you

6   don't see any increase.  He didn't have a full explanation.

7   Mr. Brooks' article seemed to indicate that.

8        I'm not saying it's not a toxic problem, it doesn't have

9   problems with it.  In terms of Is it really impacting a

10  broader area?  The literature doesn't support that.  It

11  doesn't support there is really any significant leaching,

12  like Mr. Farlow tried to offer through that formula.  And,

13  you know, those numbers, just because it contains that stuff

14  doesn't mean it leaches out that way.

15       So there is not an evidentiary basis to find a viable

16  sediment transport mechanism from the wharf to 14.  And

17  that's where the costs were incurred.  There's no near wharf

18  chemistry or Upper Turning Basin chemistry indicating there

19  is impacts from the creosote at Weyerhaeuser's wharf.

20  Literature doesn't support pilings are a significant source.

21  CO-14 PAH concentrations do not support it.

22       Dr. Boehm says it's different.  You can't use something

23  from Canada and say it's creosote from CO-14.  We've got a

24  sample, why don't you use it?  They didn't use it.

25  Commonsense says, you know, it doesn't add up.

1      By the way, they hit this sample under the wharf that the

2   Battelle study did that had elevated PAHs.  I want to remind

3   everybody Dr. Boehm testified there was a lot of wet scrubber

4   sludge in those samples and there was -- there was a faint

5   PAH signature that he identified with creosote.  But to

6   attribute that to creosote wouldn't be fair.

7      Quickly on the measure net circulation.  You remember

8   where Mr. Cox said we put the instruments out and where we

9   study go quickly to the summary.  I'm not going to play the

10  little video, but very elaborate study.  Very good impressive

11  scientists.  Guy knows his business.  That is all his firm

12  does.  He established there is a net current inwardly, and

13  Dr. Floyd testified, and that current if ships go by, indeed

14  the last two things here, do create enough energy to

15  resuspend and that is why you can see it in the bathymetry.

16  It will get resuspended.  She says it gets redeposited on

17  sides and some goes to the Upper Turning Basin.

18     So that particular aspect of it makes it very difficult to

19  get a transport mechanism from this TEF wharf, where they say

20  it's coming from, down into -- somehow radar in on that spot

21  in CO-14 where these PAHs were found, which I think everybody

22  understands is from Kaiser.

23     Let me talk about de minimus sources and try to summarize

24  them.  I might -- I don't agree with the Court's analysis

25  that the wood waste piles are generating a hazardous

1    substance on our facility, but if they did -- the reason I

2    don't agree, I don't think natural biodegradation is -- in

3    any way can hold an owner to generating a hazardous

4    substance.

5         Every farmer's peat bogs, everybody walk by and smell

6    hydrogen sulfide, this goes on across the world, the whole

7    earth.  Good for it or we would have lots of problems.  When

8    wood dies -- something needs to happen.  God has given us

9    some bugs to take care of that.  That doesn't mean it's all

10   hazardous or what they produce is generation of a hazardous

11   substance on your facility.  I totally disagree with -- and

12   there is a case -- I can't think of it, I'm getting too

13   old -- that says, You don't have to take CERCLA so far that

14   you end up with a nonsensical result.  And this is that point

15   right there.  It's just going too far, trying to stretch

16   CERCLA too long to capture this idea that Well, there is a

17   hazardous substance being generated.

18        There is whole bunch of sources here, I believe I would

19   argue, that if the Court believes that's true, it would be de

20   minimus as well.  I don't think -- there was no SQOs, as Mr.

21   Klein says.  There was no contribution to the cost from what

22   the bugs were doing, just absolutely none.  It doesn't

23   increase the cost whatsoever.

24        And as all of these different types of sources are, the

25   upland was nothing more than urban runoff, which is

1    background.  CO-14 had urban runoff signature.  PAHs were not

2    the remedial driver, the petrogenic ones, the LPAHs.  The

3    Kaiser Ditch had a petrogenic source, but it wasn't

4    identified with the TEF or if it came from Taylor Way or

5    maybe Kaiser.

6        The wharf creosote signature, I've covered that.  It's de

7    minimus, it doesn't even show -- there is no evidence that

8    supports TEF creosote got into CO-14.  Is there some releases

9    around there?  Absolutely.  But that wasn't a release in

10   CO-14 that created any response cost to be incurred.  And

11   that's the important aspect of it.

12       Pilings and stubs, was there a release there?  Yes.  Was

13   it measurable?  Dr. Floyd said no.  Dr. Boehm said no.

14   They're just insufficient mass there for the -- for the CO-14

15   pilings and stubs, the 30 to 50, whatever number you want to

16   use, to have any meaning in the sense of what is going on in

17   CO-14.

18       Then there is cables and spikes.  There's just a few yards

19   of those.  And they're very insignificant.  We're not saying

20   they weren't there, though.

21       And, you know, there may be some other de minimus sources,

22   but the whole point here is as a chemical party Weyerhaeuser

23   is de minimus.  And I'm not saying that about wood, I'm

24   saying it about chemicals.  So I'm going to sort when we --

25   I'm going to sort out wood and I'll try to deal with it and

1   then we'll talk about chemicals and how you might look at us

2   as de minimus chemical party.  We'll go to this case and talk

3   about it.

4       This is an unpublished case.  It wasn't reported in Fed

5   Sup.  This is the only one I found that answered your

6   question:  Does this term "driver" or "drive" get used?  This

7   Court -- and this had to do with Blaw-Knox sand.  This was up

8   in Gary, Indiana, it was right near Chicago.  Everybody was

9   dumping, mixing it up back in the early days of the '70s.

10  The sand had a little bit of phenol in it, like 18 parts per

11  billion, and a trace of furan, which is one of the exotic

12  dioxins.  But the point here -- as it ended up, EPA ordered

13  sand to be used as additional cover for the remedy.

14      But they analyzed this case -- you analyze this case on

15  Okay, I view it as, okay, here is something similar to wood,

16  sand.  And you got de minimus amount of chemicals in it.  How

17  is a way to look at this thing?  The Court noted a key

18  equitable factor in CERCLA allocation is whether an allowable

19  party is responsible for the hazardous substances that drive

20  the remedy because its remedy drivers are the main reason for

21  undertaking response action in the first place.

22      And consequently for incurring response costs, the

23  determination of which liable parties have contributed to the

24  remedy drivers is critical to adjust in fair allocation.  So

25  that is a fundamental concept here.

1      Court found they hadn't met their burden here.  But there

2      is some very important language I want to share with the

3      Court.  At the top it says, Indeed a Court must ask how each

4      party's waste affected the total cost of the cleanup.  Zero

5      allocation appropriate where party's waste did not

6      significantly add to the cleanup cost.

7          And then it starts talking about CERCLA applies only to

8      release or cause incurrence of response cost under the legal

9      constraints of the new Akzo case, they reviewed this and they

10     said WCI was the party to be allocated.

11         And they're looking at this concept that I saw the Court

12     go to.  WCI may not be allocated less than the increase in

13     marginal cost of cleanup due to the presence of Blaw-Knox

14     foundry sand at the site no more than the total cost it would

15     have born had it been the only polluter.

16         Therefore, plaintiffs may not recover any share of the

17     site response cost from the WCI unless they have proven by a

18     preponderance of the evidence that Blaw-Knox foundry sand

19     significantly increased site response costs, to the costs

20     that they seek to recover from WCI represent at least the

21     increase in marginal cost necessitated by Blaw-Knox's foundry

22     sand -- in other words, the floor, established in, they quote

23     Akzo.  And third, the cost they seek to recover from WCI

24     represent no more than, "The total cost it would have born

25     had Blaw-Knox foundry sand been the only material placed in

1   the site -- in other words, the ceiling.

2        When you asked us to look at what would have

3   Weyerhaeuser's responsibility been for the wood under its

4   agreement with Ecology if -- wasn't any chemistry.  I think

5   this case picks up on this idea.

6        And I want to share with you some information that we have

7   in the file that examines what the floor would be, and would

8   look at the ceiling.

9            THE COURT:  We're going to take our mid afternoon

10  break.  Let me ask you, with regard to the -- I'm trying to

11  keep time and the length of the break.

12       How long do you think rebuttal will be?  You wanted an

13  hour.

14           MR. MYERS:  We went from --

15           THE COURT:  We've been trying to shrink the number of

16  issues.

17           MR. MYERS:  We went from 9:00 to 11:25.  My

18  understanding was, given how you broke it up, that included

19  breaks.  And so we've got 35 minutes left on our clock.

20  They've got -- they did 35 minutes from 11:25 to noon.  They

21  have now added another hour and a half on top of that so that

22  looks like they've got --

23           MR. COLDIRON:  I don't think I'll take the full hour.

24           THE COURT:  All I want to do is make sure everybody

25  gets a chance to say everything they want to say because

1    staff, at least -- this is fun for me, it's not -- it's less

2    fun for them.

3    (Court in recess.)

4         THE COURT:  Please be seated.

5         MR. COLDIRON:  Before I move to the next case I want

6    to make a couple more comments about this Ninth Avenue case.

7    Here they didn't assess any lability or any cost on the

8    foundry sand because EPA had decided to go ahead and use the

9    sand for part of the remedy.  So the Court said, Really, this

10   cheaper sand was a net benefit to the site, so they didn't

11   find any evidence to say that there should be any marginal

12   cost.

13      The Akzo case, I want to briefly touch on that.

14         THE COURT:  I've read it.  Go ahead.

15         MR. COLDIRON:  Hypothetical that is there, if you

16   have volume of the performing party spends $500, and the

17   marginal extra cost for the nonperforming is another hundred

18   dollars, then the $100 becomes the floor, the difference

19   there of what it cost them to do the extra volume.  But if

20   the nonperforming party standing alone would have had to do

21   it, he would have spend $900 for his volume, then the ceiling

22   becomes the 900 and the floor is 100.

23      That hypothetical they use in the Akzo case is where

24   this concept came in the Ninth Avenue case.

25         THE COURT:  If you were to do that hypothetical for

1   this case, how would you do that?

2          MR. COLDIRON:  I'll show you.

3       Next case is *Acushnet v. Mohasco*.  We had an unpermitted

4   beautiful scenic place that over the years become a dump,

5   trash dump, Superfund site.  And unfortunately for that.

6       But there was some interesting fact questions here and

7   they were dealing with de minimus parties.  These were

8   parties EPA left out.  The Acushnet group were the performing

9   parties, a large group of companies listed there, and other

10  companies did not get named.  They got named, but EPA didn't

11  pursue them, similar to Weyerhaeuser here.  They had to deal

12  with some kind of unique facts.

13      This one, a company called Nett, N-E-T-T, had dumped a

14  bunch of old -- it says here, The butts of old telephone

15  poles that had been treated with liquid creosote.  The Court

16  describes it as chock full of polycyclic aromatic

17  hydrocarbons.  And there was also discarded scrap table

18  containing lead and copper and zinc.  There were some other

19  things generated by the other parties.

20      And in looking at this, Court granted a summary motion

21  and -- as to Nett and they just said that the scientific

22  evidence showed that the creosote-treated pole butts could

23  not have leached PAHs into the soil in an amount greater than

24  the preexisting background PAH levels and that other sources

25  provided the overwhelming proportion of PAH found at

1    Sullivan's Ledge.  Sullivan's Ledge is the unpermitted waste

2    dump.

3         Because plaintiffs did not produce any evidence

4    challenging that testimony, then there was nothing to try.

5    And the lower court had a causation basis for it which the

6    second -- First Circuit here said that's not the law here.

7    But they said on the fact we can uphold the decision.

8         The other thing was -- this is another look at de

9    minimus -- was this cable.  They made this analysis how much

10   was there, and a couple of cubic yards, I think, versus the

11   overall volume.  They said it's not enough to be even talked

12   about.  This de minimus party shouldn't even be here.

13        So all these de minimus parties were not found to have

14   caused any response costs.  And at the bottom here they say

15   the evidence at trial, again, fails every version one might

16   conceive of an equitable factors test.  So while there might

17   be liability, there is times for de minimus parties where it

18   doesn't make sense to charge them with anything.

19        So they note the basis for it.  And three is where --

20   under 9607 where you have the release or threatened release

21   clause.  A little footnote said that the hot contest here was

22   the correct legal standard by which one had been said to have

23   caused it.  That was what the fight over.  And I guess that's

24   what the fight is over here, Judge.

25             THE COURT:  Yes.

1          MR. COLDIRON:  The Court went on to say that -- the

2     lower court here -- that the causal element, you don't have

3     to have anything more than they do in the Ninth Circuit.  If

4     there is a facility and release of a hazardous substance,

5     that's enough causal.  And they disagreed with the judge on

6     that.

7          But they -- on the evidence they said that it doesn't

8     necessarily mean, however, that the de minimus polluter must

9     necessarily be held liable for all response costs.  They were

10    looking at it not under the Pinal Creek contribution several

11    standard out here, they were wrestling with joint and

12    several.  And they noted that you could escape liability if

13    it's divisible.

14         And the logic there is if your harm is divisible and it's

15    so little not to count that it doesn't even cause you to

16    incur response costs, at the end of this case they say in

17    equity in 113, the judge that charged with this can do

18    something about it.  He can fix that if you're that de

19    minimus.

20         THE COURT:  So you would say, for example in this

21    case, what strikes me is in the real world wood increased the

22    cost of cleanup significantly by virtue of its volume.  But

23    this Court is holding that wood doesn't give rise to CERCLA

24    liability as a hazardous substance itself.

25         MR. COLDIRON:  Yes --

1            THE COURT:  But to the extent it is associated or

2      generates, or whatever, ammonia hydrogen sulfide 4-methyl,

3      those didn't drive the cleanup and didn't add the response

4      cost.  On the other hand, PAHs did.  And the creosote, which

5      is a hazardous substance, CERCLA gives the hook creating

6      CERCLA liability, you're de minimus.

7            MR. COLDIRON:  Exactly.

8            THE COURT:  But then wet scrubber sludge, which is

9      the driver of the response costs here is an orphan share.

10          Are we comparing Weyerhaeuser's de minimus share with

11     General Metals' perhaps de minimus share and splitting on

12     that basis or are we going to say, You, General Metals, were

13     in this soup long before we got here and for a variety of

14     reasons and this is the area that CERCLA carved out for you

15     to clean up.  So we're looking at Weyerhaeuser severally,

16     even as to division of orphan share and we focus on

17     Weyerhaeuser only, they get a de minimus share, you get

18     everything else.

19            MR. COLDIRON:  I heard exactly what you said.  And it

20     can all be thought through that way.  I want to say what I

21     think these cases are instructing us on that, helpful to you

22     perhaps, I think the hook is there.  We're de minimus

23     chemical party from three or four sources.  No question about

24     that.

25          I think under the case I just talked to you about, the

1    Indiana case, the foundry sand case, you can say under the

2    equitable party you have in 113, I got a liable party here.

3    I want to do something about what -- even though the wood is

4    nonhazardous, I want to do something about that because these

5    folks spent money to get rid of it and it caused them some

6    problems when they were getting rid of it.  They had spikes

7    that flattened their tires, and all the reasons that they

8    said.

9        You should look at that and decide how much should be

10    allocated past the floor, which is what we caused.  You have

11    to decide, Your Honor, how far you want to take that.  But

12    I'm going to show you some metrics in a minute that give you

13    the power to do that.  I won't spend a lot of time here.

14        But I do want to say that -- let me --  well, there is an

15    actual statement here at the bottom, Alcan II panel -- that's

16    a real famous Superfund case -- took great pains to leave the

17    questions of liability, including divisibility of

18    environmental harm and equitable apportion of cleanup costs,

19    to the sound discretion of the trial judge to be handled in

20    the manner and the order that he or she deems best.

21        I think that's some of the best law we have because you're

22    the one that can listen to everything.  You understand it and

23    you can do some things to make sure it's fair and follow the

24    law at the same time.

25        I'm going to jump back here.  I pulled out quite a bit of

1    this.   There is a line of cases that say spills could be so
2    inconsequential as to where nothing should be assessed and
3    whatnot.   At the end of this case it talks about three
4    reasons why de minimus -- a de minimus party doesn't have to
5    pay a whole lot.   There is a concept that maybe we should
6    under Superfund just because you're liable.   And the whole
7    idea behind 113 was to take this draconian sting of joint and
8    several liability out of people who really shouldn't be
9    standing out there.

10        So the case discusses three reasons.   It talks about
11    congressional intent was never to reach everything out there,
12    wood, for instance, and make it hazardous or impose on there
13    any quantity of a hazardous substance.   So there is some
14    cases that go along that line.

15        So this particular piece is worth thinking about.   It
16    says, Third, the CERCLA defendants who prevail on issues of
17    fair apportionment, even if summary judgment stays allow the
18    CERCLA defendant to prevail, is consistent with Congress's
19    intent that joint and several liability would not be imposed
20    mechanically in all cases.

21        Permitting a result that is tantamount to no liability
22    finding is in keeping with the legislative goal that cleanup
23    efforts begin in a speedy fashion and that litigation over
24    the details of actual responsibility follow.   In fact, to
25    require an inconsequential polluter to litigate until the

1    bitter end -- we feel that way, Judge -- that -- to the

2    bitter end would run counter to the Congress's mandate that

3    CERCLA actions be resolved as fairly and efficiently as

4    possible, and on the whole the cost and inherited in

5    fairness.

6         And second, saddling a party who has contributed only

7    trace amounts of hazardous waste with the joint and several

8    liability of all costs incurred outweigh the public interest

9    in requiring full contribution from de minimus polluters.

10        That says how I feel about this based on our facts in this

11   particular case.

12        Then it says there was argument by the plaintiffs, No one

13   will sign a consent decree again if you let that happen.

14   Court says, Because we ground the quantum inquiry solidly in

15   9613 F, we are satisfied that the prophesy will not come to

16   pass.  The ultimate failure of a contribution claim because

17   someone did only a negligible amount of harm does not impede

18   enforcement by EPA or frustrate any of CERCLA's objectives.

19        And, you know, you don't have to make wood a hazardous

20   substance here to cause Weyerhaeuser to pay its fair share

21   for the wood.  We're a de minimus chemical party.  You've got

22   the power under 113 to fashion what is fair there.  But --

23   you've got the power under 113 to decide how orphan share

24   should be distributed.  I don't believe that orphan share

25   should be distributed based on Weyerhaeuser being responsible

1    for nonhazardous wood even though you have the power to do

2    it, to hold us responsible for the wood.

3        I want to go through what our costs were.  Mr. Klein noted

4    this.  We've never been treated like we've ever done

5    anything.  That's been a constant theme although we did quite

6    a bit for a party that has a log sort yard with wood on it,

7    one single piece of equipment that is of any significance, a

8    de-barker, loading ships.  I mean, we've done a lot.  We paid

9    a lot.  And, you know, the study cost and remedial cost and

10   Kaiser Ditch and TEF study cost all came up to $5.4 million,

11   they act like we didn't do that, that we weren't cooperative

12   with the agency, that we didn't function, that we didn't

13   dredge and that we didn't do these studies, we didn't

14   cooperate with EPA.  That's all wrong.  We did.  These costs

15   were legitimate costs and they should be considered by the

16   Court as an equitable factor.

17       Mr. Recker gave us a metric on disposal at PSDDA.  And I

18   don't think anyone is really disputing that particular 59

19   bucks, roughly.  And then he also give us the reason and

20   rationale behind the Battelle study cost of $1.9 million.

21       I want to look at plaintiffs' incremental wood cost, which

22   I'm going back to the Ninth Street landfill case.  We can see

23   the wood, we know where it's at.  It's identifiable.  And

24   Dr. Floyd estimated those volumes for the wood two ways.  In

25   her first analysis, bottom line, she comes up with 5500 cubic

1    yards and she said that number was good plus or minus

2    25 percent.  She used bathymetry.  It's a legitimate number.

3    It's one metric the Court can use in considering it in terms

4    of the wood there is -- it's above the 72 line or very near

5    it.  Maybe not perfect, but when you add or subtract what she

6    did and what she said, it's a fair number.

7        And if the difficulty of removing the wood or whatever you

8    want to think about the wood needs to be increased, it's easy

9    to increase that volume and add to those costs.  But it's a

10   real metric is what I'm saying.

11       Mr. Dovell, who strikes me as very knowledgeable in

12   Superfund, very sharp guy, he analyzed all the costs of the

13   HHCG and he said there is some things in their cost that

14   shouldn't be there for the marginal or incremental cost.  You

15   recall that, Your Honor.

16       And he came up with a very important metric for the Court

17   to use, I think, and that is the cost per ton.  And the cost

18   per ton is 49.23 when you take all their numbers and pull out

19   the things that shouldn't be there.  And that is their real

20   out-of-pocket hard dollar regardless of -- all of this was

21   going upland.  That's the real cost they went to.

22       If you convert that to cubic yards, which is a little

23   easier to use, you get $72 a cubic yard, which is roughly

24   $20, $22 more than the PSDDA disposal cost.  So their real

25   bottom-line cost of about $72 compared to 60 that we have.

1    If you wanted to think about our floor, if you don't agree

2    with the 5500 in her -- in the table, the one she offered

3    this week, it was 5600.

4        In my table I'm suggesting you can adjust that however you

5    want to, to say this is equitable volume for wood.  You run

6    it by the $72 -- in my table you can see how that's computed

7    that fairly easily -- you increase this number -- if you want

8    to use the plaintiffs' real out-of-pocket costs you increase

9    this number by about 20 percent and that's what -- that's

10   what they had to pay for taking the wood out of there.

11       So I would view this as the floor dollars.  This is

12   marginal or incremental cost for dealing with or managing

13   wood even though it's not hazardous in CO-14.

14       Is that understandable?

15       Let's look at Weyerhaeuser's wood debris consent decree

16   obligation.  We've seen this chart.  This is Dr. Floyd's

17   analysis.  She did it a different way through a different

18   door, really put a lot of work into this.  Use TVS and the --

19   all the barge loads and everything she can get her hands on

20   for three days and she ends up at 5600 cubic yards saying --

21   although she didn't subtract some areas where she thought she

22   might be able to, she left it all in, we're still at 5600

23   cubic yards.

24       Only way I can relate to that is a big dump truck is 10

25   cubic yards, so this is like 550 dump truck loads coming out

1   there.  It's not a small volume of wood.  It's a large volume

2   of wood.

3       In my view, if the Court wanted to a bullet on us use a

4   number.  If you want to make them totally whole for the wood,

5   one was $72, you come up with $550,000, $600,000.

6       How much sediment is associated with that wood?  We feel

7   like yes, if there had been no chemistry we would have

8   removed that sediment under our consent decree.  She gave us

9   a range of between 13,900 and 16,200 cubic yards as

10  reasonable.  She felt those were good numbers.  It's

11  comparable to the 15,000 she did the other way.

12      So if the Court wants to impose more volume on us for this

13  contaminated sediment, all you have to do is say, Okay, I'm

14  going to add to Weyerhaeuser's burden here some of this

15  sediment.  And you've got -- you can take it all the way up

16  based on her numbers, which I think are good numbers, the

17  total there would be -- if you go the wood and add it on it's

18  about an additional 10,000 cubic yards belongs to sediment.

19      So, you know, that would be something the Court could do.

20  It could add sediment on to whatever you think is fair or you

21  could add to wood.  I'm not trying to suggest I know it all,

22  but I do understand numbers pretty well and I do understand

23  volumes.  I know this metric here and the Table 1 is an

24  important metric.

25      You -- you've not talked about 13.  I'm going to use her

1    Table 13 in my -- end table on orphan share.  But it's there.

2         Now I would like to visit about equitable factors for a

3    little bit.  We started as an industrial site.  We know

4    Kaiser has a lot of responsibility.  They emitted a lot of

5    different waste.  We know Arkema put a lot of metals into the

6    waterway.  We know that General Metals put PCBs.  We know the

7    sort yard is de minimus.  I don't think there is any evidence

8    to indicate we're not a chemical de minimus party, but it's

9    from several different sources, I grant you.  But all of them

10   are de minimus chemical volumes and none of them caused

11   any -- either plaintiff to incur response costs.  We put wood

12   out there.

13        This is the site thing that Mr. Klein suggested.  The

14   Court can, if it wants to -- I don't think it's a good way

15   personally.  I think the wood debris site is where chemicals

16   and wood mixed.  I think that is what this lawsuit is about.

17   I think a way to look at this is:  What did the five

18   performing parties do, not just the three of us?  There is

19   five performing parties.

20        You'll find in my table and analysis that Manke did more

21   than anybody.  I know it didn't start out that way and he

22   wasn't planning on paying for chemicals, but he paid for more

23   than anyone else.

24             THE COURT:  And he's not happy about it.

25             MR. COLDIRON:  But a better site to use for orphan

1   share analysis.  I'm saying here is what you've done, you

2   have fixed the wood by making us pay some volume.  I don't

3   know how you'll set that.  You've got metrics.  And we'll pay

4   "X" dollars and the wood deal is done.

5        Now let's talk about orphan share.  Here you got the site,

6   you've got chemicals, wood, five people dredging out there.

7   That's, in essence, what you have.

8        And here is some factors that go into that.  Weyerhaeuser,

9   as Dr. Floyd noted, has been dredging stuff for a long time.

10  And ever since they've been there, according to Dr. Floyd,

11  we've been dredging wet scrubber sludge from around our

12  facility that gets moved up the waterway.

13       How much of this 61,200 yards accounts for wet scrubber

14  sludge?  I don't know.  We didn't get an estimate.  But she

15  said it was there.

16       So I think that is a factor to put in the back of your

17  mind when you think about what Weyerhaeuser's responsibility

18  because we've removed and paid for in the past wet scrubber

19  sludge removal.

20       We've got our costs.  We've covered those.  We've got the

21  volume that we dredged under the consent decree and it

22  amounted to -- this is not the corrected volume, but --

23  table, but I'm showing this to say We've some cost that go to

24  PAHs that is from wet scrubber sludge.  No one disputes that

25  those PAHs we dredged in excess of SQOs -- I think it's 5600

1   cubic yards -- wasn't wet scrubber sludge.  It's undisputed

2   that the PAHs were.

3       Now, this is Dr. Floyd's Exhibit A-795.  It shows how much

4   Manke did, how much Manke volume exceeded SQOs and how much

5   of that volume was PCBs greater than 300.  And Manke,

6   45 percent of what they took out of there sediment wise

7   directly benefitted the chemical parties here.  And all they

8   had was wood.  And you'll see in my orphan share analysis

9   they've overperformed everybody else.

10      THE COURT:  I think Mr. Jacoby indicated they had

11  started out as a chemical -- they were brought into the --

12      MR. COLDIRON:  I think they had some metals around

13  their dock.  But they ended up moving a lot of sediment and a

14  lot of wood for reasons -- they had this large amount of

15  wood.  It served as a barrier for sediment to sit on so they

16  moved it.  So they end up in the mix benefitting all the

17  parties really because they moved a lot of sediment that

18  should be considered.

19      You remember the Battelle thing.  This is an equitable

20  factor in Weyerhaeuser's favor the Court should balance.  It

21  was an expensive study, but it performed an important

22  function.  It identified Kaiser as a major source.  They had

23  somehow, amazingly so, been able to duck that.  I can't

24  believe with all the historical stuff nobody dug it out and

25  figured it out.  No one had.  Weyerhaeuser did and EPA used

1    it and so did the trustees.

2         The only negative on that, and it's not Weyerhaeuser's

3    fault, Kaiser took bankruptcy.  They should have paid all

4    this.  But it wasn't that these costs were incurred in good

5    faith and we should be given some credit for it.

6         Back to the comparative analysis, we've talked about that

7    one.  This is the settlement chart out of the consent decree

8    that we got into evidence.  This has the settlements of the

9    plaintiffs during the case.  This was Mr. Gross's exhibit

10   where he looked around the Hylebos Wood Debris Group site

11   and -- we're not trying to put in play the whole $10 million.

12   That's not a good way to do it.

13        There is about 2.1, 2.2 million here that pertains to the

14   Hylebos wood debris site.  The other 8 million goes to the

15   Middle Turning Basin where chemicals were.

16        This is a better way, I think, to say what happened here

17   and how does this fit in to the equation or calculus, however

18   you want to talk about it?  So what are some of the summaries

19   here that are important --

20        THE COURT:  Characterize your view of what those

21   settlements were for.

22        MR. COLDIRON:  They were for a whole host of things.

23        THE COURT:  They're CERCLA related.

24        MR. COLDIRON:  They were CERCLA settlements.  They

25   included for contribution like the Asarco slag and their

1   contribution.  Obviously there was probably some

2   settlement -- at least volume concept dealing with the wood.

3   You've got some future costs tagged in.

4        What drives the numbers are premiums you get for

5   settlement.  For getting out you pay a big premium.  The

6   number's about double here.  So the premium does something.

7   I mean, in these settlements -- and under the law they're

8   suppose to reduce everybody's liability -- we haven't gotten

9   any money.  My analysis is they've got the money.  I'm not

10  looking at this from a dollar standpoint.  I'm analyzing it

11  this from a cubic yards standpoint.  It's a lot easier to

12  figure out.

13       And this -- Mr. Dovell's number, the $72 into that, that's

14  a cubic yard they got.  It's easier to analyze it when you do

15  that.  If you want to give us credit for the Battelle report,

16  give us some of the money, divide by the 72 and you get

17  volume.  You will know how much credit we get against Kaiser.

18  It's an easier way to analyze what is a very complex pie.

19       Okay.  Volume -- main equitable factors under the case

20  law.  There was a lot of industrial plants and a lot of

21  history.  Of those volumes the TEF is de minimus.  We talked

22  about that.

23       The driver for the remedy is a chemistry.  And there is

24  three chemicals here.  Plaintiffs have always tried to act

25  like they don't have chemicals.  That's been exposed in the

1   litigation here.

2       And, Judge, I don't think these are bad people.  I really

3   don't.  I mean, I admire the companies for stepping up and

4   doing it.  I work with companies all the time and so does Mr.

5   Myers.  We're not here picking on each other.  I know lawyers

6   advocate positions.  All the companies in the room here did

7   what they should have done.  I agree with the Court on that.

8       But nonetheless, they're the ones under the law that

9   created a problem.  They created a problem for a long period

10  time and it had far-reaching influence in the waterway.  The

11  law holds them principally responsible.  That's the way it

12  works.

13      They tried their best to make wood hazardous.  They tried

14  their best to say that biological testing means wood was in

15  the ROD.  It doesn't hold up.  Wood was not in the CERCLA

16  consent decree and statement of work.  It wasn't in the 2000

17  ESD and wasn't in ROD in a direct way.

18      Even though they talk about consistency with the ROD, sure

19  it is, it's cleaning up the waterway.  When Ecology said,

20  We're taking care of this, it's got to be consistent because

21  it's the goal.  Regulators aren't going to say anything

22  differently.  Make no mistake about it, chemistry is driving

23  this remedy, and just chemistry.

24      Incremental wood.  When I did this it was -- I used 5600.

25  I say that's the floor.  If the Court wants to adjust that

1   volume, you adjust it, multiply it by the $72 per cubic yard

2   that Mr. Dovell used and you come up with a higher number.

3   That allows the Court to satisfy itself and everything it's

4   heard, all the testimony, what Weyerhaeuser's share that

5   admittedly we get hooked into because we're a de minimus

6   chemical party that we have to pay for the wood that is

7   there.  Weyerhaeuser has said it's willing to do that.  It's

8   never said it wouldn't do that.  And I think it's a fair

9   result.

10       We don't know how to set the number.  You've got to set

11   the number.

12       Weyerhaeuser -- CO-14 -- this is the other part of the

13   equation that you asked.  I don't know how you're going to

14   apply it.  I believe from the case law I brought to the

15   Court's attention it represents the ceiling.  These are total

16   volumes that include all the wood and all the sediment above

17   the '91 bathymetry when Weyerhaeuser started operating in

18   that area next to CO-14.

19       If the Court wants to impose on us all the sediment

20   including the wood debris that is in CO-14 from the time we

21   started operating on the waterway, then you run the number at

22   13.9 to 16.2.

23       Now, this number -- these numbers use the PSDDA cost.

24   That won't make the parties whole.  You got to run the number

25   with the $72.  It will increase these costs like a million to

1   a million and a half, something like that.  If the Court

2   feels inclined to do that, that is within the Court's power.

3   You're the one that has to decide for us.  We don't

4   personally think we should be paying for chemistry.

5       If you think that's a fair way to deal with orphan share,

6   let us pay for chemistry.  That's the way to do it.  It's a

7   metric that has some reliability to it.  There is basis for

8   doing it, not just guesswork.  It's a known thing, how much

9   sediment was added after we showed up on the scene as the kid

10  buying into a Superfund site, as you said.

11      I want to pass on 13.  That had to do with Wood Debris

12  Group.  I have no idea how they would resolve that.  I've

13  included those settlements in orphan share analysis.  These

14  are Dr. Floyd's numbers again on Table 2 dealing with CO-13.

15  And I think that CO-13 costs, those settlement numbers, that

16  2.1 million, should be looked at to see how they work there.

17  Convert that to cubic yards, see how that works to make these

18  guys whole.  I think that's an important metric to consider.

19      For Weyerhaeuser, I first of all think for orphan share

20  consideration we have to be viewed as a de minimus chemical

21  party.  We have to be viewed as somebody that's performed.

22  We're not -- we're not zero as Mr. Myers writes down out

23  here.  For this site we're not zero.  We spent 3.4 million

24  directly in the waterway and we moved chemicals along with

25  the wood when we did that.  We did a study and we -- this

1  5600 is exceedances of SQOs that they would had to have pick

2  up on their order.

3       So I don't know how you get us to zero.  I don't know how

4  you say we haven't performed.  I don't see it.  I don't think

5  that's fair or the right way to look at it.  And here, these

6  are factors that the Court can weigh and decide on in some

7  fashion to make it right.

8       We have dredged a lot of material and some of that

9  material contained wet scrubber sludge.  And we did do the

10  Battelle study.  And you can run how much ever credit, maybe

11  it's 50 percent, maybe it's -- I don't know how much credit

12  you think we'll get out of that.  You can run the $72 into

13  that and it will give you a cubic yard that we did against

14  Kaiser.  And I think it should be thought of as an orphan

15  share credit.

16       Like I said, there is settlement of funds to consider.

17  There is future Kaiser Asarco settlements.  We don't know

18  what those are.  It's something for the Court to ponder.

19       I have to say this, plaintiffs have been pretty

20  unrelenting here with Weyerhaeuser.  And the effort to make

21  us a chemical party in spite of all this historical stuff, I

22  think the Court can weigh that.  You may not feel that way.

23  I think it's an important fact.  We have had to fight this

24  thing tooth and toenail for two and a half, three years now

25  and we're a de minimus chemical party.  There is no question

1    the evidence showed that.  I think that is a factor.

2         You've mentioned in the neighborhood and I agree we're in

3    the neighborhood.  We wish we weren't.  In fairness, I don't

4    think that should be a penalty just because we're in the

5    neighborhood.  I think it should be viewed in the sense of

6    Wood Debris Group site at the neck and Upper Turning Basin

7    and see what everybody did and how they contributed.  I don't

8    think there should be some massive penalty for that.

9         I don't feel like the 1970s level of environmental

10   sophistication was high enough to blame us for not doing due

11   diligence.  Who would have looked in the waterway in 1970?

12   They didn't even look upland.  No one would have looked in

13   the waterway to see there is PCBs and arsenic and wet

14   scrubber sludge there.  This wouldn't have happened.  I don't

15   think -- I think the statute allows us a defense there for

16   those chemicals in the waterway.

17        Performing parties and economics, these are all big

18   companies.  As a factor I don't think that helps.  Regulatory

19   cooperation, I don't think that helps.  Both parties have

20   cooperated with the respective agencies.  I didn't call the

21   Gore factors.  I don't think it helps.

22        They've asked for 18 percent of all the future costs.  I

23   don't think that is right.  I don't think it's fair.  The

24   MTCA future cost Weyerhaeuser has under its order, we've got

25   a -- up in Wasser Winters there is a large area where all

1   those rafts were that called NEBA, Net Environmental Benefit
2   Area.  If that doesn't recover we got to be out there
3   re-dredging a very large area.  They've got to monitor that.
4   Nobody knows how that will work out.  It can go the other
5   way.  And there is more dredging cost for the wood debris
6   companies.
7       All the wood debris companies had to implement what is
8   called this OMMP plan.  So they're -- all of them are having
9   to work on the waterway to keep as much wood waste out of the
10  waterway as they can.  That's a continuing cost to comply
11  with and report on.
12      So Weyerhaeuser has its own set of future costs that the
13  Court should consider.  We shouldn't -- as a de minimus
14  party, to be honest, we shouldn't be imposed CERCLA future
15  cost.  Shouldn't happen.
16      Let me go to my harrowed attempt to give you something to
17  work with.  There is not -- I want to show you the next
18  slide.  What I'm doing at the end of the day here, Judge, I'm
19  saying let's look at who did what, give them credit and
20  adjust it on the right as you see fit to adjust it.
21      The end-of-day analysis is on this second sheet.  I want
22  to tell what you assumptions I put in to the calculus here.
23  I need to go through the comments.
24          MR. MYERS:  Your Honor, I don't want to interrupt
25  Mr. Coldiron as he goes into this, but I think his time is up

1   and we want to make sure that we have our adequate time.

2         THE COURT:  We're going to do --

3         MR. COLDIRON:  I'll do this in five minutes.

4         THE COURT:  And you'll have your 35 minutes.

5         MR. COLDIRON:  The two key assumptions here -- three

6   or four of them -- is the Hylebos wood debris site, Comment 4

7   is that the $72 that Mr. Dovell came up with, that's the key

8   metric to use here.  And then you've got settlements and that

9   converts -- that settlement converts to 30,400 cubic yards.

10  In my analysis I assign all the orphans 30 percent of all

11  volumes.  That's hefty, but Kaiser was pretty hefty and who

12  knows about Asarco.

13      If you want to follow along here, I looked at all areas

14  where people dredged and what those volumes were.  And that

15  gives you a total volume.  They dredged in 13, 14, and you

16  can see who did what where.  And what I've done in 14 is I've

17  subtracted or I've taken -- I assume the Court was going to

18  make us pay for the wood, so I've subtracted from the

19  plaintiffs' volume the wood volume out of 14.

20      So you can play with that number and make it the way it

21  needs to be.  But at the end of the day you end up with total

22  volumes that everybody dredged.  And, of course, you see

23  Manke is twice as much as the plaintiffs here.  Weyerhaeuser

24  is 24,000 and LP is not really a player here, they had too

25  small a volume.

1        Then I looked at SQO exceedances.  You can see Manke

2   and -- Manke had 41,000.  And to me that's orphan share.

3   That's chemicals that nobody paid for.  It's wet scrubber

4   sludge and PCBs and whatnot.  And we know ours is wet

5   scrubber sludge from Kaiser.  So in fairness would say you

6   adjust orphan share that you're going to calculate down --

7   you credit this volume and see what you turn up with.  So

8   when you run -- keep that number in mind.

9        When you look at these adjusted volumes, which gets

10  everybody lined up, then you run 30 percent on that volume,

11  that shows you how much volume each party really moved in

12  terms of dredging orphan share.  And you can see Manke moved

13  27,900.  When you subtracted the 27- from the 41-, they're

14  13,000 more than the percentage at 30 percent.  Weyerhaeuser

15  is barely over by 16- and then you've got the plaintiffs here

16  at ten eight.

17        Now, I did not adjust -- I did not adjust the plaintiffs'

18  numbers here for any share they should be bearing.  I think

19  the Court should do that.  Let's say you view them 25 percent

20  responsible for the whole side orphan share wise, you would

21  cut that volume in half, adjust that number by whatever you

22  think their responsibility under Pinal Creek would be for

23  their share of the orphan share.

24        It certainly wouldn't be unreasonable to say that, you

25  know, they're 25 a piece or 30 percent a piece and everybody

1    else is ten.  So that's the calculus there.

2        I'm going to move on to this last chart.  You can see that

3    Manke paid a large excess.  This is not complicated math,

4    it's a logic diagram to weigh it.  You can see Weyerhaeuser

5    was under by adding wood volume in CO-14, that created a

6    shortfall.  We didn't net on our SQOs out in front of our

7    dock.  We're under 1600.  But if you give us any credit at

8    all for Battelle -- I took all the credit -- that is 26,000

9    cubic yards.  That leaves us over 24,000.  That would make us

10   larger than anyone else in excess.  LP is under by 1170.  And

11   General Metals, they're 10,800 when you subtract the

12   settlement money.  Here's where the settlement money comes in

13   from the prior page.

14       Right here is settlement volume for 2.3 million.  You

15   divide it in half.  You see that this nets out -- take the

16   ten eight, they're -- they've got an excess.  They're totally

17   made whole.  In fact, even if you credit the 6,000, 3,000

18   yards a piece for CO-13, they're still 1300 yards more

19   than -- because of the credit from the performing -- from the

20   settlements.

21       So that was the way I conceptualize this.  It's a way to

22   let you see if people are being treated right.  I think it

23   will help the Court to consider it that way.  Thank you.

24           MR. McCARTHY:  I thought chemistry was complicated.

25       Mr. Myers and I are going to share our rebuttal time as

1    hopefully we'll share some liquid refreshment when this is

2    all over.

3        Your Honor, I would like to start with a third-party

4    defense.  And I'll try to be brief but go slowly for Nichole

5    on this as we're getting towards the end of the day.  But

6    Weyerhaeuser's third-party defense.  That argument was

7    briefed in summary judgment.  And the Court found that they

8    were liable.

9        Do I need to go into the third-party defense?

10        THE COURT:  No.  Legal matter, I understand it.  I'm

11    going to look at it.

12        MR. McCARTHY:  But the judge already ruled they're

13    liable.

14        THE COURT:  I understand.  At this point I'm not

15    persuaded to change my mind.  But I'm going to look at

16    everything in coming up --

17        MR. McCARTHY:  Then just briefly, if you're going to

18    look at it again, to qualify for the third-party defense

19    under CERCLA you have to have absolutely no connection with

20    any contamination at the site.  You cannot be in a

21    contractual relation with anybody who did, and they bought

22    the property from Kaiser.

23        THE COURT:  Third-party defense in the motion, if

24    you'll remember, was related to Foss and others.  That was as

25    an independent contractor and so forth.  I didn't buy that

1    argument at all.  The third-party defense today really was

2    your Exhibit 11.  So it's oriented in a different direction.

3    That's my recollection.

4            MR. McCARTHY:  That's fine, Your Honor.  And they

5    cited Section 9601 Q, which is, I think, about three or four

6    pages long of the requirements that you have to do as far as

7    due diligence.  And although I know Weyerhaeuser purchased

8    the property in 1970, CERCLA is retroactive.  They just don't

9    qualify.

10     Weyerhaeuser's contribution claim, they didn't brief that

11   in their trial brief.  I thought they had dropped it, but

12   they haven't.

13           THE COURT:  Are you talking about the offsets?

14           MR. McCARTHY:  No, Your Honor, simply that -- this is

15   Exhibit 581, I believe, which is the plaintiffs' consent

16   decree with EPA.  And this is the plaintiffs' contribution

17   protection clause, Section 100.  Here, unlike the Wood Debris

18   Group's consent decree, this contribution protection clause

19   defines matters addressed and it includes all response

20   actions taken or to be taken and all response costs incurred

21   or to be incurred by the United States settling defendants,

22   party implementing remedial design and remedial action in the

23   mouth of the Hylebos Waterway or any other person with

24   respect to the Hylebos Waterway problem area, which included

25   the area -- the Upper Turning Basin.

1        And, Your Honor, there wasn't much time over the lunch

2    hour to do any research, but there is ample case law in the

3    record.  I'll cite one case that also has -- it's useful

4    because it cites other cases, but this is the first one I

5    could find in the time that we had.  But it's well

6    established that the CERCLA contribution protection preempted

7    state law claims for contribution and indemnity.  And the

8    case is *Alcan Aluminum* -- this is another unreported case, I

9    apologize -- *v. Butler Aviation-Boston, Inc.*, from the middle

10   district of Pennsylvania, 2003 case.  The cite would be --

11   it's a LEXIS cite, 2003 U.S. Dist.  LEXIS 16435.

12        MR. KLEIN:  We concede they have CERCLA contribution

13   protection.

14        MR. McCARTHY:  It preempts --

15        THE COURT:  That's fine.

16        MR. McCARTHY:  If you look at this page, it's page 9,

17   there is ample case law from other circuits on this issue.

18        THE COURT:  Okay.  I think that the contribution

19   claim --

20        MR. McCARTHY:  This is the total defense.  Our

21   contribution protection that we received under our consent

22   decree is a complete defense.

23        I want to touch briefly on the settlements.

24        Your Honor asked Mr. Coldiron about the settlements with

25   all the wood-related parties, what those settlements were

1   for.

2        First of all, each of the Dunlap settlements had to do

3   with both wood and arsenic and other chemicals associated

4   with Asarco slag.  It was not just for wood.  And as

5   Weyerhaeuser demonstrated, there is a clear demarcation.

6   That area is 12 and 13.  That's where the Dunlap operations

7   were.  All those parties were both chemical parties and wood

8   parties.  And their operations only affected CO-12 and CO-13.

9        If we go to LP and Manke, they were also slag and wood,

10  and their liability in the neck of the waterway was because

11  they tied up at Pennwalt tie and their log rafting activities

12  impacted CO-12 and 13.  None of the these settlements had

13  anything to do with CO-14.

14       THE COURT:  Manke didn't -- I don't think Manke, as I

15  recall, had very much slag.  I can't remember them being

16  part --

17       MR. McCARTHY:  That was one of the hooks that the

18  EPA --

19       THE COURT:  Right, but I don't think -- okay.  But I

20  don't think they had very much, if I recall.  They were not

21  involved in the log sort yard litigation.  I know that.

22       MR. McCARTHY:  That -- all I know is that they were,

23  as far as their CERCLA liability and their settlement, one of

24  the factors.

25       THE COURT:  Okay.

1          MR. McCARTHY:  On the issue of settlements counsel

2     also suggested to the Court that if the Court allocates CO-14

3     to Weyerhaeuser it should first take back a share -- back out

4     a share of the settlements, some kind of proportional share

5     of the settlements.  There is not a settlement --

6          THE COURT:  I think I spent the settlement in

7     narrowing the focus to CO-14.  You've indicated CO-12 and 13

8     were -- people paid for wood and so forth.  And I'm focusing

9     on CO-14 and sort of --

10         MR. McCARTHY:  Then our position, if you're to focus

11    on CO-14, the settlements didn't have anything to do with

12    CO-14.

13         THE COURT:  I understand that, but the Pennwalt tie

14    and so forth, and chemicals, if any -- go ahead.  I think --

15    in deciding preliminary that I was going to focus today

16    primarily on CO-14, I think I spent the settlement money and

17    attributed that already, allocated it already.

18         MR. McCARTHY:  Before we lose focus on CO-12 and 13 I

19    want to make a few comments on that.  The impact of CO-12 and

20    13, in addition to the chemicals, was log rafting.  And the

21    log rafting occurred from 1966.  And I believe I've seen log

22    rafting, at least since I've been involved in this case, that

23    occurs in that area.  So that's about 40 years.

24      The Dunlap operators operated for 20 -- half of those

25    years.  The rest of the time it was pretty much

1   Weyerhaeuser's log tie.  I think we had testimony from

2   Mr. Lewis from Foss who said that, at least while he worked

3   there '88 to 2002, there were log rafts from Weyerhaeuser

4   nearly every day.

5       And then also speaking about Dunlap, there is an orphan

6   share there.  For the 20 years of Dunlap operations, ten of

7   those -- the site was operated by Johnson-Byers, Goodwin

8   Johnson, related entity.  And they're not here.  So there

9   is -- half of that is an orphan share.

10      Orphan shares.  We're moving right along here.  Well,

11  we've dealt with that issue.  We've dealt with that issue in

12  CO-14.

13      I wanted to touch on contribution protection and Russ

14  McMillan's testimony.  The plaintiffs make -- they quoted,

15  conveniently, the cross-examination of Mr. McMillan regarding

16  language, regarding the definition of "site" in that subtidal

17  area.  Mr. Klein didn't mention Mr. McMillan's -- I believe

18  he didn't mention his direct testimony on the issue of what

19  was the intent.  Mr. McMillan's testimony was consistent with

20  the '99 interchange with the proposed language.  That was

21  Ecology rejected attempts to apply contribution protection to

22  the plaintiffs.

23      Couple of comments on the *Acushnet* case.  First of all,

24  it's inapposite.  Unlike -- *Acushnet* is a generator case.

25  You don't have an owner/operator.  You have a de minimus

1    generator in the case.  It was found that there was

2    negligible harm by the de minimus generator's activities.

3         Here the wood waste issue is completely different.  It's

4    acknowledged by everyone there is serious environmental harm

5    caused by that.

6         Also, we strongly dispute this whole de minimus argument

7    about chemicals in CO-14.  If you compare CO-14, PAHs is the

8    driver.  We have two acknowledged sources, one is huge and an

9    orphan.  You have Weyerhaeuser saying, Well, I own the

10   property and I contributed some of the chemicals, but I'm so

11   much smaller than this person who isn't around here to pay.

12        Let's compare Weyerhaeuser, their de minimus, with the

13   plaintiffs as far as PAHs in CO-14.  Are we demicromus or --

14   are we subatomic?  It's not even on the scale.  So I think

15   that de minimus argument is something of a red herring if

16   you're focusing on CO-14.

17        Just one final note, Mr. Klein, in his closing he was

18   talking about how the HCC or the plaintiffs could have

19   challenged EPA's directive to us, the Allison Hiltner letter,

20   at some point like when the administrative order was -- the

21   unilateral order was issued against us.

22             THE COURT:  I just asked that question because I was

23   curious.

24             MR. McCARTHY:  My understanding of CERCLA, because

25   I've represented parties who have received collateral orders

1   under Section 106, there is no pre-enforcement review.  You

2   have to do the entire cleanup before you can do anything.  If

3   you don't obey that order, EPA cleans it up in their thrifty

4   way and then you get assessed treble damages.  So this

5   50-million-dollar cleanup would have been a

6   hundred-million-dollar cleanup times three.

7        THE COURT:  That is why Mr. Beverage is making wine

8   now.

9        MR. McCARTHY:  So just on that issue I think that's

10  all I have to say.  I will pass to Mr. Myers.

11       THE COURT:  Thanks.

12       MR. MYERS:  Your Honor, again, before we leave the

13  issue of de minimus, the cases, as I understand -- I haven't

14  spent a whole lot of time reading unpublished cases.  I'll be

15  first to admit that.  In my quick review of the pieces that

16  Mr. Coldiron pulled up, I think those are all generator

17  cases.

18       THE COURT:  I'm going to look at them.

19       MR. MYERS:  Those are cases where you have a burning

20  house and somebody is throwing a toothpick on the burning

21  house.  What the courts are saying, Throwing a toothpick on a

22  burning house isn't the problem.

23      Here, Weyerhaeuser owns the burning house.  They own

24  CO-14.  Whether they are, as they claim, a de minimus

25  chemical source, which I think is completely contradictory to

1    the evidence, or not is irrelevant.

2        What is relevant here is they own the property.  It's

3    their property.  Arkema and General Metals never contaminated

4    it.  This nonsense about there being PCBs driving cleanup.

5    The evidence is that PCBs never drove the cleanup anywhere in

6    CO-14.  They may have been detected, but they were never at

7    levels that required any remediation in CO-14.  It's Kaiser

8    PAHs, it's Weyerhaeuser PAHs, and it's a huge volume of wood

9    waste.

10       Regarding release, Mr. Coldiron showed you the definition

11   of "release" under CERCLA.  And, again, looking at that

12   definition of release it says nothing about a hazardous

13   substance having to be released or having to be the

14   substance.  What it says is that there has to be a hazardous

15   substance released, not that the original material had to be

16   itself a CERCLA or MTCA hazardous substance.  And I would

17   like -- I'm sure you will look at that closely again.

18       But, again, the term "release" talks about it getting out

19   into the environment, these harmful products getting out into

20   the environment.  Then the legal liability is if there has

21   been a release or threatened release of a hazardous substance

22   from a facility.  And that has clearly happened here from

23   what has occurred on Weyerhaeuser's own property in CO-14.

24           THE COURT:  So you would look at -- in terms of cases

25   that focus on whether a hazardous substance is contained

1  within a material, the focus shifts really from the tree to

2  the facility?

3          MR. MYERS:  Your Honor, I'm not smart enough to

4  understand all the science and chemistry.  Mr. McCarthy has a

5  good handle on it.  Mr. Coldiron has a good handle on it.  I

6  don't.

7          THE COURT:  Okay.

8          MR. MYERS:  All I know is that on Weyerhaeuser's

9  property, from the evidence both by the Wood Debris Group, by

10  the HHCG, by the experts, it's undisputed hazardous

11  substances have been released from the wood waste piles in

12  the water in CO-14 on Weyerhaeuser's property and on the

13  property that Weyerhaeuser exclusively uses.

14      Quickly, I'm doing kind of the kibbles and bits here, the

15  issue of threatened release.  Mr. Klein argued that they have

16  to cause the incurrence of response costs.  Here, these

17  threatened releases, as listed in EPA's directive, the HHCG

18  spent $11 million investigating releases and threatened

19  releases chasing down things like ammonia and other

20  substances.  There has been substantial costs incurred on the

21  issue of threatened releases.

22      On the issue of what drove the remedy, again, if you look

23  at the chemical data, you look at the data that was available

24  at the time the decisions were made to clean up, that data

25  showed that the driver in CO-14 was absolutely PAHs and wood

1    waste.  And it was wood waste because of the biological

2    failure in that one station in CO-14 that had almost no

3    chemicals.  It had one low SQO exceedance that elsewhere at

4    higher concentrations showed to have no adverse biological

5    effect.

6        It wasn't just our expert saying that here in this

7    lawsuit.  That was EPA's position.  And that is what resulted

8    in that November 3, 1998, letter where words matter and where

9    EPA says, You have to expand your cleanup and you have to

10   take care of wood waste because wood waste is causing

11   biological problems, biological effects.

12       That resulted in 100,000 cubic yards, plus or minus, going

13   into those blue areas.  And those were the areas that we had

14   to address.

15       Again, as part of this cathartic experience we're

16   having --

17            THE COURT:  I know you're going to miss us all.

18            MR. MYERS:  I want to comment on the PCBs.  I feel

19   that Weyerhaeuser didn't hear the testimony on that issue.

20   General Metals never said they were not a source of PCBs.

21   Mr. Cusma said, Yes, we are a source of PCBs.  Key issue is

22   they're not the sole source.  So if you find PCBs at the

23   outfall of the Kaiser Ditch and they're PCBs in the Kaiser

24   Ditch and they're PCBs released to the environment on

25   numerous occasions in sizable amounts on Kaiser's property

1  that drains to the Kaiser Ditch that goes out into the

2  sediments --

3       THE COURT:  You should have talked to Mr. Farlow

4  about wet scrubber sludge.  I feel the same way.

5       MR. MYERS:  I'll pass, Your Honor, on that.  I have

6  some responses, but I don't want to make them.

7       I would like to address this issue:  Weyerhaeuser

8  continually says and claims that they had to dredge in front

9  of their own dock because of chemicals.  That is baloney.

10  The data that was taken at the time decisions were made to

11  clean up, there was no chemical exceedance in front of their

12  dock that triggered any cleanup requirement.

13       Where did these chemistry levels come up that they point

14  to in DMMU 2 and 5 and 10?  They come from PSDDA sampling.

15       What is PSDDA?  Puget Sound Dredged Disposal authority or

16  agency [sic], whatever it is.  I always forget what the "A"

17  is.

18       The tests here were done after the decision was made to

19  dredge.  The tests here were done to characterize this

20  sediment for disposal purposes, not to decide where to

21  dredge, not to decide -- not to drive any decisions on where

22  to dredge.  It was for disposal purposes.

23       What did they find when they did that and then they did

24  their bioassay sampling?  They found that two of the three

25  had had no bioassay failures and could go to PSDDA, where

1   they intended to take it anyway.  And one did have a bioassay

2   failure, but it was surrounded by three others with no

3   chemicals that also failed bioassays.  To say that chemicals

4   drove their need to dredge is completely disingenuous.

5         Last thing I would like to touch on, I think, is the issue

6   of bathymetry.  Your Honor, in the Bean case, as I understand

7   it, the bathymetry issues involved taking a pre-dredge and a

8   post-dredge survey using the same equipment, same methods, to

9   determine volume, areas dredged and so forth.  That is not

10  what Dr. Floyd did.

11        What Dr. Floyd did is took a survey from 1965 using some

12  type of equipment, she thought lead line, and comparing it

13  over a 30-year period with various dredging techniques that

14  she had no idea what they were used -- what -- what was done.

15  That is inappropriate.

16        She also missed the fact that in her key area, CO-14,

17  Weyerhaeuser dredged in 1976 and went much deeper than the

18  line she was using.  And the testimony is in CO-14 that that

19  dredge -- that those areas went five feet or more of wood

20  waste deeper than what the deepest historical bathymetry

21  show.

22        So her reliance on that methodology is number one, it's

23  not an appropriate methodology to use; number two, it was

24  shown to be flawed in the actual data in the observers that

25  were doing the dredging; and number 3, it was also flawed

1    because Weyerhaeuser at their own dock found the exact same

2    problem.  Their own dredging went several feet deeper in

3    front of the dock than what the bathymetry showed.

4        To be able to create these calculations of 5500 cubic

5    yards, or whatever it is, is completely fiction because the

6    methodology is inappropriate and the -- and the facts of the

7    site show that it's contrary to the evidence.

8        And with that, Your Honor, I am going to stop.  Thank you.

9            THE COURT:  Thank you.

10       All right.  As they say at the Circuit, the case is under

11   submission.  And my aspiration is -- I've got a lot of

12   reading to do on motions for summary judgment tomorrow in a

13   case and it's a big stack.  So I'm not going to be directing

14   much attention.  But over the weekend I hope to -- cribbing

15   in part, perhaps, from your respective findings and

16   conclusions, get a decision out.  I've got meetings Monday

17   afternoon, Tuesday, Wednesday, and Thursday of next week.  So

18   if I don't get it out Monday morning it won't be until the

19   end of next week that I get it out.

20       There are some things I want to review and I think -- the

21   easy part, ultimately, has become the facts.  Oddly enough,

22   most of the time the facts lead to a logical and self-evident

23   conclusion in most cases.  This is not one of those cases

24   because there are significant issues that I think would

25   perplex anyone about what a fair and reasonable allocation is

1   for Weyerhaeuser in this case.  I'll wrestle with that and do

2   the best I can.

3       Let me say before you all leave what a pleasure it has

4   been to have you all here.  This is an interesting case.

5   It's a subject matter which I have some familiarity but not

6   nearly the level of expertise that you all have.

7       And I have greatly appreciated the manner in which you've

8   presented the case, the spirit with which you have cooperated

9   one with another.  And I will tell you, a good friend of

10  mine, when he was president of the state bar, dedicated the

11  year to a series of articles on why he was proud to be a

12  lawyer.  And I will tell you that your performance here over

13  the last five or six weeks has made me proud to be a lawyer.

14      MR. MYERS:  Your Honor, on behalf of the plaintiffs,

15  and I'm sure on behalf of Weyerhaeuser, we would like to

16  thank Jean and Nichole for their courtesy and cooperation and

17  patience in putting up with us.  We really appreciate their

18  efforts to make this go so smoothly.

19      THE COURT:  I'm sure Nichole accepts it.  It may be

20  too little too late for Jean.

21      Thank you.  Court in recess.

22

23      (Proceedings concluded.)

24

25

1                    C E R T I F I C A T E

2

3

4            I, Nichole Rhynard, CCR, CRR, RMR, Court Reporter

5    for the United States District Court in the Western District

6    of Washington at Tacoma, do hereby certify that I was present

7    in court during the foregoing matter and reported said

8    proceedings stenographically.

9            I further certify that thereafter, I have caused

10   said stenographic notes to be transcribed under my direction

11   and that the foregoing pages are a true and accurate

12   transcription to the best of my ability.

13

14

15           Dated this 17th day of July, 2007.

16

17                           /S/  Nichole Rhynard_____

18                           Nichole Rhynard, CCR, CRR, RMR

19                           Official Court Reporter

20

21

22

23

24

25